**204**

**MACDONALD | FERNANDEZ LLP**
IAIN A. MACDONALD (SBN 051073)
RENO F.R. FERNANDEZ III (SBN 251934)
MATTHEW J. OLSON (SBN 265908)
914 Thirteenth Street
Modesto, CA 95354
Telephone: (209) 521-8100
Facsimile: (415) 394-5544

Attorneys for Debtor in Possession,
JEFFERY EDWARD ARAMBEL

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: | Case No. 18-90029-E-11 |
| JEFFERY EDWARD ARAMBEL, | Chapter 11 |
| Debtor. | DCN: MF-40 |
| | Confirmation Hearing:<br>Date: September 10, 2019<br>Time: 10:00 a.m.<br>Place: Courtroom 33<br>501 I Street, 6th Floor<br>Sacramento, California<br><br>Hon. Ronald H. Sargis |

**DISCLOSURE STATEMENT IN SUPPORT OF
PROPOSED PLAN OF REORGANIZATION (Dated July 19, 2019)**

**PRELIMINARY STATEMENT**

Jeffery Edward Arambel, Debtor in Possession herein, offers this Disclosure Statement ("Disclosure Statement") in support of his proposed plan of reorganization pursuant to the provisions of Chapter 11 of the Bankruptcy Code.

This Disclosure Statement provides information concerning the Debtor in Possession and the Plan, and it includes a summary of the Debtor in Possession's assets and liabilities, a summary of what the holders of Allowed Claims and Allowed Interests will receive under the Plan, a discussion of certain alternatives to the Plan, and a summary of the procedures necessary for Confirmation (approval) of the Plan. Capitalized terms are defined in Article III, below. Capitalized terms in this

Disclosure Statement which are not otherwise defined herein shall bear the definition and meaning ascribed to them in Article I of the Plan.

The Debtor in Possession has asked the Bankruptcy Court to confirm the Plan and to do so, if applicable, in accordance with the provisions of § 1129(b) of the Bankruptcy Code.

This Disclosure Statement has been approved by the Court as containing adequate information to enable creditors to make an informed judgment on whether to accept or reject the Plan. The Plan should be read in conjunction with this Disclosure Statement. No other statement or representation as to assets, liabilities or financial affairs is authorized that is not contained in this Disclosure Statement or the Plan. Once confirmed, the provisions of the Plan will legally bind the Reorganized Debtor and creditors regardless of whether such creditors have filed claims or have accepted or rejected the Plan. Creditors should thoroughly review the Plan and the Disclosure Statement before determining whether to accept or reject the Plan.

**ARTICLE I**
**INTRODUCTORY MATTERS AND HOW TO VOTE**

A.    <u>Plan and Case Background</u>

On the Petition Date, which was January 17, 2018, Jeffery Edward Arambel commenced the within case under chapter 11 of the Bankruptcy Code. The case is being administered in the Bankruptcy Court before the Honorable Ronald H. Sargis.

This Disclosure Statement contains information with respect to the Debtor in Possession's proposed plan of reorganization. A copy of the Plan is attached hereto as Exhibit "A."

Pursuant to § 1125 of the Bankruptcy Code, this Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan. The Debtor in Possession has examined various alternatives and, based on information contained in this Disclosure Statement, and for the reasons set forth below, have concluded that the Plan provides the best recovery to creditors.

The Disclosure Statement describes the Plan and contains information concerning, among other matters: (1) the history, business, results of operations, management, properties and liabilities of the Debtor; (2) the proposed conclusion of the liquidation of sufficient assets owned by the Debtor

in Possession to pay Allowed Claims in full pursuant to the terms of the Plan, and (3) the proposed distribution to creditors and holders of Allowed Claims against the Debtor. The Debtor in Possession request that you carefully review the contents of this Disclosure Statement and the Plan (including the exhibits) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

Your vote on the Plan is important. For the Plan to be accepted by a class of Claims, the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Allowed Claims in such class who vote on the Plan must vote to accept the Plan.

Non-acceptance of the Plan may lead to a liquidation under Chapter 7 of the Bankruptcy Code, or to the confirmation of another plan. These alternatives may not provide for a distribution of as much value to holders of Allowed Claims as the Plan will. Accordingly, the Debtor in Possession urges you to accept the Plan by completing and returning the enclosed ballot by no later than August 27, 2019, at 5:00 p.m. (Pacific Time).

B.      <u>Information Regarding the Plan</u>

1.      <u>Plan is the Governing Document.</u>

Although the Debtor in Possession believes that this Disclosure Statement accurately describes the Plan, all summaries of the Plan contained in this Disclosure Statement are qualified by the Plan itself and the documents described therein, which shall be controlling. You are urged to read the Plan and not only this Disclosure Statement.

2.      <u>Sources of Information.</u>

Factual information, including all financial information contained in this Disclosure Statement, has been provided by the Debtor in Possession and his professionals, or has been obtained from the Debtor in Possession's records, except where otherwise specifically noted. None of the Debtor in Possession's attorneys, accountants, or other professionals make any representation regarding that information. The Debtor in Possession does not represent or warrant that the information contained in this Disclosure Statement is free from any inaccuracy. The Debtor in Possession has, however, attempted to present the information accurately and fairly, and the Debtor in Possession believes that the information is substantially accurate. The assumptions underlying the

projections contained in this Disclosure Statement concerning the sources and amounts of payments to Creditors and Interest Holders represent the Debtor in Possession's best estimate as to what he expects will happen. Because they are only assumptions about or predictions of future events, many of which are beyond the Debtor in Possession's control, there can be no assurances that the assumptions will in fact materialize or that the projected realizations will in fact be met. Except as otherwise provided herein, this Disclosure Statement will not reflect any events that occurred after the hearing before the Bankruptcy Court to determine the adequacy of the Disclosure Statement.

3. <u>Bankruptcy Court Approval.</u>

Following a hearing held on July 18, 2019, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor to make an informed judgment about the Plan. Under § 1125 of the Bankruptcy Code, this approval enabled the Debtor in Possession to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not, however, approved the Plan itself, nor conducted a detailed investigation into the contents of this Disclosure Statement.

C. <u>Voting Instructions</u>

1. <u>How to Vote.</u>

A ballot is enclosed herewith for creditors entitled to vote to accept or reject the Plan. To vote on the Plan, indicate on the enclosed ballot that you accept or you reject the Plan and sign your name and mail the ballot in the envelope provided for this purpose.

To be counted, ballots must be completed, signed and returned so that they are received no later than **August 27, 2019, at 5:00 p.m. (Pacific Time)** at the following address:

Jeffery Arambel Ballot Processing
c/o Macdonald Fernandez LLP
914 Thirteenth Street
Modesto, CA 95354

Do not send your ballot via facsimile or e-mail. If your ballot is not properly completed, signed and returned as described, it will not be counted. If your ballot is damaged or lost, you may request a replacement by sending a written request to the above address.

4

2.    Who May Vote.

The Plan divides the Claims of creditors into seven classes. There is also one class of Interests. The classes are as follows: Class 1 (Secured Claims of Prepetition Lenders; Paid from Plan Assets), Class 2 (Secured Claims of Governmental Units), Class 3 (Secured Claims of Prepetition Lenders; Defaults to be Cured), Class 4 (Claims of LBA RV-Company XXVII, LP), Class 5 (Secured Claims Satisfied by Surrender of Collateral), Class 6 (General Unsecured Claims), Class 7 (Insider Claims), and Class 8 (Equity Interests).

Classes of creditors that are impaired by the Plan are entitled to vote, unless no compensation or payment is provided for such class, in which event such class is conclusively deemed to have rejected the Plan. Each holder of an Allowed Claim in an impaired class that will receive distributions under the Plan on account of such claims may vote to accept or reject the Plan. A class is impaired if the legal, equitable or contractual rights attaching to the claims or interests of the class are modified, other than by curing defaults and reinstating maturities.

Classes 4, 5, and 8 are Unimpaired and deemed to have accepted the Plan. Classes 1, 2, 3, 6, and 7 are impaired under the Plan and are entitled to vote on the Plan.

In determining acceptances of the Plan, the vote of a creditor will only be counted if submitted by a creditor whose Claim is an Allowed Claim as defined by the Plan. Generally speaking, a Creditor holds an Allowed Claim if (i) such Claim was duly scheduled by the Debtor in Possession as other than disputed, contingent or unliquidated, or (ii) the Creditor has timely filed with the Bankruptcy Court a proof of Claim which has not been (a) marked as disputed in the Plan, or (b) objected to or disallowed prior to computation of the votes on the Plan. The Ballot form that you received does not constitute a proof of Claim.

D.    Confirmation

"Confirmation" is the technical phrase for the Bankruptcy Court's approval of a plan of reorganization. At the Confirmation Hearing, in order to confirm the Plan, the Debtor in Possession must demonstrate that he has met the requirements of § 1129 of the Bankruptcy Code. If the Bankruptcy Court determines that all of the requirements of § 1129 have been satisfied, the Bankruptcy Court will enter an order confirming the Plan. The Debtor in Possession believes that

the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code for confirmation of the Plan.

Voting is tabulated by class. As discussed above, a class of creditors or interest holders has accepted a plan of reorganization if the plan has been accepted by two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of creditors or interest holders holding allowed claims or interests in that class who actually vote to accept or reject such plan.

Even if a class of creditors or interests votes against a plan of reorganization, the Plan may nevertheless be confirmed by the Bankruptcy Court, notwithstanding the rejection of the Plan by such class, so long as certain statutory requirements are met by the Plan. This procedure is called a "cram down." The Debtor in Possession will request that the Bankruptcy Court confirm the Plan in accordance with § 1129(b) of the Bankruptcy Code if any class rejects the Plan.

The Bankruptcy Court has set September 10, 2019, at 10:00 a.m. (Pacific Time) as the hearing date to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for confirmation of the Plan have been satisfied. The hearing on confirmation will be held at the United States Bankruptcy Court, 1200 I Street, Suite 4, Modesto, California 95354. This hearing may be continued from time to time and day to day without further notice. If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order. Any objections to confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the parties set forth below on or before the date set forth in the Notice of Confirmation Hearing sent to you with this Disclosure Statement and the Plan. Objections must be served upon:

Matthew J. Olson (counsel to the Debtor in Possession)
Macdonald Fernandez LLP
914 Thirteenth Street
Modesto, CA 95354

Jeffery E. Arambel (Debtor in Possession)
433 Roxanne Drive
Patterson, CA 95363

and

Office of the United States Trustee
Robert T. Matsui United States Courthouse
501 I Street, Suite 7-500
Sacramento, CA 95814

E.     Disclaimers

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION WHICH MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR IN POSSESSION'S PROPOSED PLAN.  PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THIS DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTOR IN POSSESSION AND THE CONDITION OF THE DEBTOR IN POSSESSION'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. SEE 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN WILL CONTROL. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM OR INTEREST.

## ARTICLE II
## HISTORY OF THE DEBTOR IN POSSESSION, HIS OPERATIONS, AND THE BANKRUPTCY CASE

The within case was commenced on January 17, 2018, and was precipitated in part by a trustee's sale (a foreclosure sale) of certain of the Debtor in Possession's real property that was scheduled for the Petition Date.  The filing of the within case stayed the sale.  A trustee has not been appointed, and the Debtor is in possession of the Estate.

The Debtor in Possession owns a mix of almond, cherry, peach and apricot orchards, rangeland and undeveloped but entitled business lots known as the Arambel Business Park. The land is encumbered by liens securing claims in excess of $70 million. The Secured Creditors holding the largest claims are SBN V Ag I LLC ("Summit") and Metropolitan Life Insurance Company ("MetLife").

The Debtor in Possession estimates that the land, in aggregate, is worth significantly more than such claims, being worth more than $150 million, conservatively. The Secured Claims are summarized in Sections 4.1 through 4.5 of the Plan and their proposed treatment is discussed in Sections 6.1 through 6.5 of the Plan.

The Debtor in Possession estimates that he is subject to Unsecured Claims of approximately $11 million. The Unsecured Claims are summarized in Sections 4.6 and 4.7 of the Plan and their proposed treatment is discussed in Sections 6.6 and 6.7 of the Plan. For further particulars regarding the assets and liabilities of the Estate, reference is made to the amended schedules of assets and liabilities filed on March 1, 2018 (Docket No. 114), copies of which are available upon request.

Beginning before and continuing after the Petition Date, the Debtor in Possession has been in the process of selling real property to pay Secured Claim and eventually to pay Unsecured Claims. Prior to the Petition Date, the Debtor in Possession sold approximately $16 million in real property consisting of some of the Arambel Business Park and some of the agricultural land. After the Petition Date, as of the time this Disclosure Statement was filed, the Debtor in Possession had sold additional real property for the gross aggregate sum of approximately $10.44 million, resulting in net proceeds of approximately $9.9 million, and further sales for the gross aggregate sum of approximately $18.2 million remain pending. Said proceeds were chiefly used to pay down Secured Claims, but a relatively small portion in excess of $300,000 was used to fund the Debtor in Possession's operating and living expenses with approval of the Bankruptcy Court. The Plan provides for sales of real property to continue until all allowed Secured and Unsecured Claims are paid in full.

The Debtor in Possession is the sole shareholder of Filbin Land & Cattle Co., Inc., a California corporation, which itself recently owned approximately 93 acres of real property in two

parcels, comprised of rangeland, almond orchards, a defunct restaurant, a leased gasoline station and mini-mart, a truck weighing station and a residence. Filbin Land & Cattle Co., Inc. and the Debtor in Possession are subject to certain related and overlapping claims. Filbin Land & Cattle Co., Inc. commenced its own chapter 11 bankruptcy case on January 17, 2018, which is now pending before the Bankruptcy Court as *In re Filbin Land & Cattle Co., Inc.* (Case No. Case No. 18-90030-E-11). A plan of reorganization was confirmed in the Filbin Bankruptcy Case on March 18, 2019. In that case, Filbin Land & Cattle Co., Inc. liquidated some but not all of its real property prior to plan confirmation for net proceeds of $8,173,058.12. Of this, approximately $1.8 million was deposited into the Summit Reserve (as that term is defined in Filbin Plan of Reorganization) to be disbursed as provided in the confirmed plan, including to fund certain obligations under the Plan in this case or to pay Summit's Allowed Claim. Because Summit's Claim arose from Filbin Land & Cattle Co., Inc.'s guarantee of a portion of the Debtor in Possession's own indebtedness to Summit, Summit's claims against the Debtor in Possession were reduced by the same amount. The Debtor in Possession estimates that the remaining real property of Filbin Land & Cattle Co., Inc. is worth not less than $2.5 million and that the only claim remaining against the corporation is Summit's guarantee claim. The remaining real property is to be sold, the claims of Summit against the corporation are to be paid, reducing Summit's claims against the Arambel Estate, and it is expected that any remaining proceeds after payment of Summit's claims in full will be deposited into the Plan Accounts and may help fund distributions under the Plan.

The Debtor in Possession is the sole member of JEA2, LLC, a California limited liability company, which itself owns approximately 155 acres of land, mostly comprised of almond orchards. JEA2's assets were briefly in receivership pursuant to a lawsuit brought by Summit, which lawsuit is still pending, but neither JEA2 or its assets are currently subject to a bankruptcy, receivership or other similar proceeding. The Debtor in Possession estimates that JEA2's real property is worth approximately $20 million and that claims against the company total approximately $5.4 million (predominantly claims held by Summit and guaranteed by the Arambel Estate). If necessary, JEA2's real property may be sold, the claims against the company paid, and the remaining proceeds deposited into the Plan Accounts and may help fund distributions under the Plan.

The administration of the within case is described in certain operating reports that the Debtor in Possession filed on a monthly basis. As described in the operating reports, the Debtor in Possession has received various amounts from business operations and other sources. Use of the income from business operations that are subject to liens have been approved by various cash collateral orders or by consent of the party holding a claim secured thereby. Additionally, Summit received approximately $396,399 of crop retain proceeds which it applied to its Claim. For further particulars, reference is made to the operating reports filed in the case, copies of which may be obtained by contacting the undersigned.

**ARTICLE III**
**DEFINITIONS**

Unless otherwise expressly defined, capitalized terms shall have the same meaning as set forth in Article I of the Plan.

**ARTICLE IV**
**DESIGNATION OF CLAIMS AND INTERESTS**

The Allowed Claims against and Interests in the Debtor in Possession are designated and classified below for purposes of the Plan. Except to the extent that the Plan provides otherwise, a Claim or Interest that is properly includable in more than one class is classified in a particular class only to the extent that it qualifies within the description of that class, and is placed in a different class to the extent it qualifies within the description of such different class.

**Class 1—Secured Claims of Prepetition Lenders; Paid from Plan Assets**

Class 1 consists of Secured Claims of prepetition lenders (except those treated in Classes 3 and 5 and any portions of such Secured Claims which are Unsecured Claims pursuant to Section 506 of the Code, which are treated in Class 6). Each individual Secured Claim in Class 1 is an individual sub-Class of Class 1, to wit:

/ / /

| Class | Name of Creditor | Estimated Amount of Claim | Interest Rate | Disputed? |
|-------|------------------|---------------------------|---------------|-----------|
| 1(a) | MetLife | $6,655,067.15 | 16% (7.5% non-default) | No |
| 1(b) | Summit | $43,652,766.22 | 12% | No |
| 1(c) | Carolyn Dilday and Dan Stadtler, Successor Co-Trustees of the Philip N. Stadtler & Lois C. Stadtler Trust UAD 3/4/1994 | $1,722,954.70 | 5% | No |
| 1(d) | Dorothy M. Arnaud, et al. (POC 27) | $633,422.91 | 10% | Yes |
| 1(e) | Dorothy M. Arnaud, et al. (POC 26) | $2,328,909.29 | 10% | Yes |
| 1(f) | West Valley Agricultural Services, LLC | $3,610,488.70 | 4.75% | No |

Each Secured Claim in Class 1 not identified above as a Disputed Claim shall be an Allowed Secured Claim.

**Class 2—Secured Claims of Governmental Units**

Class 2 consists of the Secured Claim of the Stanislaus County Tax Collector in the amount of $308,233.27. The Secured Claim in Class 2 shall be an Allowed Secured Claim.

**Class 3—Secured Claims of Prepetition Lenders; Defaults To Be Cured**

Class 3 consists of Secured Claims of prepetition lenders (except those treated in Classes 1 and 5 and any portions of such Secured Claims which are Unsecured Claims pursuant to Section 506 of the Code, which are treated in Class 6). Each individual Secured Claim in Class 3 is an individual sub-Class of Class 3, to wit:

| Class | Name of Creditor | Estimated Amount of Claim | Amount of Arrears | Disputed? |
|-------|------------------|---------------------------|-------------------|-----------|
| 3(a) | Chase Bank, N.A. | $173,330.00 | $0.00 | No |
| 3(b) | U.S. Bank, N.A. | $784,961.69 | $25,192.60 | No |
| 3(c) | Westlake Financial Services[1] | $0.00 | $0.00 | No |

Each Secured Claim in Class 3 not identified above as a Disputed Claim shall be an Allowed Secured Claim.

---

[1] This claim was paid in full by the co-borrower.

11

**Class 4—Claim of LBA RV-Company XXVII, LP**

Class 4 consists of the Claim of LBA RV-Company XXVII, LP ("<u>LBA</u>") consisting of two sub-classes: (i) a Class 4(a) Secured Claim in the nature of a right of first refusal against certain parcels of real property which are part of the Arambel Business Park as more particularly described in the Disclosure Statement and (ii) a Class 4(b) Unsecured Claim consisting certain other and ancillary rights as identified in the Proof of Claim filed by LBA (Claim No. 12, Page 2 of Addendum, ¶¶ 14–16), including rights under a development agreement between LBA, the Debtor in Possession, and the City of Patterson and certain rights to indemnity and reimbursement from the Debtor in Possession. The Estate's obligations to LBA for its Class 4(b) Unsecured Claim is contingent upon the events and occurrences described in the agreements between the Debtor in Possession and LBA, as attached to the Proof of Claim filed by LBA.  In addition, LBA and the Reorganizing Debtor each assert the right to receive $750,000 currently held in escrow by Commonwealth Land Title Company pursuant to prepetition joint escrow instructions executed by Jeffery Edward Arambel and LBA.  However, because that dispute is in the nature of whether or not the funds are Property of the Estate, LBA's asserted right to the funds held in escrow is not treated as part of its Claim but rather is addressed in Section 7.9 of this Plan.  The Secured Claim in Class 4(a) shall be an Allowed Secured Claim and the Unsecured Claim in Class 4(b) shall be an Allowed Unsecured Claim.

**Class 5—Secured Claims Satisfied by Surrender of Collateral**

Class 5 consists of Secured Claims of prepetition lenders (except those treated in Classes 1 and 3 and any portions of such Secured Claims which are Unsecured Claims pursuant to Section 506 of the Code, which are treated in Class 6).  Each individual Secured Claim in Class 5 is an individual sub-Class of Class 5, to wit:

| Class | Name of Creditor | Estimated Amount of Claim | Collateral |
|---|---|---|---|
| 5(a) | American AgCredit, FLCA ("<u>American AgCredit</u>") | American AgCredit completed a non-judicial foreclosure of its collateral prior to the Effective Date. | |
| 5(b) | Cazale Creditors | $1,229,382.00 | Cazale Ranch |
| 5(c) | Irrigation Design & Construction (POC 15) | $277,860.25 | Cazale Ranch |

The Secured Claims in Class 5 shall be Allowed Secured Claims.

**Class 6—General Unsecured Claims**

Class 6 consists of general Unsecured Claims (except those listed in Class 7), any portions of the Secured Claims which are Unsecured Claims pursuant to Section 506 of the Code, and any Rejection Claims. This Class includes any and all Claims not more particularly described in the Plan. The Debtor in Possession estimates general Unsecured Claims, including disputed portions of those Claims, to total $6,830,303.59.[2]

| Name of Creditor | Estimated Amount of Claim | Disputed? |
|---|---|---|
| AT&T Mobility II LLC | $1,193.28 | No |
| Benjamin Lopez | $2,363,723.00 | Yes |
| Berline Cohen, LLP | $56,828.15 | No |
| BPM LLP | $7,698.03 | No |
| Carolyn Dilday and Dan Stadtler, Successor Co-Trustees of the Phlip N. Stadtler & Lois C. Stadtler Trust UAD 3/4/1994 | $2,740,000.00 | No |
| Castello, Marion & Orr, a General Partnership | $28,571.80 | No |
| Colby Bell | $1,098.00 | No |
| Commercial Trade, Inc. | $174,940.93 | No |
| Creditors Bureau USA, Assignee for The Burchell Nursery | $76,828.19 | No |
| Dave Wilson Nursery | $248,209.60 | No |
| Dept. of Industrial Relations | $49,999.00 | Yes |
| Flory Industries, Inc. | $17,060.44 | No |
| Fred Frias Union Service | $5,804.04 | No |
| GDR Engineering Inc. | $36,947.50 | No |
| Giddings, Corby, Hynes, Inc. | $21,351.97 | No |
| Grower's Link | $96.071.15 | Yes |
| Howk Systems | $93,660.00 | No |
| Irrigation Design & Construction (POC 28) | $500,000.00 | Yes |
| Joe Di Anna Harvesting Inc. | $40,000.00 | No |
| PG&E | $153,853.32 | No |

---

[2] The Claim of the El Che Corporation was scheduled as disputed, the El Che Corporation did not timely file a proof of Claim, and the El Che Corporation has not yet filed a proof of Claim. Hence, the Claim is disallowed. *See* Fed. R. Bankr. P. 3002(a), 3003(c)(2).

| | | |
|---|---|---|
| Pillsbury Winthrop Shaw Pittman LLP | $127,431.92 | No |
| Raymond V. Castello or Wanda Castello | $14,285.74 | No |
| Turlock Irrigation District | $3,466.00 | No |
| U.S. Bank N.A. dba Elan Financial Services | $11,485.47 | No |
| V. Alonzo, Inc. | $65,000.00 | No |

Each Unsecured Claim in Class 6 not identified above as a Disputed Claim shall be an Allowed Claim.

**Class 7—Insider Claims**

Class 7 consists of Claims that are held by insiders of the Debtor in Possession. The Debtor in Possession identifies the insider Claims as follows:

| Name of Creditor | Estimated Amount of Claim | Disputed? |
|---|---|---|
| Laura Arambel (Loan) | $451,619.00 | No |
| Laura Arambel (Seller Financing) | $1,017,880.00 | No |
| Laura Arambel, Trustee of the Credit Trust under the Harold and Laura Arambel Family Trust Dated December 16, 2005 (Sale of Jointly Owned Property) | $2,631,040.48 | No |
| Sherry Arambel | $125,150.00 | No |

Each Claim in Class 7 not identified above as a Disputed Claim shall be an Allowed Claim or an Allowed Secured Claim, as applicable.

**Class 8—Equity Interests**

Class 8 consists of the Equity Interests of the Debtor in Possession.

**ARTICLE V**
**CLASSES OF CLAIMS AND INTERESTS NOT IMPAIRED UNDER THE PLAN**

Classes 4, 5, and 8 are not impaired because the Plan provides that holders of claims or interest in Classes 4, 5, and 8 shall retain all their prepetition rights and interests unmodified by the Plan. Holders of claims or interests in Classes 4, 5, and 8 are conclusively presumed to have accepted the Plan, and, therefore, their votes not be solicited.

/ / /

# ARTICLE VI
## TREATMENT OF UNCLASSIFIED CLAIMS

**A.**     **Allowed Administrative Claims.**  The holders of Allowed Administrative Claims (other than Professional Fees and U.S. Trustee Fees) shall receive, on account of such Allowed Administrative Claims, cash in the amount of such Allowed Administrative Claims as soon as practicable after the date on which such Administrative Claim becomes an Allowed Administrative Claim or on the Effective Date, whichever is later, unless different treatment is agreed to by the holder of such Allowed Administrative Claim.  All such payments shall be made by use of the Plan Funding Sources (other than the Plan Funding Loans, unless such Administrative Claim constitutes a business expense as determined by the applicable Plan Funding Lender, in its sole and absolute discretion).  Except as may be expressly set forth in the Plan or an order of the Bankruptcy Court, no holder of such an Administrative Claim shall be entitled to payment on account of any postpetition interest or penalties arising with respect to such Administrative Claim.  In the event that a holder of such an Allowed Administrative Claim agrees to be paid such Allowed Administrative Claim on a date later than the date for payment provided by Section 3.1 of the Plan, its Allowed Administrative Claim shall accrue and be paid simple interest at the Federal Judgment Rate (1.78% per annum).  All motions requesting payment of Administrative Claims (other than Professional Fees and U.S. Trustee Fees) must be filed on or before the Administrative Claim Bar Date or the holders thereof shall be forever barred from asserting such Administrative Claims against the Estate and from sharing in any Distribution under the Plan.

**B.**     **Tax Claims.**  Holders of Tax Claims that are Allowed Claims, if any, will be paid on account of such Claims either in accordance with Section 1129(a)(9)(C) of the Code or in full in cash as soon as practicable after the date on which such Tax Claim becomes an Allowed Claim or on the Effective Date, whichever is later, unless different treatment is agreed to by the holder of such Tax Claim.  Payment of Tax Claims that are Allowed Claims shall include interest at the rate applicable under non-bankruptcy law.  All such payments shall be made by use of the Plan Funding Sources (other than the Plan Funding Loans, unless such Tax Claim constitutes a business expense as determined by the applicable Plan Funding Lender, in its sole and absolute discretion).

# ARTICLE VII
## TREATMENT OF CLAIMS AND INTERESTS

Each Class of Allowed Claims shall be treated as follows:

**Class 1— Secured Claims of Prepetition Lenders; Paid from Plan Assets**

Creditors holding Allowed Secured Claims in Class 1 will be paid from the Proceeds of the sale of the applicable Plan Assets securing such Claims, through the refinancing of the Plan Assets, from unencumbered Plan Assets, or a combination of any of the forgoing.  The Reorganizing Debtor shall use commercially reasonable efforts to cause Allowed Secured Claims in Class 1 to be paid in full as soon as practicable after the Effective Date.  Creditors in Class 1 shall retain their interest in their collateral until paid in full.

The Reorganizing Debtor reaffirms all obligations owed to Allowed Secured Claims in Class 1 pursuant to the loan documents attached to proofs of Claim filed by holders of Allowed Secured Claims in Class 1, and the Plan does not limit the rights of Creditors in Class 1 to make protective advances as permitted in their loan documents.  Except as expressly provided otherwise in the Plan, Allowed Secured Claims in Class 1 shall continue to be governed and secured by the terms and conditions of the prepetition agreements applicable to such Allowed Secured Claims.

The Reorganizing Debtor will not be required to make regularly scheduled principal and interest payments or any other payments under the prepetition agreements applicable to Allowed Secured Claims in Class 1 that come due after the Effective Date.  However, nothing in the Plan forgives or waives the amount of principal, interest, or other amounts due to such Creditors; late fees, default interest, and other fees and costs (including attorneys' fees) continue to accrue and may be added to each applicable Allowed Secured Claim as provided in the applicable prepetition agreements and allowed under applicable non-bankruptcy law (up to the value of the collateral securing such Allowed Secured Claims), and the Plan shall does not waive, forgive, or suspend the Reorganizing Debtor's other obligations under the applicable prepetition agreements (such as the duty to maintain collateral, pay property or other taxes, insure collateral, or pay over Proceeds of collateral).

Except as otherwise provided in the Plan, creditors holding Allowed Secured Claims in Class 1 shall not seek relief from the automatic stay to exercise their rights related to their collateral

upon the earlier of (a) the date that is sixteen months after the Effective Date or (b) the occurrence and continuance of a Material Default under the Plan.

The Plan includes additional provisions for treatment of the claims of MetLife and Summit:

*MetLife:*  With respect to MetLife, the Plan provides that all payments to MetLife made after the Petition Date on account of sale of its collateral have been previously authorized by orders of the Bankruptcy Court.  Any continuing "Event of Default" under MetLife Loan Documents first occurring after the Effective Date of the Plan is a Material Default under the Plan.  The Plan does not modify the intercreditor agreement MetLife and Summit.  Notwithstanding any other provision of the Plan (including, without limitation, Section 12.4) if there is a Material Default under the Plan or upon the date that is sixteen months after the Effective Date, MetLife shall, without the requirement of further order of the Bankruptcy Court but immediately after a notice is filed with the Bankruptcy Court and served upon those parties on the Post-Confirmation Service List, be (a) deemed to have been granted relief from the automatic stay of Section 362 of the Code with respect to its collateral which forms part of the Plan Assets and from any injunction imposed by the Code or the Plan in this Case or in any subsequent bankruptcy case filed by or against the Debtor in Possession or the Reorganizing Debtor, or involving MetLife's collateral; and (b) entitled to exercise any rights or remedies available to MetLife under the MetLife Loan Documents and applicable law.

*Summit:*  With respect to Summit, the Plan provides that all payments to Summit made after the Petition Date on account of sale of its collateral have been previously authorized by orders of the Bankruptcy Court.  Any continuing "Event of Default" under Summit Loan Documents first occurring after the Effective Date of the Plan is a Material Default under the Plan.  The Plan does not modify the intercreditor agreement MetLife and Summit.  Notwithstanding any other provision of the Plan (including, without limitation, Section 12.4) if there is a Material Default under the Plan or upon the date that is sixteen months after the Effective Date, Summit shall, without the requirement of further order of the Bankruptcy Court but immediately after a notice is filed with the Bankruptcy Court and served upon those parties on the Post-Confirmation Service List, be (a) deemed to have been granted relief from the automatic stay of Section 362 of the Code with respect to its collateral which forms part of the Plan Assets and from any injunction imposed by the Code or the Plan in this

Case or in any subsequent bankruptcy case filed by or against the Debtor in Possession or the Reorganizing Debtor, or involving Summit's collateral; and (b) entitled to exercise any rights or remedies available to Summit under the Summit Loan Documents and applicable law.

**Class 2— Secured Claims of Governmental Units**

The Creditor holding the Allowed Secured Claim in Class 2 will be paid (a) if such Creditor votes in favor of the Plan, in full as soon as practicable after the Effective Date from the Proceeds of the sale of the applicable Plan Assets securing such Claim, through the refinancing of the Plan Assets, from unencumbered Plan Assets, or a combination of any of the forgoing; or (b) if such Creditor does not vote in favor of the Plan, regular installment payments satisfying the requirements of Section 1129(a)(9)(D) of the Code to be paid using the Plan Funding Sources (other than the Plan Funding Loans, unless such Allowed Secured Claim constitutes a business expense as determined by the applicable Plan Funding Lender, in its sole and absolute discretion). The Creditor in Class 2 shall retain its interest in its collateral until paid in full and shall be entitled to receive payment pursuant to Section 7.8.2 of the Plan. The Creditor in Class 2 shall not seek relief from the automatic stay to exercise their rights related to their collateral unless a Material Default has occurred under the Plan.

**Class 3— Secured Claims of Prepetition Lenders; Defaults To Be Cured**

Creditors holding Allowed Secured Claims in Class 3 will be paid (a) all arrears (including attorneys' fees and late charges) owed as of the Effective Date, which payments shall be made on the Effective Date by use of the Plan Funding Sources (other than the Plan Funding Loans), and (b) by making all regular monthly payments that become due after the Effective Date, which payments shall be made by use of the Plan Funding Sources (other than the Plan Funding Loans). Allowed Secured Claims in Class 3 shall continue to be governed and secured by the terms and conditions of the prepetition loan documents applicable to such Allowed Secured Claims with such amendments as are mutually agreeable among the interested parties. To the extent arrears as of the Effective Date are determined to be other than as shown in Section 4.3 of the Plan, appropriate adjustments will be made to the payment. Creditors in Class 3 shall retain their interest in their collateral until paid in

full. Creditors in Class 3 shall not seek relief from the automatic stay to exercise their rights related to their collateral unless a Material Default has occurred under the Plan.

**Class 4—Claim of LBA RV-Company XXVII, LP**

The Allowed Secured Claim in Class 4(a) of LBA is not modified by the Plan. The Allowed Unsecured Claim in Class 4(b) of LBA is not modified by the Plan.

**6.5    Class 5—Secured Claims Satisfied by Surrender of Collateral**

**6.5.1    Class 5(a)—Secured Claim of American AgCredit, FLCA**

The Allowed Secured Claim in Class 5(a) of American AgCredit is not modified by the Plan and has been satisfied by American AgCredit's foreclosure upon its collateral.

**6.5.2    Class 5(b)—Secured Claim of the Cazale Creditors**

The Allowed Secured Claim in Class 5(b) of the Cazale Creditors is not modified by the Plan. On the Effective Date, Cazale Creditors are granted relief from the automatic stay to commence nonjudicial foreclosure proceedings of their collateral in accordance with the applicable prepetition loan documents and applicable non-bankruptcy law, and to obtain possession of their collateral following sale in accordance with applicable non-bankruptcy law. Upon the conclusion of any foreclosure proceedings by the Cazale Creditors, the Reorganizing Debtor shall voluntarily surrender his possession of any foreclosed collateral. The Allowed Secured Claim in Class 5(b) of the Cazale Creditors shall be satisfied in full by their recovery on their collateral.

**6.5.3    Class 5(c)—Secured Claim of Irrigation Design & Construction (POC 15)**

The Allowed Secured Claim in Class 5(c) of Irrigation Design & Construction (POC 15) is not modified by the Plan. Prior to the Effective Date, Irrigation Design & Construction obtained relief from the automatic stay to foreclose on its lien against its collateral. Irrigation Design & Construction has commenced nonjudicial foreclosure proceedings under applicable non-bankruptcy law. Specifically, on June 18, 2019, Irrigation Design & Construction recorded a Notice of Default and Election to Sell with the Stanislaus County Recorder (Instrument No. 2019-0039213) declaring a default under its deed of trust. Confirmation of the Plan does not modify the effectiveness of the Court's pre-confirmation order granting Irrigation Design & Construction relief from the automatic stay. Upon the conclusion of any foreclosure proceedings by Irrigation Design & Construction, the

Reorganizing Debtor shall voluntarily surrender his possession of any foreclosed collateral. The Allowed Secured Claim in Class 5(c) of Irrigation Design & Construction shall be satisfied in full by its recovery on its collateral.

**Class 6—General Unsecured Claims.**

Allowed Claims in Class 6 shall receive periodic Pro Rata Distributions up to the full amount their Allowed Claims, plus simple interest at the Federal Judgment Rate (1.78% per annum). Such periodic Pro Rata Distributions shall be made from the Proceeds of the sale of the Plan Assets, through the refinancing of the Plan Assets, from unencumbered Plan Assets, from the use of Plan Funding Cash Collateral determined by the Plan Administrator to be Available Cash, or a combination of any of the forgoing.

Summit, both for itself and in its capacity as a Plan Funding Lender, shall allow the Reorganizing Debtor to fund such periodic payments to Allowed Claims in Class 6 prior to the repayment in full of Summit's Allowed Secured Claim in Class 1 and Summit's Plan Funding Claim. Pursuant to the terms and conditions of the Cash Collateral Fund (as defined in the Plan Credit Agreement with Summit), Plan Funding Cash Collateral shall be made available to the Reorganizing Debtor as follows: upon the consummation of any sale or refinance of Summit's collateral authorized by a Final Order of the Bankruptcy Court, the cash Proceeds of any such sale or refinance otherwise due to Summit (after payment of all Claims having priority over Summit) shall be distributed: (a) first, to Summit on account of its Allowed Secured Claim in Class 1 until Summit has received a total of $2,000,000.00 on account of such Allowed Secured Claim; and (b) second, 90% to Summit on account of its Allowed Secured Claim in Class 1 and 10% to fund the Cash Collateral Fund until the Cash Collateral Fund has been funded in full up to the Plan Funding Maximum Cash Amount ($3,500,000.00).

**Class 7—Insider Claims**

Allowed Claims in Class 7 shall receive periodic Pro Rata Distributions up to the full amount their Allowed Claims, plus simple interest at the Federal Judgment Rate (1.78% per annum). Such periodic Pro Rata Distributions shall be made from the Proceeds of the sale of the Plan Assets, through the refinancing of the Plan Assets, from unencumbered Plan Assets, or a combination of any

of the forgoing.  The Reorganizing Debtor shall use commercially reasonable efforts to cause Allowed Claims in Class 7 to be paid in full as soon as practicable after the payment in full of Allowed Claims in Class 6.

**Class 8—Unimpaired Equity Interest**

As all creditors will be paid in full under the Plan, Debtor in Possession shall retain his equity interests, unimpaired by the Plan, subject to the provisions of Article VII of the Plan.

**ARTICLE VIII**
**MEANS FOR EXECUTION OF THE PLAN**

The Plan shall be implemented though the appointment of the Plan Administrator, with the Reorganizing Debtor performing such duties as assigned by the Plan until the earlier of his termination for cause or the expiration of the sixteenth month following the Effective Date.  The Plan provides for the appointment of an Oversight Committee to consult with the Plan Administrator on certain subjects.  Operating expenses of the Plan will be funded though the Plan Funding Loans, the Filbin Available Cash, Other Cash Collateral, and the net proceeds of any sale of Plan Assets (after payment of all claims secured thereby).  As more fully described herein, and in the Plan, the Plan provides certain releases to Plan Funding Lenders in exchange for their loans.  Payments on claims will be made through the Proceeds of the sale of the Plan Assets, through the refinancing of the Plan Assets, from unencumbered Plan Assets, from the use of Plan Funding Cash Collateral (for holders of Class 6 Allowed Claims), or a combination of any of the forgoing.

**A.      Effective Date Transactions**

On (or, where appropriate, after) the Effective Date, the following actions shall occur:

(a)      The transactions contemplated under the Plan shall be consummated;

(b)      The Plan Credit Agreement and all related Loan Documents with Summit, in its capacity as a Plan Funding Lender, shall be executed; and

(c)      The Plan Administrator shall assume its assigned duties and responsibilities under the Plan.

All payments contemplated to be made on the Effective Date (a) from funds on deposit in the Reorganizing Debtor Farm Expense Account or the Reorganizing Debtor Personal Expense Account,

shall be made by the Reorganizing Debtor, provided, however, that if the Reorganizing Debtor fails to make such payments on the Effective Date, the Reorganizing Debtor shall transfer the funds necessary to make such payments to Plan Accounts and the Plan Administrator shall make such payments; and (b) from funds on deposit in Plan Accounts shall be made by the Plan Administrator.

**B.    Revesting of Property of Estate.**

*1.    Property of the Estate Does Not Revest on the Effective Date.*  The Reorganizing Debtor shall not be revested with the Property of the Estate on the Effective Date of the Plan. Accordingly, among other things, the automatic stay pursuant to Section 362 of the Code shall remain in effect with respect to Property of the Estate following the Effective Date of the Plan, except to the extent otherwise provided by the Plan, until such time as (a) such property is no longer Property of the Estate; (b) relief from stay is granted by Final Order of the Bankruptcy Court, or (c) the Bankruptcy Court enters a Final Decree and the Case is closed.

*2.    Revesting of Property Upon Entry of Final Decree.*  Upon entry of the Final Decree, except as otherwise provided in the Plan, the Reorganizing Debtor shall be revested with all property still held or owned by the Estate that was formerly Property of the Estate (including, without limitation, all remaining Claims belonging to Debtor in Possession or the Estate) free and clear of all liens, Claims, and interests, except as expressly provided by the Plan.

**C.    Plan Administrator.**  The Plan appoints a Plan Administrator pursuant to Section 1142 of the Code.  The Plan Administrator has specifically assigned duties and responsibilities under the Plan, including the administration of all of the Plan Assets (other than the Farm Assets prior to the Termination Date) and the Proceeds, as a fiduciary of the Estate, and, subject to the specific provisions of the Plan, shall have the authority to exercise all of the rights and powers of a debtor in possession (with certain exceptions described in the Plan) granted pursuant to Section 1107 of the Code in connection with managing such duties and responsibilities and administering the Plan Assets (other than the Farm Assets prior to the Termination Date) and the Proceeds.  In addition, the Plan Administrator shall have such other and further authority and powers as are set forth in the Plan and the Confirmation Order.  The Plan Administrator, to the extent required to perform its duties and responsibilities, will be granted a power of attorney by the Reorganizing Debtor, revocable only

upon entry of an order of the Bankruptcy Court so directing, to execute such documents and perform such acts on behalf of the Reorganizing Debtor or the Estate as contemplated by the Plan.

      *1.*    *Appointment; Termination; Successor.* The Plan appoints Focus Management Group USA, Inc. ("Focus") as Plan Administrator. The Plan Administrator may only be terminated: (a) by unanimous consent of the Reorganizing Debtor and the Oversight Committee; (b) "for cause" (as defined by Section 7.3.7 of the Plan ) by order of the Bankruptcy Court, after a motion initiated by the Reorganizing Debtor or the Oversight Committee; (c) upon completion of its duties and responsibilities under the Plan; or (d) by the Plan Administrator providing notice of its intention to terminate its appointment to the Creditors and parties in interest on the Post-Confirmation Service List. A successor Plan Administrator shall be appointed by: (a) unanimous consent of the Reorganizing Debtor and the Oversight Committee, subject to the approval of the Bankruptcy Court; or (b) by order of the Bankruptcy Court after a motion initiated by the Reorganizing Debtor, the Oversight Committee, or the Plan Administrator.

      *2.*    *Duties and Powers of Plan Administrator.* On and after the Effective Date, the Plan Administrator shall be responsible for implementation of the Plan and the administration of the Plan Assets (other than the Farm Assets prior to the Termination Date). In carrying out its duties and responsibilities, the Plan Administrator shall exercise prudent business judgment and shall be a fiduciary of the Estate. Subject to the foregoing, the Plan Administrator shall use commercially reasonable efforts to (a) maximize Proceeds from the Plan Assets in order to implement the Plan; (b) maintain, preserve, or realize value of the Plan Assets for Creditors holding Allowed Claims; and (c) maintain, preserve, or realize the value of the Equity Interests of the Reorganizing Debtor in the Plan Assets. To the extent practicable, the Plan Administrator shall maintain books and records related to the Plan Assets, the Proceeds, and the Distributions made under the Plan pursuant to the Plan. Specific powers of the Plan Administrator are described in Section 7.3.3 of the Plan.

      *3.*    *Information Sharing.* The Plan requires the Reorganized Debtor to share with the Plan Administrator financial and other information concerning the business and affairs of the Plan Assets as the Plan Administrator shall reasonably request from time to time. For further particulars, reference is made to Section 7.3.4 of the Plan.

4. *Plan Assets – Cash and Proceeds.*  The Plan Administrator shall establish Plan Accounts, and the Plan Assets consisting of cash shall be transferred to the Plan Accounts. Thereafter, all cash Proceeds shall be deposited into Plan Accounts.

5. *Reporting Requirements.*  The Plan Administrator shall provide the Oversight Committee (a) monthly reports (within 25 days after the end of the prior month) containing a full accounting related to the Plan Assets, the Proceeds, and any Distributions, including, without limitation, the prior month's cash flow, income statement, and balance sheet as of the end of the month and (b) on the first Business Day of each calendar week, a report of any offers or counteroffers made or received (written or verbal) related to the final disposition of any Plan Asset since the last weekly report, including relevant supporting documents.  The Plan Administrator shall provide such additional information as the Oversight Committee may reasonably require to keep itself fully informed of the Plan Administrator's performance of its duties and responsibilities under the Plan.

6. *Plan Expenses on or after the Effective Date.*  The proposed Plan Administrator, the Reorganizing Debtor, and the Plan Funding Lenders have agreed upon the Plan Budget for the sixteen-month period beginning on the Effective Date, a copy of which is offered as Exhibit "B" attached hereto.  The Plan Budget may be adjusted from time to time by the Plan Administrator after consultation with Reorganizing Debtor and the Oversight Committee, with material modifications of Plan Administration Budget or the Farm Expense Budget requiring certain additional approvals described in Section 7.3.8 of the Plan.  Unspent budgeted amounts may be spent by the Plan Administrator or the Reorganizing Debtor, as applicable, at any time from the date budgeted to the date of payment, so long as the cumulative amount for the budgeted item does not exceed the amount budgeted for the applicable line item from the Effective Date of the Plan to the date of the applicable payment.  The Plan also requires the establishment of an Administrative Fund by the Plan Administrator to fund payments of the fees and expenses of the Plan Administrator and its professionals.

7. *Compensation of Plan Administrator; Priority Payment.*  The Plan Administrator shall be compensated for services and reimbursed for expenses from the Administrative Fund at the

rates and on the terms to which the Plan Funding Lenders, the Reorganizing Debtor, and the Plan Administrator have agreed, which rates and terms are appended as Exhibit "3" to the Plan. Changes to such compensation rates and terms shall be subject to the approval of the Bankruptcy Court after a motion initiated by the Oversight Committee, the Reorganizing Debtor, or the Plan Administrator. The Plan Administrator shall file a monthly compensation report detailing total compensation and expense reimbursements to be paid to the Plan Administrator for the prior month; provided, however, that the Plan Administrator shall not be required to file detailed time records as part of the report. The Oversight Committee and the Reorganizing Debtor shall have seven (7) Business Days after the filing of any monthly compensation report to object to the same. Absent any such objection, all compensation and expense reimbursements owed to the Plan Administrator as set forth on such monthly compensation report shall constitute Plan Expenses and shall be paid by the Plan Administrator in accordance with the terms and conditions of the Plan. In the event of any such objection, the Bankruptcy Court shall determine the compensation and expense reimbursements owed to the Plan Administrator with respect to such monthly compensation report by determining whether the fees and expenses are reasonable under the circumstances. The initial Plan Budget shall not constitute or be construed as a cap on the compensation, expenses or fees of the Plan Administrator or the Post-Confirmation Professionals retained by the Plan Administrator and such budget, including the Plan Administration Budget, may be modified as provided herein.

All fees and expenses shall be paid from the Administrative Fund, and such right to payment shall be prior and superior to any other rights, including rights of the holders of Claims to receive any Distribution or payment of the Plan Assets. Plan Administrator and the Post-Confirmation Professionals retained by the Plan Administrator are granted a first-priority security interest in the Administrative Fund, which shall (i) be deemed automatically perfected without the need for any other documents, deposit account control agreements, filings or otherwise, and (ii) shall not be subordinate to any other lien, Claim or interest notwithstanding any other provision of the Plan, any order or any other documents to the contrary. The security interest provision shall survive any termination of a Plan Administrator. The rights of any successor Plan Administrator shall be subordinate to the rights of the initial or preceding Plan Administrators.

8.      *Limitation of Liability of Plan Administrator and Related Parties.*  The Plan limits the liability of the Plan Administrator, any director, officer, affiliate, employee, employer, attorney, professional, Post-Confirmation Professional retained by the Plan Administrator, successor, assign, agent, or representative of the Plan Administrator.  The Plan also requires the Estate to indemnify the Plan Administrator and related parties for certain matters, limits the liability of the Plan Administrator if it reasonably relies upon the advice of counsel, and permits the Plan Administrator to purchase insurance to protect against certain losses.  For further particulars, reference is made to Section 7.3.11 of the Plan.

**D.      Reorganizing Debtor Duties and Responsibilities.**

1.      *Duties of the Reorganizing Debtor with Regard to the Plan Assets.*  On and from the Effective Date to and including the date that is sixteen months after the Effective Date, unless terminated earlier "for cause" (as defined by Section 7.4.3 of the Plan) by the Plan Administrator in accordance with the Plan (the earlier of such dates, the "Termination Date"), the Reorganizing Debtor shall serve and perform services with regard to the Plan as provided in the Plan.   The Reorganizing Debtor shall be a fiduciary of the Estate.  The Reorganizing Debtor shall cooperate with the Plan Administrator in the performance of its duties and responsibilities under the Plan. Notwithstanding anything contained herein, subject to Bankruptcy Court approval, the Plan Administrator shall have final authority regarding any decisions related to the terms of final disposition of any Plan Assets constituting real property.  The Reorganizing Debtor shall be reimbursed for reasonable and documented out-of-pocket expenses incurred by the Reorganizing Debtor in the performance of his duties and responsibilities under the Plan to the extent a request for such reimbursement is approved in writing by the Plan Administrator in advance of the time that the Reorganizing Debtor incurs any such expense.  The amounts paid shall not be Property of the Estate, notwithstanding Section 1115 of the Code.

With respect to the Farm Assets, Reorganizing Debtor shall be fully and solely responsible for the day-to-day management, control, and operation of the Farm Assets in the ordinary course of business.  To fund such efforts of the Reorganizing Debtor, the Reorganizing Debtor Farm Expense Account, funded on a monthly basis, shall be established in the name of, and

under the control of the Reorganizing Debtor, for purposes of paying costs and expenses included in the Farm Expense Budget. Under no circumstances shall the Reorganizing Debtor incur or pay amounts for costs or expenses in excess of the amounts budgeted for in the Farm Expense Budget. The Reorganizing Debtor shall have sole, full power and responsibility with regard to the employment and payment of all employees and independent contractors performing services with regard to the Farm Assets (other than the Plan Administrator), and shall be fully and solely responsible for paying all related employment and withholding taxes concerning such employees and independent contractors. In connection with the activities under the Plan, the Reorganizing Debtor shall keep the Plan Administrator reasonably informed regarding the day-to-day management, control, and operation of the Farm Assets in accordance with the Plan; and the Reorganizing Debtor will use best efforts to address any questions, concerns, or differences of opinion with the Reorganizing Debtor which the Plan Administrator may have arising from the Reorganizing Debtor's action or inaction, or the Farm Assets.

With respect to the remaining Plan Assets, the Reorganizing Debtor shall use his expertise and knowledge of the Plan Assets to price, market, and recommend terms of final disposition of the Plan Assets. The Reorganizing Debtor shall, in consultation with the Plan Administrator, be responsible for establishing the initial sale prices and terms of the listing of each Plan Asset, and the negotiation of offers and counteroffers for the sale of Plan Assets. Such initial pricings and listings shall be established in such a way as to maximize the ultimate value of the Plan Assets. Thereafter, any changes to such prices or listings may be made by the Reorganizing Debtor in consultation with the Plan Administrator. Any offers or counteroffers (written or verbal) related to the final disposition of any Plan Asset, and the terms of any final disposition of any Plan Asset, must be approved by the Plan Administrator in advance. In the event of any disagreement between the Plan Administrator and the Reorganizing Debtor regarding any offers or counteroffers (written or verbal) related to the final disposition of any Plan Asset, or the terms of final disposition of any Plan Asset, the Plan Administrator's decision shall control the issue; provided, however, that that the final disposition of any Plan Asset constituting real property, whether by sale, refinancing, abandonment, or otherwise, and the terms thereof shall require an order of the Bankruptcy Court approving such

final disposition and such terms after a motion initiated by the Plan Administrator or, with the consent of the Plan Administrator, the Reorganizing Debtor.

        2.     *Duties of the Reorganizing Debtor with Regard to the Personal Assets.*   On and from the Effective Date, the Reorganizing Debtor shall be fully and solely responsible for the Personal Assets. Prior to the Effective Date, the proposed Plan Administrator, the Reorganizing Debtor, and the Plan Funding Lenders shall agree upon the Personal Expense Budget for the sixteen month period beginning on the Effective Date, which Personal Expense Budget may be adjusted from time to time in accordance with the terms of the Plan. On the Effective Date, the Reorganizing Debtor Personal Expense Account shall be established in the name of, and under the control of the Reorganizing Debtor, for purposes of paying costs and expenses included in the Personal Expense Budget. Until the Termination Date, the Reorganizing Debtor Personal Expense Account shall be funded on a monthly basis from the Plan Funding Sources (other than the Plan Funding Loans) in the lesser of (a) the monthly amount set forth in the Personal Expense Budget and (b) the monthly amount set forth in the Personal Expense Budget, less unspent budgeted funds on deposit in the Reorganizing Debtor Personal Expense Account. Under no circumstances shall the Reorganizing Debtor incur or pay amounts for costs or expenses in excess of the amounts budgeted for in the Personal Expense Budget.

        3.     *Reporting Requirements.*   The Reorganizing Debtor is required to provide various reports to the Plan Administrator, including some information due on a weekly basis and certain additional month-end reporting. Additionally, on the last Business Day of each calendar week, the Reorganizing Debtor shall provide the Plan Administrator with a report of any offers or counteroffers (written or verbal) related to the final disposition of any Plan Asset since the last weekly report to the Plan Administrator, including relevant supporting documents. The Reorganizing Debtor shall provide such additional information as the Plan Administrator may reasonably require to keep itself fully informed of the Reorganizing Debtors' performance of his duties and responsibilities under the Plan, and any matter relating to the Plan Assets. For further particulars, reference is made to Sections 1.84, 1.86, and 7.4.2 of the Plan.

**E.  Oversight Committee.** The Plan creates an Oversight Committee consisting of each Creditor with an Allowed Secured Claim in Class 1; the Creditor with an Allowed Secured Claim in Class 2; to the extent appointed by the Plan Administrator and such appointment is accepted by such person, a representative Creditor with an Allowed Claim in Class 6; and each Plan Funding Lender. The Oversight Committee shall act by a vote of more than 50% of the number of members that are Class 1, Class 2, and Class 6 Creditors plus the unanimous consent of the Plan Funding Lenders.  In the event of a tie in the vote of Class 1, Class 2 and Class 6 members, the Plan Funding Lenders (acting unanimously) may break the tie.  In the event of a tie between the Plan Funding Lenders, either Plan Funding Lender may apply to the Bankruptcy Court to break the tie.  For the avoidance of doubt, a Plan Funding Lender that is also a Class 1 Creditor may vote in both capacities.  Each member of the Oversight Committee shall not be liable for any act or omission taken or omitted to be taken by such member in its capacity as a member of the Oversight Committee.  Upon the repayment in full of the Allowed Claims of any member in any of Classes 1, 2, or 6, the member of the Oversight Committee from such repaid Class shall no longer serve on the Oversight Committee. Upon repayment in full of a Plan Funding Lender's Plan Funding Claims and Allowed Secured Claims, such Creditor shall no longer serve on the Oversight Committee.

**F.  Sales of Plan Assets – Real Property.**  Sales of Plan Assets constituting real property shall be made pursuant to Section 363 of the Code (including Sections 363(f) and (h)) and shall be brought before the Bankruptcy Court for approval by a motion initiated by the Plan Administrator.  All parties-in-interest shall retain the right to object to any such motion on any bases permitted by the Code or applicable case law.  Unless the Bankruptcy Court orders otherwise, a Creditor in Class 1 or 2 with an Allowed Secured Claim shall have the right to credit bid up to the amount of its Allowed Secured Claim in connection with any sale of a Plan Asset that constitutes its collateral, provided that such credit bid shall also include a cash portion in the amount necessary, if any, to pay in full (a) all Allowed Secured Claims against the same collateral having priority over such Creditor's Allowed Secured Claim and (b) any Plan Expenses directly related to the consummation of such transaction.

**G.    Plan Funding Loans.**  MetLife and Summit have agreed, in their capacity as Plan Funding Lenders, to provide the Plan Funding Loans, for an amount not to exceed $1,000,000.00 each, on the terms and conditions set forth in the Plan and related loan documents described in the Plan.

    *1.    Credit Agreement; MetLife:* MetLife, in its capacity as a Plan Funding Lender, may provide a senior secured credit facility or advance to the Reorganizing Debtor comprised of a non-revolving line of credit or advance in the maximum aggregate principal amount of up to the Plan Funding Loans Maximum Amount to be used solely to fund the Plan, pursuant to the terms and conditions of the Plan and the Plan Credit Agreement.  Nothing in the Plan shall limit MetLife's ability to make protective advances under the MetLife Loan Documents, provided that advances in excess of the Plan Funding Loans Maximum Amount and advances not deposited in the Plan Accounts shall not be considered a Plan Funding Loan.  The proceeds of all Plan Funding Loans shall be deposited into Plan Accounts.  The proceeds of the Plan Funding Loans shall not be used for personal, family, or household purposes.  Upon repayment in full of all obligations to MetLife, MetLife shall cease to be a Plan Funding Lender.

    *2.    Credit Agreement; Summit:* Summit, in its capacity as a Plan Funding Lender, shall provide a junior secured credit facility to the Reorganizing Debtor comprised of a non-revolving line of credit in the maximum aggregate principal amount of up to the Plan Funding Loans Maximum Amount to be used solely to fund the Plan, pursuant to the terms and conditions of the Plan, the Plan Credit Agreement and other Loan Documents, copies of which are offered as Exhibit "4" to the Plan.  The proceeds of all Plan Funding Loans shall be deposited into Plan Accounts.  The proceeds of the Plan Funding Loans shall not be used for personal, family, or household purposes.

    *3.    Essential Terms of Plan Funding Loans.*  The Plan Funding Loans shall accrue interest at rate not to exceed 10% per annum, paid-in-kind monthly.  The scheduled maturity date of the Plan Funding Loans shall be the date that is sixteen months after the Effective Date.  The Plan Funding Loans shall be repaid through a balloon payment of all principal, including paid-in-kind interest, on their maturity.  Subject to Summit's consent to providing the Reorganizing Debtor to use

Plan Funding Cash Collateral, proceeds of the sale of collateral securing a Plan Funding Loan shall first be applied to the repayment of the Plan Funding Loan or other advance and only after such loan or advance has been paid in full to any unpaid Class 1 Claims of the Plan Funding Lender.

Summit, for itself and in its capacity as a Plan Funding Lender, shall allow the Reorganizing Debtor to use Plan Funding Cash Collateral, to the extent determined by the Plan Administrator to be Available Cash, to fund periodic payments on account of Allowed Claims in Class 6, prior to the repayment in full of Summit's Allowed Secured Claim in Class 1 and Summit's Plan Funding Claim. Pursuant to the terms and conditions of the Cash Collateral Fund (as defined in the Plan Credit Agreement with Summit), Plan Funding Cash Collateral shall be made available to the Reorganizing Debtor as follows: upon the consummation of any sale or refinance of Summit's collateral authorized by a Final Order of the Bankruptcy Court, the cash Proceeds of any such sale or refinance otherwise due to Summit (after payment of all Claims having priority over Summit) shall be distributed: (a) first, to Summit on account of its Allowed Secured Claim in Class 1 until Summit has received a total of $2,000,000.00 on account of such Allowed Secured Claim; and (b) second, 90% to Summit on account of its Allowed Secured Claim in Class 1 and 10% to fund the Cash Collateral Fund until the Cash Collateral Fund has been funded in full up to the Plan Funding Maximum Cash Amount.

4. *Collateral for Plan Funding Loans; Replacement Liens.* MetLife's Plan Funding Claim, including, without limitation, all Plan Funding Loans made by MetLife, shall be, and will be secured by, perfected liens and security interests in favor of MetLife, in its capacity as a Plan Funding Lender, on and in the collateral securing the Allowed Secured Claim of MetLife with the same priority as the liens and security interests on and in such collateral securing the Allowed Secured Claim of MetLife.  Summit's Plan Funding Claim, including, without limitation, all Plan Funding Loans made by Summit, is secured by perfected liens and security interests in favor of Summit, in its capacity as a Plan Funding Lender, on and in the Plan Assets and the Proceeds, subject and subordinate only to (a) existing Allowed Secured Claims against the Plan Assets and the Proceeds and (b) the liens of the Plan Administrator granted pursuant to the Plan.

In consideration of the Reorganizing Debtor's use of the Other Cash Collateral and the Plan Funding Cash Collateral in connection with, and pursuant to the terms and conditions of, the Cash

Collateral Fund, Summit shall receive, and will be granted, perfected replacement liens and security interests in favor of Summit on and in the Plan Assets and the Proceeds, subject and subordinate only to (a) existing Allowed Secured Claims against the Plan Assets and the Proceeds and (b) the liens of the Plan Administrator granted pursuant to the Plan, which replacement liens and security interests shall secure Summit's Allowed Secured Claim in an amount equal to the extent of such use of the Other Cash Collateral and the Plan Funding Cash Collateral (the "Replacement Liens").

On the Confirmation Date, the liens and security interests securing the Plan Funding Claim, and the Replacement Liens, shall be deemed valid, binding, enforceable, and perfected with respect to all of the Plan Assets and the Proceeds. The Plan Funding Lenders and Summit are not be required to file any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien or any similar document or take any other action (including, without limitation, possession of or control of any of the Plan Assets or the Proceeds or the obtaining of any consent of any Third Party) in order to validate the perfection of such liens and security interests, however the Plan permits Plan Funding Lenders and Summit to file or record any such document, and all such documents and instruments shall be deemed to have been filed or recorded as of the Confirmation Date. The Reorganizing Debtor and the Plan Administrator are authorized and directed to enter into such control agreements with a Plan Funding Lender or Summit and the financial institutions at which the Plan Accounts are located, as a Plan Funding Lender or Summit may require. The Plan Funding Lender and Summit are granted additional authority related to their security interest. For additional particulars, reference is made to Section 7.7.3 of the Plan.

All liens and security interests, all Replacement Liens, and any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien, or any similar document, obtained and provided to the Plan Funding Lenders or Summit in connection with the Plan have been issued and delivered pursuant to the Plan. Pursuant to Section 1146 of the Code, such liens and security interests, such Replacement Liens, and any filing or recording of any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien, or any similar document, shall be free from any stamp, transfer, recording, or similar tax.

5. *Intercreditor Agreement.* To the extent that the Plan Funding Claim is secured by collateral, or the Replacement Liens attach to collateral, which in either case is also collateral for the Allowed Secured Claim of MetLife or the Allowed Secured Claim of Summit, the Plan Funding Claim and such Replacement Liens shall be subject to the terms of the Intercreditor Agreement between MetLife and Summit (as attached to MetLife's Proof of Claim).

6. *Release in Favor of Summit and MetLife.* In consideration of the Plan Funding Lenders making the Plan Funding Loans and the Plan Funding Cash Collateral, and Summit making the Filbin Available Cash and the Other Cash Collateral, available to the Reorganizing Debtor in order to fund the payments to be made under the Plan and the Plan Expenses to be incurred in connection with the Plan, the Plan includes a release of any and all Claims against Plan Funding Lenders and Summit by the Debtor in Possession, the Reorganizing Debtor, and the Estate, including claims under Chapter 5 of the Code or under any other similar provisions of applicable state or federal law. The release is binding on all parties-in-interest in the Case, including, without limitation, any trustee or committee hereafter appointed or elected for the Estate in this Case or in any superseding chapter 7 case. For further particulars, reference is made to Section 7.7.5 of the Plan.

7. *Other Terms and Conditions.* The Plan Credit Agreements and other Loan Documents for the Plan Funding Loans shall be in substantially the form attached as Exhibit "4" to the Plan or as attached to the MetLife Proof of Claim. Any continuing "Event of Default" under a Plan Credit Agreement and other Loan Documents first occurring after the Effective Date of the Plan shall be deemed to be a Material Default under the Plan. Notwithstanding any other provision of the Plan (including, without limitation, Section 12.4) if there is a Material Default under the Plan or upon the date that is sixteen months after the Effective Date, the Plan Funding Lenders shall, without the requirement of further order of the Bankruptcy Court but immediately after a notice is filed with the Bankruptcy Court and served upon those parties on the Post-Confirmation Service List, be (a) deemed to have been granted relief from the automatic stay of Section 362 of the Code with respect to its collateral which forms part of the Plan Assets and from any injunction imposed by the Code or the Plan in this Case or in any subsequent bankruptcy case filed by or against the Debtor in

Possession or the Reorganizing Debtor, or involving such Plan Funding Lender's collateral; and (b) entitled to exercise any remedies available to the Plan Funding Lenders under the Loan Documents and applicable law.

**H.    Distributions and Payments Under the Plan.**  The Reorganizing Debtor shall make all Distributions and payments due under the Plan on the Effective Date, and the Plan Administrator shall confirm that such payments were made by the Reorganizing Debtor.  The Reorganizing Debtor shall make all Distributions and payments due under the Plan related to the Personal Assets and, prior to the Termination Date, the Farm Assets.  Except as provided by Section 7.4.1 of the Plan, the Plan Administrator shall make all other Distributions and payments under the Plan.

*1.    Distributions and Payments from Plan Assets and Proceeds.*  After the Effective Date, and except as provided by Section 7.4.1 and Section 7.4.4, all cash consisting of Plan Assets, all cash Proceeds, including, without limitation, the Plan Funding Cash Collateral, and all proceeds of the Plan Funding Sources shall be deposited into Plan Accounts from which all Distributions and payments to be made by the Plan Administrator under the Plan shall be made by the Plan Administrator.  The Plan Administrator shall pay Plan Expenses in accordance with the Plan Budget, and the other terms and conditions of the Plan, and may do so without further order of the Bankruptcy Court.

Subject to Section 7.7.2 of the Plan, in connection with a final disposition of any Plan Asset that is real property approved by the Bankruptcy Court, the Plan Administrator shall first pay disposition expenses with respect to the sale (consisting of reasonable, documented, and customary closing costs related to any such final disposition, withholdings for income taxes attributable to such disposition, and U.S. Trustee Fees attributable to such disposition (all of which shall be deemed Plan Expenses)), pursuant to the order of the Bankruptcy Court approving such final disposition, then post-Effective Date protective advances secured by such Plan Asset, then Plan Funding Claims secured by such Plan Asset, then Allowed Secured Claims in order of their priority on such Plan Asset to the extent of the Proceeds of such final disposition.  In addition, on the first Business Day of each calendar month, the Plan Administrator shall pay Allowed Secured Claims in

Class 1 and in Class 2 on a Pro Rata basis to the extent of unencumbered Available Cash and may do so without further order of the Bankruptcy Court.

On the first Business Day of each calendar month, and only after all Allowed Secured Claims in Classes 1 and 2 and the Plan Funding Claims have been paid in full, the Plan Administrator shall pay Allowed Claims in Class 6 on a Pro Rata basis to the extent of Available Cash and may do so without further order of the Bankruptcy Court.

2.    *Distribution Addresses.*  Unless a Creditor has provided the Reorganizing Debtor and the Plan Administrator with written notice of a different address, Distributions will be sent to Creditors at their addresses as set forth in their proofs of Claim filed with the Bankruptcy Court.  If no proof of Claim is filed with respect to a particular Claim, Distributions on account of such Claim will be mailed to the applicable Creditor at its address as set forth in the Schedules.

3.    *De Minimis Distributions.*  Notwithstanding any other provision of the Plan, Distributions of less than $25.00 need not be made on account of any Allowed Claim; provided that Distributions that would otherwise be made but for this provision shall carry over until the next Distribution date until the cumulative amount to which any holder of an Allowed Claim is entitled to more than $25.00, at which time the cumulative amount of such Distributions will be paid to such holder.

4.    *Withholding Taxes.*  Pursuant to Section 346(f) of the Code, the Reorganizing Debtor and the Plan Administrator shall be entitled to deduct any applicable federal, state or local withholding taxes from any cash payments made with respect to Allowed Claims, as appropriate. The Reorganizing Debtor and the Plan Administrator shall be permitted to withhold a Distribution to any Creditor that has not provided information requested by the Reorganizing Debtor and the Plan Administrator for the purpose of fulfilling his or her obligations under the Plan.  The Reorganizing Debtor and the Plan Administrator, as applicable, shall comply with all reporting obligations imposed by any governmental unit with respect to withholding and related taxes.

5.    *Unclaimed Distributions.*  Any cash Distributions that remain unclaimed or unnegotiated for 120 days following Distribution or are returned for reasons other than the absence of a current or correct address (unless a current or correct address cannot be determined after

reasonable inquiry) shall become the Property of the Estate and distributed in accordance with Section 7.8 of the Plan.

      6.    *Disputed Claim Reserve.*  The Plan Administrator will create a Plan Account for use as a reserve for Disputed Claims.  Each time the Plan Administrator makes a Distribution to the holders of Allowed Claims, the Plan Administrator will deposit into a reserve the aggregate Pro Rata amount that would have been distributed to the holders of Disputed Claims.  If a Disputed Claim becomes an Allowed Claim, the Plan Administrator shall promptly distribute to the Creditor from the reserve an amount equal to all Pro Rata Distributions that would have otherwise been due to such Creditor to date under the Plan, calculated using the amount of such Creditor's Allowed Claim.  Any funds no longer needed in reserve shall be distributed in accordance with Section 7.8 of the Plan.

      7.    *Insurance Policies.*  To the extent any insurance policies exist in which Jeffery Edward Arambel, in his capacity as the prepetition debtor or the Debtor in Possession, his personnel, or the Estate have an insurable or other interest in or right to make a claim, such policies shall remain available before and after the Effective Date, in addition to covering the Plan Administrator, and its Post-Confirmation Professionals, as applicable, on and after the Effective Date, to satisfy any and all Claims held by, or asserted against, the Estate, the Reorganizing Debtor, or the Reorganizing Debtor's current or former personnel that may be covered by such policies.

    **I.**    **LBA Adversary Proceeding.**  LBA and the Reorganizing Debtor each assert the right to receive $750,000 currently held in escrow by Commonwealth Land Title Company, pursuant to prepetition joint escrow instructions executed by Jeffery Edward Arambel and LBA.  After the Effective Date, and subject to approval of Plan Administrator (*provided*, however, that approval of the Plan Administrator shall not be required if the professionals employed to prosecute the adversary proceeding are paid from a source other than the Plan Funding Sources), the Reorganizing Debtor shall commence an adversary proceeding to resolve his disputes with the LBA with respect to the funds held by Commonwealth Land Title Company and any other claims or defenses the Debtor in Possession and the Reorganizing Debtor may hold against LBA (or its predecessors and successors), including (but not limited to) the relative rights of the Reorganized Debtor and LBA to the $750,000 currently held in escrow, whether or not such funds are Property of the Estate, declaratory relief

concerning the enforcement of the agreements with LBA, breach of contract, and breach of the implied obligation of good faith and fair dealing, amongst other possible claims under state and federal law, all of which are specifically retained. Specifically, it is the Debtor in Possession's position that he and LBA agreed prepetition and in writing to resolve their respective claims to the $750,000 currently held in escrow by Commonwealth Land Title Company by allocating that amount between them ($615,500 to the Debtor in Possession, $22,000 to the Debtor in Possession's prepetition real estate broker, and $112,500 to LBA with a six-month extension of its Right of First Refusal) and that the prepetition agreement was fully documented and signed postpetition. Thereafter, and while the Debtor in Possession was finalizing a stipulation with Creditors holding Claims secured by the funds, LBA wrongfully repudiated the agreement. The Bankruptcy Court reserves jurisdiction to resolve such disputes. To the extent the Reorganizing Debtor receives any monetary amount in connection with this adversary proceeding (whether by Final Order, by settlement with the LBA, or otherwise), all such amounts shall be Property of the Estate and Plan Assets, transferred by the Reorganizing Debtor to a Plan Account, and available for Distribution by the Plan Administrator in accordance with Section 7.8 of the Plan. Any monetary amount received on account of the adversary proceeding is the collateral of MetLife and Summit as it is traceable to a sale of a parcel from within the Arambel Business Park.

**J.      Execution and Delivery of Documents.** The Reorganizing Debtor and the Plan Administrator are authorized to execute and deliver such agreements, instruments, and documents as are necessary or appropriate to promote and implement the Plan or to carry out the purposes of the Plan.

**K.      Objections to Claims and Estimation of Claims.** Subject to Section 7.3.3 of the Plan, any objection to Disputed Claims by the Plan Administrator, the Reorganizing Debtor, or other parties in interest must be filed before the date that is sixteen months following the Effective Date, unless such period is extended by the Bankruptcy Court for cause shown on motion filed within such original or extended objection period. Any and all objections to Disputed Claims pending as of the Confirmation Date and not resolved by the Plan or by other order of the Bankruptcy Court are

specifically reserved by the Plan and shall not be barred by any theory of *res judicata* solely by Confirmation of the Plan.

In general, in addition to any claims listed as disputed, the LBA Adversary Proceeding described in paragraph I of this Section, and any rights or claims described in the schedules filed in this case, the Reorganizing Debtor contemplates examining and may pursue the following claims:

| Description | Estimated Value |
| --- | --- |
| Note Receivable from City of Patterson, California | $223,717.00 |
| Claims against A & G Farm Management, Inc. for Breach of Oral Contract, Breach of Written Contract, Constructive Trust, and Unjust Enrichment (Stan. Cnty. Supr. Ct. No. 2016040) | Unknown |
| A/R Interests from Co-Ops (Pacific Coast Producers Cooperative, Western Growers, Westside Hulling, Apricot Producers-California, & California Canning Peach Association) | $433,000.00 |
| Delivery Rights from Co-Ops (Pacific Coast Producers Cooperative, Western Growers, Westside Hulling, Apricot Producers-California, & California Canning Peach Association) | Unknown |
| Preference Claim against Rabobank, N.A. | $910,200.00 |
| Preference Claim against Credit Counseling Services, Inc. | $55,117.00 |
| Preference Claim against Commercial Trade, Inc. | $30,000.00 |
| Preference Claim against El Che Corporation | $75,000.00 |
| Intercompany Claims against JEA2, LLC | Unknown |

**L.** **Claim Bar Dates.** The last day for filing proofs of Claim in the Case shall be the Bar Date fixed by the Court before Confirmation of the Plan, except for Administrative Claims and Rejection Claims. The deadline for filing and serving requests for the allowance of Administrative Claims (other than Professional Fees and U.S. Trustee Fees) shall be the Administrative Claim Bar Date. For Administrative Claims which accrued on or before March 31, 2019 (other than Professional Fees and U.S. Trustee Fees), the Administrative Claims Bar Date is June 4, 2019. *See* Order, Dckt. No. 780. The deadline for filing proofs of Rejection Claim in the Case shall be the Rejection Claim Bar Date.

**M.** **Retention and Enforcement of Claims.** Pursuant to Section 1123(b)(3) of the Code, the Reorganizing Debtor may, on and after the Confirmation Date, maintain and enforce any Claims of the Debtor in Possession or the Estate (except to the extent such Claims have been or will be

settled or released on or before the Effective Date). To the extent the Reorganizing Debtor receives any monetary amount in connection with retained Claims, all such amounts shall be Property of the Estate and Plan Assets, transferred by the Reorganizing Debtor to a Plan Account, and available for Distribution by the Plan Administrator in accordance with Section 7.8 of the Plan.

**N. Jurisdictional Limitations on Claims re: Plan Implementation.** All Claims related to the post-Confirmation conduct of the Reorganizing Debtor, the Plan Administrator, or the Post-Confirmation Professionals must be filed in and determined by the Bankruptcy Court. No concurrent jurisdiction shall exist for the determination or enforcement of any such Claims.

**O. Court and United States Trustee Fees; Post-Confirmation Reports; Final Decree.**

*1.* On or before the Effective Date, all fees due to the Clerk of the Court and all U.S. Trustee Fees shall be paid in full by the Reorganizing Debtor from the Plan Funding Sources (other than the Plan Funding Loans, unless such U.S. Trustee Fee constitutes a business expense as determined by Summit as a Plan Funding Lender, in its sole and absolute discretion).

*2.* Quarterly U.S. Trustee Fees shall be budgeted for and paid by the Plan Administrator as Plan Expenses and thereafter by the Reorganizing Debtor for each calendar quarter (including any fraction thereof) until the Case is closed by entry of a Final Decree, converted, or dismissed. Upon the closing of the Case, no further U.S. Trustee Fees shall be due, except for any calendar quarter (including any fraction thereof) during which the Case may be reopened.

*3.* Following the Effective Date, the Plan Administrator, shall prepare and submit to the Bankruptcy Court and the Office of the United States Trustee, post-Confirmation reports in the form suggested by the Office of the United States Trustee for Region 17, the purpose of which is to explain the progress made toward full administration of the confirmed Plan. The first post-Confirmation report shall be due within thirty (30) days following the end of the first calendar quarter from the Effective Date and shall be filed on a quarterly basis thereafter within thirty (30) days after the end of each calendar quarter, unless otherwise agreed to by the Office of the United States Trustee and the Reorganizing Debtor, after consultation with the Plan Administrator, until the Case is closed by entry of a Final Decree, converted, or dismissed.

4.    The aforementioned post-Confirmation reports shall include a statement of receipts and disbursements from the Plan Assets, the Proceeds, and the Plan Funding Sources, with the ending cash balances of the Plan Accounts, for the entire quarter.  The post-Confirmation reports shall also include information sufficiently comprehensive to enable the Bankruptcy Court to determine: (1) whether the Confirmation Order is final; (2) whether deposits required by the Plan, if any, have been made and distributed; (3) whether property to be transferred under the Plan, if any, has been transferred; (4) whether the Plan Administrator has assumed management of the Plan Assets; (5) whether Disbursements have commenced; (6) whether quarterly U.S. Trustee Fees due to the United States Trustee have been paid; and (7) whether all motions, contested matters, and adversary proceedings have been finally resolved.

5.    A copy of each aforementioned post-Confirmation report shall be served upon each person and entity on the Reorganizing Debtor and the members of the Oversight Committee.

6.    After the Plan and the Estate is fully administered, the Reorganizing Debtor shall file an application for a Final Decree, and serve the application on the United States Trustee, together with a proposed Final Decree.  The United States Trustee shall have fourteen (14) calendar days to object to the Bankruptcy Court's entry of the Final Decree.

**P.    Conditions Precedent; Notice of Effective Date.**  Confirmation of the Plan is conditioned upon entry of a Confirmation Order in form and substance acceptable to the Debtor in Possession, the Plan Funding Lenders, and the Plan Administrator.  Upon satisfaction of such condition, on the Effective Date, the Reorganizing Debtor shall have the power and authority to file a notice of effective date with the Bankruptcy Court.

**Q.    Post-Confirmation Employment and Compensation of Professionals.**  After the Effective Date, the Reorganizing Debtor and the Plan Administrator may employ, without notice, hearing, or order of the Bankruptcy Court, Post-Confirmation Professionals, provided that all costs and expenses incurred by a Professional employed by the Reorganizing Debtor prior to the Effective Date shall remain subject to Bankruptcy Court approval and shall not be paid until allowed by an order of the Bankruptcy Court.  Upon such allowance of fees incurred prior to the Effective Date, the Plan Administrator is authorized to pay for such services as Plan Expenses in accordance with the

terms and conditions of the Plan. Any and all Post-Confirmation Professionals of the Plan Administrator shall be employed by the Plan Administrator, in its capacity as such, pursuant to the Plan, in its discretion, and shall not be subject to retention by the Bankruptcy Court or the retention and fee application process, provided under, inter alia, Sections 327 and 331 of the Code and applicable law. For periods on or after the Effective Date the Plan Administrator and the Reorganizing Debtor shall each file a monthly compensation report detailing total compensation and expense reimbursements to be paid to each of their Post-Confirmation Professionals for the prior month; provided, however, that the report shall not include detailed time records for the Post-Confirmation Professionals. The Plan Administrator, Oversight Committee, and the Reorganizing Debtor shall have seven (7) Business Days after the filing of any monthly compensation report to object to the same. Absent any such objection, all compensation and expense reimbursements owed to the Post-Confirmation Professional as set forth on such monthly compensation report shall constitute Plan Expenses and shall be paid by the Plan Administrator in accordance with the terms and conditions of the Plan, without further notice or order of the Bankruptcy Court. In the event of any such objection, the Bankruptcy Court shall determine the compensation and expense reimbursements owed to the Post-Confirmation Professional with respect to such monthly compensation report. For purposes of any such determination, the standard for approval and payment shall be whether such request is reasonable under the circumstances.

## ARTICLE IX
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.     Leases and Executory Contracts Expressly Assumed.** The Reorganizing Debtor expressly assumes all unexpired leases where the Debtor in Possession is a landlord, all contracts to provide water services to the Debtor in Possession (including agreements, if any, with Del Puerto Water District, Patterson Irrigation District, and West Stanislaus Irrigation District), and all Executory Contracts entered into before the Petition Date which have been assumed pursuant to a prior order of the Bankruptcy Court or which are subject to a motion already filed with the Bankruptcy Court. Any assumed Executory Contracts shall remain in full force and effect, be unimpaired by the Plan except as specifically modified by the Plan or the Confirmation Order, and

be binding on the parties thereto.  The Reorganizing Debtor believes, and, therefore, asserts, that no cures under Section 365 of the Code are required for the Reorganizing Debtor to assume the unexpired leases to be assumed by the Reorganizing Debtor, pursuant to the Plan.  If any counterparty to any such unexpired lease claims that a cure is required, such counterparty must assert such rights on or before the hearing on the Confirmation of the Plan or be forever barred from asserting such rights.

**B.**     **Other Leases and Executory Contracts Rejected.** All Executory Contracts entered into before the Petition Date which have not been assumed pursuant to a prior order of the Court, which are not subject to a motion already filed by the Debtor in Possession with the Bankruptcy Court, or which are expressly assumed in the Plan, are rejected upon Confirmation of the Plan. Among the rejected Executory Contracts is an agreement with Irrigation Design and Construction related to certain irrigation equipment (Proof of Claim No. 28).

**C.**     **Claims for Rejection Damages.**  Rejection Claims must be filed with the Bankruptcy Court no later than the Rejection Claim Bar Date.  Failure to timely file Rejection Claims shall result in their disallowance without notice or order of the Bankruptcy Court.  Allowed Rejection Claims shall be paid as Class 6 Claims.

### ARTICLE X
### EFFECT OF ORDER OF CONFIRMATION

As of the Confirmation Date, the effect of the Order of Confirmation shall be as provided in Section 1141 of the Bankruptcy Code, and as follows:

**A.**     **Binding Effect of Plan.**  Upon Confirmation of the Plan, the Debtor in Possession, the Reorganizing Debtor, the Plan Administrator, all Creditors, and interest holders, whether or not the Claim of such Creditor is impaired under the Plan and whether or not such Creditor or Equity Interest holder has accepted the Plan, shall be bound by the provisions of the Plan pursuant to Section 1141(a) of the Code.

**B.**     **Discharge of Debts.** Pursuant to Section 1141(d)(5) of the Code, except as otherwise provided in the Plan, the Reorganizing Debtor shall, upon satisfaction of the conditions stated Section 1141(d)(5) of the Code, be discharged from any and all Debt that arose before the

Confirmation Date and any Debt of any kind specified in Sections 502(g), 502(h), or 502(i) of the Code, whether or not: (1) a Proof of Claim based on such Debt is filed or deemed filed under Section 501 of the Code; (2) such Claim is allowed under Section 502 of the Code; or (3) the holder of such Claim accepts the Plan.

**C.     Judgments Obtained on Discharged Debts are Void.** Pursuant to Section 524(a)(1) of the Code, the aforesaid discharge voids any judgments at any time obtained to the extent that such judgment is a determination of the liability of the Reorganizing Debtor with respect to any Debt discharged whether or not discharge of such Debt is waived.

**D.     Discharge Injunction.** Except as otherwise provided in the Plan, pursuant to Section 524 of the Code, the said discharge operates as an injunction against the commencement or a continuation of an action, the employment of process or the commission of an act to collect, recover or offset any discharged Debt whether or not discharge of such Debt is waived.

**ARTICLE XI**
**MODIFICATION OF PLAN**

**A.     Pre-Confirmation Modification.** Pursuant to Section 1127(a) of the Code, the Plan may be modified upon motion of the Debtor in Possession or corrected by the Debtor in Possession before the Effective Date, without notice and a hearing and without additional disclosure pursuant to Section 1125 of the Code, provided that, after notice to the United States Trustee and all parties that have filed and served a request for special notice in the Case, the Bankruptcy Court finds that such modification does not materially or adversely affect any Creditor or any Class of Creditors.

**B.     Post-Confirmation Immaterial Modification.** At any time before thirty (30) calendar days after the Effective Date, the Plan Administrator or the Reorganizing Debtor, after consultation with the Oversight Committee, may seek Bankruptcy Court authorization to remedy any defect or omission, reconcile any inconsistencies in the Plan or in the Confirmation Order, or effect such other changes, modifications, or amendments as may be necessary to carry out the purposes and intent of the Plan, provided the Court finds that such changes, modifications, or amendments do not materially or adversely affect any Creditor or any Class of Creditors.

**C.     Post-Confirmation Material Modification.**  The Plan may be modified at any time after Confirmation, after a noticed hearing and order of the Court pursuant to Section 1127(b) or (e) of the Code, by the Plan Administrator or the Reorganizing Debtor, after consultation with the Oversight Committee, provided, however, that any material amendment or modification obtained without the prior written consent the Plan Funding Lenders and Summit shall constitute a Material Default under the Plan.

**ARTICLE XII**
**REMEDIES IF REORGANIZED DEBTOR DEFAULTS IN PERFORMING THE PLAN**

**A.     Creditor Action Restrained.**  The confirmed Plan is binding on every Creditor whose Claim is provided for in the Plan.  Therefore, no Creditor may take any action to enforce either pre-Confirmation obligations or obligations due under the Plan so long as there has not been a Material Default under the Plan, except as otherwise provided in the Plan.

**B.     Obligations to Each Class Separate.**  Obligations under the Plan are separate with respect to each Class and sub-Class of Creditors.  Except as otherwise provided in the Plan, default in performance of an obligation due to members of one Class or sub-Class shall not by itself constitute a default with respect to members of other Classes.  For purposes of this Article, the holders of all Administrative Claims shall be considered to be a single Class, and each Third Party to an Executory Contract shall be considered to be a separate Class.

**C.     Additional Material Defaults.**  If the Reorganizing Debtor or the Plan Administrator fails to make any payment or to perform any material obligation required under the Plan for more than ten (10) calendar days after the time specified in the Plan for such payment or other performance, any Creditor affected by the default, the Oversight Committee, or any Plan Funding Lender may serve a written notice of default upon the persons and entities on the Post-Confirmation Service List.  If the Reorganizing Debtor or the Plan Administrator fails within thirty (30) calendar days after the date of service of the notice of default either: (a) to cure the default, (b) obtain an order from the Court modifying the Plan after Confirmation (which thirty (30) day time period may be extended by order of the Bankruptcy Court pending confirmation of any such modified plan), or (c) obtain an order from the Bankruptcy Court determining that no default occurred (which thirty (30)

day time period may be extended by order of the Bankruptcy Court pending any such determination), then the Reorganizing Debtor shall be in Material Default under the Plan.

**D.      Remedies Upon Material Default.**  In addition to any and all other remedies set forth in the Plan, upon the occurrence of a Material Default, any Creditor affected by the default, the Oversight Committee, or any Plan Funding Lender may request appropriate relief by filing a motion with the Bankruptcy Court and setting it for hearing.  This relief may consist of, without limitation, dismissal of the Case, conversion of the Case to a case under chapter 7 of the Code, or relief from the automatic stay or discharge injunction to pursue rights against collateral.

**E.      Claims Not Affected by Plan.**  Upon Confirmation of the Plan, and subject to Section 13.3 of the Plan, any Creditor whose Claims are left unimpaired under the Plan may, notwithstanding Sections 12.1 through 12.4 above, immediately exercise all of its contractual, legal, and equitable rights, except rights based on defaults of the type that need not be cured under Section 1124(2)(A) and (D) of the Code.

**F.      Effect of Conversion to Chapter 7.**  If the Case is at any time converted to one under chapter 7 of the Code, all Property of the Estate shall vest in the chapter 7 bankruptcy estate to the same extent provided for in Section 348(f) of the Code upon conversion as if this Case had been one pending under chapter 13 of the Code.

**ARTICLE XIII**
**<u>RETENTION OF JURISDICTION</u>**

After confirmation of the Plan, the Court shall retain jurisdiction under the Plan for all purposes consistent with the Plan and the Code, which purposes include, but are not limited to:

A.      The classification or allowance of a Claim of any Creditor and the reexamination of Claims which have been temporarily allowed for purposes of voting and the determination of such objections as may be filed against Creditors' Claims;

B.      The determination of all questions and disputes regarding title to the Property of the Estate, and the determination of all causes of action, controversies, disputes, or conflicts, including the right to participate in any Distribution from the Estate, whether or not subject to an action pending as of the Effective Date, between the Reorganizing Debtor and any other party, between the Plan

Administrator and any other party, including, but not limited to, any right of the Reorganizing Debtor or the Plan Administrator to recover assets pursuant to the provisions of the Code;

C.    The correction of any defect, curing of any omission, or the reconciliation of any inconsistency in the Plan or in the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan;

D.    The determination of the allowability, validity, and priority of Claims against the Reorganizing Debtor or the Estate, whether such Claims are asserted before or after the Effective Date;

E.    The modification or amendment of the Plan after Confirmation pursuant to the Bankruptcy Rules or the Code and the other terms and conditions of the Plan;

F.    The enforcement and interpretation of the terms and provisions of the Plan, the Loan Documents, or the Confirmation Order;

G.    The entry of any order concluding or terminating the Case;

H.    The entry of orders regarding the discharge of Debts; or

I.    The administration of the Case and implementation and consummation of the Plan.

## ARTICLE XIV
## TAX CONSEQUENCES OF PLAN

The Debtor in Possession will not seek a ruling from the Internal Revenue Service prior to the Effective Date with respect to any of the tax aspects of the Plan.  EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.  With that qualification, certain significant Federal income tax consequences of the Plan under the Internal Revenue Code of 1986, as amended (the "Tax Code"), are described below.

It is Debtor in Possession's best estimate that confirmation of the Plan will generally be tax neutral for creditors.  From the perspective of Debtor in Possession and of the creditors, the payments to be made under the Plan will likely have similar tax attributes and consequences as they would have had, if the claims had been timely paid in the absence of the bankruptcy case: for example, if the payment by Debtor in Possession otherwise would have been taxable income to the creditor when received, it will be taxable income when made under the Plan.  There are two

circumstances in which the tax consequences may differ. First, payments may be made or received in a different tax year as a result of the deferrals provided by the bankruptcy process, which may have an effect on certain taxpayers. Second, there will likely be tax consequences to any creditors that have already taken a bad debt deduction with respect to any obligation of Debtor in Possession when that obligation is paid under the Plan.

The Debtor in Possession may incur significant income taxes upon the sale of its property. The Debtor in Possession may also incur significant income taxes upon sale of property by the Filbin Land & Cattle Co., Inc. because the Filbin Land & Cattle Co., Inc. has made an S Corporation election. The S Corporation election causes the corporation's taxable income to pass through to the Debtor in Possession and such income is taxable to the Debtor in Possession. The amount of tax that will be incurred is dependent on numerous factors including tax basis, net operating losses, administrative expenses, and accrued interest and other costs that may be deductible upon payment under Debtor in Possession's cash basis method of computing taxable income. Taxes arising from Filbin Land & Cattle Co., Inc.'s sale of real property prior to confirmation of the Filbin Plan of Reorganization has been funded from the proceeds of that sale.

As a result of the Plan, it is possible that some discharge of indebtedness will arise and will reduce certain tax attributes of the Debtor in Possession and Filbin Land & Cattle Co., Inc. The tax consequences of the Plan are subject to many uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law, including changes made to the applicable sections of the Tax Code by the Bankruptcy Tax Act of 1980. Uncertainties with regard to federal income tax consequences of the Plan also arise due to the inherent nature of estimates of value that will impact tax liability determinations.

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the federal income tax consequences of the Plan and the transactions contemplated there under.

CREDITORS ARE ADVISED TO CONSULT THEIR OWN TAX ADVISORS TO REVIEW THIS MATERIAL AND TO CONSIDER THE TAX CONSEQUENCES OF THE PLAN TO THEM, INCLUDING THE EFFECT OF FOREIGN, STATE AND LOCAL TAXES. THIS

DISCLOSURE STATEMENT IS NOT INTENDED TO BE AND SHOULD NOT BE CONSTRUED AS LEGAL OR TAX ADVICE TO ANY CREDITOR.

**IRS Circular 230 Notice:** To ensure compliance with IRS Circular 230, holders of Claims are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.

**ARTICLE XV**
**LIQUIDATION ALTERNATIVE**

The obvious alternative to confirmation of the Plan is conversion to a liquidating bankruptcy under Chapter 7. A liquidation analysis showing the outcome of a hypothetical liquidation under Chapter 7 is offered as Exhibit "C" hereto. The Chapter 7 liquidation values were obtained from the real estate professionals employed by the Estate based on the assumption of what price the Estate could obtain for immediate sale of the real property. The Chapter 11 values assume an orderly liquation of real property sufficient to pay Allowed Claims in full over the sixteen-month period following the Effective Date.

First, in the event of a Chapter 7 liquidation it is likely that, after accounting for estimated capital gains taxes, distributions to Unsecured Creditors will fall from 100% under the Chapter 11 Plan, to an estimated 52.66% in a Chapter 7 liquidation.

Second, there is no reason to believe that Summit would agree to make the Plan Funding Cash Collateral (which provides for an early distribution of up to $3.5 million to Unsecured Creditors) available in a Chapter 7 case and Summit has not stated that is willing to make any such distribution in a Chapter 7 case. In fact, the loan documents for Summit's Plan Credit Agreement (Exhibit 4 to Plan at § 10.01(o)(i)) describes conversion to Chapter 7 as an Event of Default, eliminating Summit's consent under the Plan Credit Agreement to provide the Cash Collateral to distribution to holders of Allowed General Unsecured Claims. Absent such an agreement, it will

take materially longer for Unsecured Creditors to receive any payments as all Secured Claims would need to be paid in full first. With Summit typically holding first- or second-position liens in excess of approximately $50 million, it is unlikely that Unsecured Creditors would receive any dividend for quite some time.

Third, the Estate's professionals are concerned that a fire sale of the Debtor in Possession's substantial land holdings will materially depress prices for real estate in the area, creating a risk that the recovery to Unsecured Creditors will be diminished even below the values represented in the liquidation analysis. Moreover, the fees for any Chapter 7 Trustee appointed in the case are likely to be substantial. The statutory fee due a Trustee under Section 326(a) of the Code is estimated at $356,483, but could be substantially higher depending on the assets administered. Fees for any professional hired by a Chapter 7 Trustee are also likely to be substantial and must be paid before distributions to Unsecured Creditors would occur.

**ARTICLE XVI**
**MISCELLANEOUS**

**A.      Interpretation.** To the extent that the terms of the Plan are inconsistent with the terms of any agreement or instrument concerning any Claim or Equity Interest, or any other matter, the terms of the Plan shall control.

**B.      Applicable Law.** The Plan is to be governed by and construed under the Code and the laws of the State of California as they may be applicable.

**C.      Severability.** If any provision in the Plan is determined to be unenforceable by the Bankruptcy Court, the determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan; and the Bankruptcy Court shall have the power to alter and interpret such provision to make it valid and enforceable to the maximum extent practicable, consistent with the original purpose of the provision and such provision shall then be applicable as altered or interpreted. The Confirmation Order shall constitute a judicial determination and shall provide that each provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**D.     Implementation Orders.** At any time, the Bankruptcy Court may make such orders or give such direction as may be appropriate under Section 1142 of the Code.

**E.     Notices.**  Any notice to the Plan Administrator shall be in writing, and will be deemed to have been given three days after the date sent by first-class mail, postage prepaid and addressed as follows:

> Focus Management Group
> Attn: Michael Doland
> 5001 W. Lemon Street
> Tampa, FL 33609
>
> <u>With a Copy To:</u>
>
> Burr & Forman LLP
> Attn: Richard A. Robinson
> 1201 N. Market Street
> Wilmington, DE  19801

Any notice to the Reorganizing Debtor shall be in writing, and will be deemed to have been given three days after the date sent by first-class mail, postage prepaid and addressed as follows:

> Jeffery Edward Arambel
> 433 Roxanne Drive
> Patterson, CA  95363
>
> <u>With a Copy To:</u>
>
> Macdonald Fernandez LLP
> Attn: Matthew J. Olson
> 914 Thirteenth Street
> Modesto, CA  95354

**F.     Rules of Construction.**  The rules of construction provided in Section 102 of the Code shall apply to the words and phrases of the Plan.  Headings and captions are utilized in the Plan for convenient reference only and shall not constitute a part of the Plan for any other purpose.

**G.     Exhibits.**  All exhibits attached to this Disclosure Statement are, by this reference, hereby incorporated into the Disclosure Statement.

**H.     Exemption from Transfer Taxes.**  The Plan provides, pursuant to Section 1146(a) of the Code, the issuance, transfer, or exchange of notes or issuance of debt or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with

the Plan shall not be subject to any stamp, real estate transfer, mortgage recording, sales, or other similar tax, irrespective of whether the underlying property is owned by the Estate or a Third Party. All transactions specifically provided for by the Plan, including but not limited to sale(s) of Plan Assets administered by the Plan Administrator, shall be deemed to have been made under, in furtherance of, or in connection with the Plan and, therefore, shall not be subject to any stamp, real estate transfer, mortgage recording, sales, or other similar tax.

## CONCLUSION

The Debtor in Possession believes that the Plan of Reorganization is substantially in the best interest of creditors and the Estate and urges creditors to vote to accept the Plan.

DATED:  July 19, 2019

_Jeffery Edward Arambel_
Jeffery Edward Arambel

DATED:  July 19, 2019

MACDONALD FERNANDEZ LLP

By: _____
Matthew J. Olson,
Attorneys for Debtor in Possession,
JEFFERY EDWARD ARAMBEL

51

# EXHIBIT A

136

**MACDONALD | FERNANDEZ LLP**
IAIN A. MACDONALD (SBN 051073)
RENO F.R. FERNANDEZ III (SBN 251934)
MATTHEW J. OLSON (SBN 265908)
914 Thirteenth Street
Modesto, CA 95354
Telephone: (209) 521-8100
Facsimile: (415) 394-5544

Attorneys for Debtor in Possession,
JEFFERY EDWARD ARAMBEL

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: | Case No. 18-90029-E-11 |
| JEFFERY EDWARD ARAMBEL, | Chapter 11 |
| Debtor. | DCN: MF-40 |
| | <u>Confirmation Hearing:</u><br>Date: September 10, 2019<br>Time: 10:00 a.m.<br>Place: Courtroom 33<br>501 I Street, 6th Floor<br>Sacramento, California<br><br>Hon. Ronald H. Sargis |

**PROPOSED PLAN OF REORGANIZATION**
**(Dated July 19, 2019)**

COMES NOW Jeffery Edward Arambel, Debtor in Possession herein, and proposes this Plan of Reorganization pursuant to Chapter 11 of the United States Bankruptcy Code. This Plan constitutes a proposal to satisfy the Debts owing as of the time the Plan is confirmed by the Bankruptcy Court.

With this proposed Plan, Creditors are receiving a Disclosure Statement that has been approved by the Bankruptcy Court as containing adequate information to enable Creditors to make an informed judgment on whether to accept or reject the Plan. This Plan should be read in conjunction with the Disclosure Statement. The Disclosure Statement provides background information, analyzes the financial circumstances of the Debtor in Possession, and summarizes the

Plan. Once confirmed, the provisions of the Plan will legally bind the Debtor in Possession, the Estate, the Reorganizing Debtor, and Creditors regardless of whether such Creditors have filed Claims or have accepted or rejected the Plan. Creditors should thoroughly review the Plan and the Disclosure Statement before determining whether to accept or reject the Plan.

**ARTICLE I**
**DEFINITIONS**

For purposes of the Plan, the following terms shall have the meanings set forth below or in the body of this Plan. Any term used in the Plan that is not defined herein, but is defined in the Code or the Bankruptcy Rules, shall have the meaning assigned to such term in the Code or the Bankruptcy Rules.

**1.1** "Administrative Claim" means (a) a Claim for an expense of administration of the Estate arising during the period commencing on the Petition Date and ending on the Effective Date under Section 503(b) of the Code, which, if allowed, would be entitled to priority under Section 507(a)(2) of the Code, (b) Professional Fees, and (c) any U.S. Trustee Fees due as of the Effective Date.

**1.2** "Administrative Claims Bar Date" means, for Administrative Claims (other than Professional Fees and U.S. Trustee Fees), as applicable, (a) the first Business Day that is thirty (30) days after the Effective Date, pursuant to which Creditors must file a motion requesting payment of any such Administrative Claim, for which notice shall be provided by the Reorganizing Debtor in the Notice of Effective Date; or (b) any earlier date by which Creditors must file a motion requesting payment of any such Administrative Claim, pursuant to a prior order of the Bankruptcy Court.

**1.3** "Administrative Claims Bar Date Order" means, for all Administrative Claims, as applicable, (a) the Confirmation Order or (b) any prior order of the Bankruptcy Court establishing an Administrative Claims Bar Date.

**1.4** "Administrative Fund" means the reserve established in a Plan Account for fees and expenses of the Plan Administrator and the Post-Confirmation Professionals retained by the Plan Administrator, which reserve shall be in an amount sufficient to fund all initially budgeted fees and

expenses of the Plan Administrator and the Post-Confirmation Professionals retained by the Plan Administrator, as set forth on the initial Plan Budget.

**1.5** "<u>Allowed Claim</u>" means, with respect to any Claim (other than an Administrative Claim as set forth below): (a) a Claim against the Estate to the extent that a proof of Claim was timely filed as of the Bar Date or the Rejection Claim Bar Date, as applicable, or tardily filed as to which the Debtor in Possession has not objected, but only if such Claim is not a Disputed Claim, (b) a Claim that appears in the Schedules and has not already been paid, but only if such Claim is not a Disputed Claim or superseded by a subsequent corresponding filed proof of Claim, pursuant to Bankruptcy Rule 3003(c)(4), or (c) a Claim that has been allowed, but only to the extent allowed by (i) a Final Order, (ii) under this Plan, or (iii) under any agreements entered into on or prior to the Effective Date (and approved by the Bankruptcy Court) or in connection with this Plan (and approved in accordance with the terms of this Plan) establishing the amount and nature of any Claim. "<u>Allowed Claim</u>" means, with respect to Administrative Claims (other than Professional Fees and U.S. Trustee Fees), an Administrative Claim for which a motion requesting payment has been filed prior to the Administrative Claims Bar Date in accordance with either Section 503(b) of the Bankruptcy Code or the procedures for filing requests for payment of an Administrative Claim set forth in the Administrative Claims Bar Date Order but only if such Administrative Claim is not a Disputed Claim.

**1.6** "<u>Allowed Secured Claim</u>" means an Allowed Claim secured by a valid, perfected, and enforceable lien, security interest, or other charge against Property of the Estate that is not subject to avoidance under bankruptcy or non-bankruptcy law, or which is subject to setoff under Section 553 of the Code, to the extent of the value (determined in accordance with Section 506(a) of the Code) of the interest of such Allowed Secured Claim in the Property of the Estate or to the extent of the amount subject to setoff, as the case may be.

**1.7** "<u>American AgCredit</u>" has the meaning set forth in Section 4.5 of this Plan.

**1.8** "<u>Arambel Business Park</u>" means the Property of the Estate – both real and personal – commonly known, and referred to in this Case, as the "Arambel Business Park" as more particularly described, without limitation, on Exhibit "2" hereto.

**1.9** "<u>Available Cash</u>" means, with respect to any Distribution by the Plan Administrator contemplated herein, the aggregate amount of all cash on deposit in Plan Accounts determined by the Plan Administrator to be available for Distribution under the Plan at the time of any such Distribution. Available Cash shall include any Plan Funding Sources, other than the Filbin Available Cash, the Other Cash Collateral, and the Plan Funding Loans.

**1.10** "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Eastern District of California or in the event such court ceases to exercise jurisdiction over the Case, such court or adjunct thereof which thereafter exercises jurisdiction over the Case.

**1.11** "<u>Bankruptcy Rule(s)</u>" means the Federal Rules of Bankruptcy Procedure and any amendments thereof.

**1.12** "<u>Bar Date</u>" means May 16, 2018, as to Claims arising before the Petition Date held by entities other than governmental units, and means July 16, 2018, as to Claims arising before the Petition Date held by governmental units, such dates being the last day for timely filing proofs of such Claims.

**1.13** "<u>Business Day</u>" shall mean any day that is not a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)) in Modesto, California.

**1.14** "<u>Case</u>" means the Debtor in Possession's bankruptcy case (Case Number 18-90029-E-11) filed in the Bankruptcy Court.

**1.15** "<u>Cazale Creditors</u>" means the Trustees of the Cazale Family Trust, the Trustees of the Cazale Revocable Trust, and the Trustees of the Josephine Cazale Trust dated October 6, 1998.

**1.16** "<u>Cazale Ranch</u>" means that certain real property located in Stanislaus County, California, east of Interstate 5 and north of Del Puerto Canyon Road and bearing APNs 021-010-006 and 021-021-001 consisting of approximately 1,285.37 acres of land.

**1.17** "<u>Claim</u>" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, as defined in Section 101(5) of the Code.

**1.18** "<u>Class</u>" means a class of Claims or Equity Interests as defined in Article IV of this Plan.

**1.19** "<u>Code</u>" means the United States Bankruptcy Code, 11 U.S.C. Section 101, *et seq.*, and any amendments thereof.

**1.20** "<u>Confirmation</u>" means entry of the Confirmation Order.

**1.21** "<u>Confirmation Date</u>" means the date of entry of the Confirmation Order on the Bankruptcy Court's docket with the meaning of Bankruptcy Rule 5003.

**1.22** "<u>Confirmation Order</u>" means the order of the Court, as entered, confirming this Plan pursuant to Section 1129 of the Code.

**1.23** "<u>Creditor</u>" means the holder of a Claim, as defined in Section 101(10) of the Code.

**1.24** "<u>Debt</u>" means liability on a Claim, as defined in Section 101(12) of the Code.

**1.25** "<u>Debtor in Possession</u>" means Jeffery Edward Arambel.

**1.26** "<u>Disclosure Statement</u>" means the Disclosure Statement in support of the Plan in the form approved by the Bankruptcy Court, as may be amended, modified, or supplemented in accordance with the Code or order of the Bankruptcy Court.

**1.27** "<u>Disputed Claim(s)</u>" means a Claim against the Estate (a) which has been included in the Schedules as disputed, contingent, or unliquidated or (b) which has been objected to by the Debtor in Possession, Reorganizing Debtor, or another party in interest in the form of an objection filed with the Bankruptcy Court and which objection has not been withdrawn or resolved by the entry of a Final Order.

**1.28** "<u>Distribution</u>" means cash or non-cash disbursements made pursuant to the Plan.

**1.29** "<u>Effective Date</u>" means the first Business Day after the fourteenth (14th) day following the entry of the Confirmation Order, provided no order of stay of Confirmation has been entered as of that date; if an order of stay is entered, the "<u>Effective Date</u>" shall mean the next Business Day after the day the order of stay expires or the Confirmation Order becomes a Final Order, whichever comes first.

**1.30** "<u>Equity Interests</u>" means the interest of the Debtor in Possession in Property of the Estate.

**1.31** "<u>Estate</u>" means the bankruptcy estate of the Debtor in Possession created pursuant to Section 541(a) of the Code.

**1.32** "<u>Executory Contract</u>" means executory contracts and unexpired leases within the meaning of Section 365 of the Code.

**1.33** "<u>Face Amount</u>" means (a) when used in reference to a Disputed Claim, the full stated liquidated amount set forth in the Schedules or, as applicable, claimed by the Creditor holding such Claim in any proof of Claim filed with the Bankruptcy Court and (b) when used in reference to an Allowed Claim, the allowed amount of such Claim.

**1.34** "<u>Farm Assets</u>" means Property of the Estate, other than the Arambel Business Park and the Personal Assets, that are to be, on and after the Effective Date (until the Termination Date), managed and controlled by the Reorganizing Debtor utilizing funds from the Reorganizing Debtor Farm Expense Account (subject to the limitations contained in this Plan such as those in Section 7.4.1 hereof).

**1.35** "<u>Farm Expense Budget</u>" means (a) the initial budget for the sixteen-month period following the Effective Date, setting forth in reasonable detail the anticipated expenses associated with maintaining, managing and controlling the Farm Assets and payment of Post-Confirmation Professionals retained by the Reorganizing Debtor, together with any amendments or modifications thereto, as prepared by the Plan Administrator and approved by the Oversight Committee; and (b) any budget for a subsequent period, setting forth in reasonable detail the additional anticipated expenses associated with maintaining, managing and controlling the Farm Assets and payment of Post-Confirmation Professionals retained by the Reorganizing Debtor, together with any amendments or modifications thereto, as prepared by the Plan Administrator and approved by the Oversight Committee.

**1.36** "<u>Federal Judgment Rate</u>" means the federal judgment interest rate as of the Friday before the Petition Date pursuant to 28 U.S.C. § 1961 (*i.e.* 1.78% per annum).

**1.37** "<u>Filbin Available Cash</u>" means cash in an aggregate amount of up to the Filbin Maximum Cash Amount from the Summit Reserve (as defined in the Filbin Plan of Reorganization) directed by Summit, pursuant to Section 2.5 of the Filbin Plan of Reorganization, to be used by the Reorganizing Debtor and the Plan Administrator, as applicable, in accordance with the terms of this Plan.

**1.38** "<u>Filbin Bankruptcy Case</u>" means the chapter 11 bankruptcy case of Filbin Land & Cattle Co., Inc. filed in the Bankruptcy Court (Case Number 18-90030).

**1.39** "<u>Filbin Confirmation Order</u>" means that certain Order Confirming Plan of Reorganization entered by the Bankruptcy Court on March 18, 2019 in the Filbin Bankruptcy Case at Docket No. 430.

**1.40** "<u>Filbin Maximum Cash Amount</u>" means (a) $1,000,000.00 or (b) such greater amount as Summit may determine in its sole and absolute discretion.

**1.41** "<u>Filbin Plan of Reorganization</u>" means that certain First Amended Plan of Reorganization, dated January 10, 2019, filed in the Filbin Bankruptcy Case at Docket No. 398 and confirmed by the Bankruptcy Court pursuant to the Filbin Confirmation Order.

**1.42** "<u>Final Decree</u>" means the decree contemplated under Bankruptcy Rule 3022.

**1.43** "<u>Final Order</u>" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction as to which (a) any appeal or petition for rehearing, reconsideration, or certiorari that has been filed timely has been finally determined or dismissed or (b) the relevant time for such appeal or such petition has expired and a notice of appeal or petition has not been filed timely.

**1.44** "<u>Focus</u>" has the meaning set forth in Section 7.3.1 of this Plan.

**1.45** "<u>Impaired Class</u>" means a Class of Claims whose treatment under the Plan is impaired within the meaning of Section 1124 of the Code.

**1.46** "<u>LBA</u>" has the meaning set forth in Section 4.4 of this Plan.

**1.47** "<u>Loan Documents</u>" has the meaning given to such term in the applicable Plan Credit Agreement.

**1.48** "<u>Material Default</u>" has the meaning set forth in Sections 6.1.1, 6.1.2, 7.7.6, 11.3 and 12.3 of this Plan.

**1.49** "<u>MetLife</u>" means Metropolitan Life Insurance Company, its successors and assigns.

**1.50** "<u>MetLife Loan Documents</u>" has the meaning set forth in Section 6.1.1 of this Plan.

**1.51** "<u>MOR</u>" means a monthly operating report in the same form as filed by the Debtor in Possession with the Bankruptcy Court prior to the Effective Date.

**1.52** "<u>Notice of Effective Date</u>" shall mean the notice filed and served by the Reorganizing Debtor on all parties-in-interest, pursuant to Section 7.17 of this Plan.

**1.53** "<u>Other Cash Collateral</u>" means cash collateral (as defined by Section 363(a) of the Code) made available to the Reorganizing Debtor by Summit prior to or after the Effective Date, pursuant to a written cash collateral stipulation agreed to by Summit, which cash collateral is subject to the Allowed Secured Claim of Summit.

**1.54** "<u>Oversight Committee</u>" means the committee formed by Section 7.5 of this Plan to oversee the Plan Administrator's performance of its duties and responsibilities under the Plan.

**1.55** "<u>Personal Assets</u>" means Property of the Estate described on Exhibit "1" hereto that is to be, on and after the Effective, managed and controlled by the Reorganizing Debtor utilizing funds from the Reorganizing Debtor Personal Expense Account (subject to the limitations contained in this Plan such as those in Section 7.4.4 hereof).

**1.56** "<u>Personal Expense Budget</u>" means the (a) the initial budget for the sixteen-month period following the Effective Date, setting forth in reasonable detail the anticipated personal expenses of the Reorganizing Debtor related to the Personal Assets, together with any amendments or modifications thereto, as prepared by the Reorganizing Debtor and approved by the Oversight Committee; and (b) any budget for a subsequent period, setting forth in reasonable detail the additional anticipated personal expenses of the Reorganizing Debtor related to the Personal Assets, together with any amendments or modifications thereto, as prepared by the Reorganizing Debtor and approved by the Oversight Committee.

**1.57** "<u>Petition Date</u>" means January 17, 2018, the date upon which the Debtor in Possession filed a petition commencing what is now the Case.

**1.58** "<u>Plan</u>" means this Plan of Reorganization as it may be amended, modified or supplemented in accordance with its terms or order of the Bankruptcy Court.

**1.59** "<u>Plan Accounts</u>" has the meaning set forth in Section 7.3.3 of this Plan.

**1.60** "<u>Plan Administration Budget</u>" means (a) the initial budget for the sixteen-month period following the Effective Date, setting forth in reasonable detail the anticipated expenses of administration of the Plan (including fees and expenses of the Plan Administrator and the Post-

Confirmation Professionals retained by the Plan Administrator, but excluding the amounts set forth in the Farm Expense Budget and the Personal Expenses Budget), together with any amendments or modifications thereto, as prepared by the Plan Administrator and approved by the Oversight Committee; and (b) any budget for a subsequent period, setting forth in reasonable detail the additional anticipated expenses of administration of the Plan (including fees and expenses of the Plan Administrator and the Post-Confirmation Professionals retained by the Plan Administrator, but excluding the amounts set forth in the Farm Expense Budget and the Personal Expenses Budget), together with any amendments or modifications thereto, as prepared by the Plan Administrator and approved by the Oversight Committee.

**1.61** "Plan Administrator" means the individual or entity appointed under Section 7.3.1 of the Plan, including any duly appointed successor.

**1.62** "Plan Assets" means the Arambel Business Park and the Farm Assets.

**1.63** "Plan Budget" means, collectively, the Plan Administration Budget and the Farm Expense Budget.

**1.64** "Plan Credit Agreement" means, as applicable, (a) that certain Junior Secured Loan and Security Agreement, dated on or about the Effective Date, entered into by and between the Estate and Summit, in its capacity as a Plan Funding Lender, as amended or otherwise modified from time to time; or (b) the MetLife Loan Documents with respect to advances made by MetLife after the Effective Date in its capacity as a Plan Funding Lender, as amended or otherwise modified from time to time.

**1.65** "Plan Expenses" shall mean (a) all actual and necessary costs and expenses incurred after the Effective Date in connection with the administration of the Plan, including taxes, (b) all fees and expenses of the Plan Administrator and the Post-Confirmation Professionals, and (c) any U.S. Trustee Fees due after the Effective Date.

**1.66** "Plan Funding Cash Collateral" means cash collateral (as defined by Section 363(a) of the Code) in an aggregate amount of up to the Plan Funding Maximum Cash Amount to be made available to the Reorganizing Debtor, pursuant to the terms and conditions of the Cash Collateral Fund (as defined in the Plan Credit Agreement) established under the Plan Credit Agreement entered

into with Summit, in its capacity as a Plan Funding Lender, which cash collateral is subject to the Allowed Secured Claim of Summit and the Plan Funding Claim of Summit.

**1.67** "<u>Plan Funding Claim</u>" means, collectively, a right to payment on account of Claims arising under the Plan Credit Agreement or any other Claim of a Plan Funding Lender under the Plan Credit Agreement and related Loan Documents.

**1.68** "<u>Plan Funding Lender</u>" means, as applicable, (a) Summit in its capacity as the lender under its Plan Credit Agreement; and/or (b) MetLife in its capacity as the lender under its Plan Credit Agreement.  Upon repayment in full of a Plan Funding Lender's Plan Funding Claims and Allowed Secured Claims, such Creditor shall cease to be a Plan Funding Lender under this Plan.

**1.69** "<u>Plan Funding Loans</u>" means loans or advances made under the Plan Credit Agreement in an aggregate amount not to exceed the Plan Funding Loans Maximum Amount.

**1.70** "<u>Plan Funding Loans Maximum Amount</u>" means (a) with respect to the Plan Credit Agreement entered into with Summit, in its capacity as a Plan Funding Lender, (i) $1,000,000.00 or (ii) such greater amount as Summit, in its capacity as a Plan Funding Lender, may agree to in its sole and absolute discretion; and (b) with respect to the Plan Credit Agreement entered into with MetLife, in its capacity as a Plan Funding Lender, $1,000,000.00.

**1.71** "<u>Plan Funding Maximum Cash Amount</u>" means $3,500,000.00.

**1.72** "<u>Plan Funding Sources</u>" means, collectively, (a) subject to the Plan Budget and the Personal Expense Budget, as applicable, the Filbin Available Cash, the Other Cash Collateral, and the Plan Funding Loans; (b) the unencumbered Proceeds; and (c) if and to the extent necessary, as determined by the Plan Administrator, the Plan Funding Cash Collateral.

**1.73** "<u>Post-Confirmation Professional</u>" means any and all attorneys, accountants, financial advisors, and other professionals employed or retained by the Reorganizing Debtor and the Plan Administrator pursuant to the Plan after the Effective Date, including, without limitation, any Professionals deemed to have been retained pursuant to the terms of this Plan that were previously retained by the Estate prior to the Effective Date.  Any and all Post-Confirmation Professionals of the Plan Administrator shall be employed by the Plan Administrator, in its capacity as such, pursuant to this Plan, in its discretion, and shall not be subject to retention by the Bankruptcy Court or the

retention and fee application process, provided under, *inter alia*, Sections 327 and 331 of the Code (but rather shall be subject to the provisions of Article IX hereof).

**1.74** "Post-Confirmation Service List" means a service list comprised of the names and email addresses for (a) all Creditors holding Claims in Classes 1 and 2, (b) the Creditors holding the five (5) largest Claims in Class 6 as of the Effective Date, (c) each member of the Oversight Committee, (d) the Reorganizing Debtor, (e) the Plan Administrator, (f) the Office of the United States Trustee, (g) any other Creditor or party in interest that files with the Bankruptcy Court a request for post-Confirmation notice after the Effective Date and serves it on all parties on the Post-Confirmation Service List; provided, however, that any Creditor or party in interest may be removed from the Post-Confirmation Service List with their consent or by order of the Bankruptcy Court on notice to the then-constituted Post-Confirmation Service List upon a showing that such Creditor or such party no longer holds a Claim or has an interest in the Case.

**1.75** "Priority Claim" means any Claim entitled to priority in payment under Section 507 of the Code, except for Administrative Claims and Tax Claims.

**1.76** "Pro Rata" means the proportion that the Face Amount of a Claim in a particular Class bears to the aggregate Face Amount of all Claims (including Disputed Claims, if any) in such Class, unless the Plan provides otherwise.

**1.77** "Proceeds" means all funds received from the monetization of the Plan Assets.

**1.78** "Professionals" means those attorneys, accountants, and other financial advisors employed by the Estate, pursuant to Sections 327 or 328 of the Code, in the Case and to be compensated for services rendered and reimbursed for expenses incurred, pursuant to Sections 330(a) and 503(b) of the Code, but shall not include Post-Confirmation Professionals.

**1.79** "Professional Fees" means all Claims for compensation for services rendered and reimbursement of expenses incurred by Professionals during the period commencing on the Petition Date and ending on the Effective Date.

**1.80** "Property of the Estate" has the meaning provided by Section 541 of the Code.

**1.81** "Rejected Contract(s)" means those Executory Contracts which are rejected by the Estate pursuant to Sections 365 or 1123(b)(2) of the Code.

**1.82** "<u>Rejection Claim</u>" means any Claim under Section 502(g) of the Code that arises under Section 365(g)(1) of the Code in favor of the Third Party to any Executory Contract that is a Rejected Contract.

**1.83** "<u>Rejection Claim Bar Date</u>" means, for Rejection Claims, the earlier of (a) the first Business Day that is thirty (30) days after the Effective Date, pursuant to which Creditors must file a proof of any Rejection Claims, for which notice shall be provided by the Reorganizing Debtor in the Notice of Effective Date or (b) such other date established by the Bankruptcy Court by which Third Parties asserting a Rejection Claim must have filed a proof of Claim.

**1.84** "<u>Reorganizing Debtor</u>" means Jeffery Edward Arambel on and after the Effective Date.

**1.85** "<u>Reorganizing Debtor Farm Expense Account</u>" means the bank account to be used by the Reorganizing Debtor for payment of costs and expenses in the Farm Expense Budget.

**1.86** "<u>Reorganizing Debtor Monthly Reporting</u>" means the following information: (a) a report of receipts and disbursements for all bank accounts of the Reorganizing Debtor, in the format of a MOR; (b) copies of all bank statements; (c) copies of all bank reconciliations; (d) an accounts payable aging report; (e) a report on the status of tax filings, including proof of payment of payroll taxes, proof of payment of sales taxes, if applicable, and status of IRS tax returns currently unfiled or requiring adjustment; and (f) any and all additional information requested by the Plan Administrator. The Reorganizing Debtor Monthly Reporting shall also include a monthly sale status report for the Plan Assets, listing each parcel of real estate, the interested parties, the status of the sale efforts, and pertinent information (such as number of acres, zoning, entitlements requested and/or approved, annual taxes, insurance, etc.).

**1.87** "<u>Reorganizing Debtor Personal Expense Account</u>" means the bank account to be used by the Reorganizing Debtor for payment of costs and expenses in the Personal Expense Budget.

**1.88** "<u>Reorganizing Debtor Weekly Reporting</u>" means the following information: (a) print outs of deposit account activity from all banks of the Reorganizing Debtor, showing all transactions posted for the week; (b) a check register showing all checks written or payments made during the week; (c) copies of all outstanding invoices; (d) an accounts payable aging; (e) copies of any

agreements or work orders entered into during the week; and (f) any and all additional information requested by the Plan Administrator.

**1.89** "Replacement Liens" has the meaning set forth in Section 7.7.3 of this Plan.

**1.90** "Secured Claim" means a Claim secured by a lien, security interest, or other charge against or interest in collateral, or that is subject to setoff under Section 553 of the Code, to the extent of the value of the interest of the holder of such Claim in the Debtor in Possession's interest in such property, or to the extent of the amount subject to setoff, as the case may be.

**1.91** "Schedules" means the schedules of assets and liabilities, schedules of executory contracts, and the statement of financial affairs filed by the Debtor in Possession with the Bankruptcy Court pursuant to Section 521 of the Code and Bankruptcy Rule 1007, as amended and supplemented from time to time.

**1.92** "Summit" means SBN V Ag I LLC, a Delaware limited liability company.

**1.93** "Summit Loan Documents" has the meaning set forth in Section 6.1.2 of this Plan.

**1.94** "Tax Claim" means a Claim entitled to priority treatment pursuant to Section 507(a)(8) of the Code.

**1.95** "Termination Date" has the meaning set forth in Section 7.4.1 of this Plan.

**1.96** "Third Party" means any person or entity that is not the Debtor in Possession or the Reorganizing Debtor.

**1.97** "Unimpaired Class" means a Class of Claims which is unimpaired under the Plan within the meaning of Section 1124 of the Code.

**1.98** "Unsecured Claim" means a Claim that is not a Secured Claim, Priority Claim, Tax Claim, or Administrative Claim.

**1.99** "U.S. Trustee Fees" means any and all fees and charges due to the United States Trustee pursuant to 28 U.S.C. § 1930.

## ARTICLE II
## GENERAL TERMS AND CONDITIONS

The following general terms and conditions apply to this Plan. Pursuant to Section 1123 of the Code, Article IV of the Plan designates Classes of Claims and Equity Interests. As set forth

13

below, and in accordance with Section 1123(a)(1) of the Code, Administrative Claims, Tax Claims, and other Priority Claims have not been classified and are excluded from the Classes set forth in Article IV of this Plan.  A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of the Claim qualifies within the description of such different Class.  A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim or an Allowed Secured Claim in that Class.  Except to the extent otherwise provided by the Plan, multiple Claims of a Creditor which qualify for inclusion within the same Class shall be deemed aggregated and, if allowed, shall constitute a single Allowed Claim.

**ARTICLE III**
**ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS**

**3.1     Treatment of Administrative Claims**

The holders of Allowed Administrative Claims (other than Professional Fees and U.S. Trustee Fees) shall receive, on account of such Allowed Administrative Claims, cash in the amount of such Allowed Administrative Claims as soon as practicable after the date on which such Administrative Claim becomes an Allowed Administrative Claim or on the Effective Date, whichever is later, unless different treatment is agreed to by the holder of such Allowed Administrative Claim.  All such payments shall be made by use of the Plan Funding Sources (other than the Plan Funding Loans, unless such Administrative Claim constitutes a business expense as determined by the applicable Plan Funding Lender, in its sole and absolute discretion).  Except as may be expressly set forth in the Plan or an order of the Bankruptcy Court, no holder of such an Administrative Claim shall be entitled to payment on account of any postpetition interest or penalties arising with respect to such Administrative Claim.  In the event that a holder of such an Allowed Administrative Claim agrees to be paid such Allowed Administrative Claim on a date later than the date for payment provided by this Section 3.1 of the Plan, its Allowed Administrative Claim shall accrue and be paid simple interest at the Federal Judgment Rate.

/ / /

### 3.2    Administrative Claims Bar Date

All motions requesting payment of Administrative Claims (other than Professional Fees and U.S. Trustee Fees) must be filed on or before the Administrative Claim Bar Date or the holders thereof shall be forever barred from asserting such Administrative Claims against the Estate and from sharing in any Distribution under the Plan.

### 3.3    Treatment of Professional Fees

Professionals shall receive cash in the amount of the Professional Fees allowed and awarded by the Bankruptcy Court to such Professionals, pursuant to Sections 330(a) and 503(b) of the Code, upon the latter of (a) the Effective Date or (b) as soon as practicable after a Final Order is entered by the Bankruptcy Court approving such Professional Fees, unless any such Professional consents to other treatment.  All such payments shall be made by use of the Plan Funding Sources (other than the Plan Funding Loans, unless such Professional Fee constitutes a business expense as determined by the applicable Plan Funding Lender, in its sole and absolute discretion).  The Professional Fees are estimated to be as follows:

| Professional | Estimated Professional Fees |
|---|---|
| Macdonald Fernandez, LLP, General Bankruptcy Counsel (net of retainer and prior court-approved payments) | $382,000.00 |
| Arch & Beam Global, LLC, Financial Adviser (net of prior court-approved payments) | $323,000.00 |
| Bachecki, Crom & Co., LLP, Tax Accountants | $67,000.00 |
| Judith G. Callaway, CPA, Tax Preparer (net of retainer) | $5,000.00 |
| Business Debt Solutions, Inc., Loan Broker (net of prior court-approved payments) | $30,000.00 |
| Braun International Real Estate, Real Estate Appraisers | $19,500.00 |

### 3.4    U.S. Trustee Fees

All U.S. Trustee Fees payable through the Effective Date shall be paid in full on the Effective Date.  All such payments shall be made by use of the Plan Funding Sources (other than the Plan Funding Loans, unless such U.S. Trustee Fee constitutes a business expense as determined by the applicable Plan Funding Lender, in its sole and absolute discretion).

/ / /

### 3.5    Holders of Allowed Priority Tax Claims

Holders of Tax Claims that are Allowed Claims, if any, will be paid on account of such Claims either in accordance with Section 1129(a)(9)(C) of the Code or in full in cash as soon as practicable after the date on which such Tax Claim becomes an Allowed Claim or on the Effective Date, whichever is later, unless different treatment is agreed to by the holder of such Tax Claim. Payment of Tax Claims that are Allowed Claims shall include interest at the rate applicable under non-bankruptcy law.  All such payments shall be made by use of the Plan Funding Sources (other than the Plan Funding Loans, unless such Tax Claim constitutes a business expense as determined by the applicable Plan Funding Lender, in its sole and absolute discretion).  The estimated Tax Claims are as follows:

| Creditor | Basis of Claim | Estimated Amount of Claim |
|---|---|---|
| Employment Development Department | Payroll Taxes | $20,245.70 |

### 3.6    Holders of Other Unclassified Claims

The Debtor in Possession is unaware of any other unclassified Claims of persons or entities who may be entitled to an Administrative Claim, a Tax Claim, or a Priority Claim.  If there are any unknown Administrative Claims, Tax Claims, or Priority Claims that become Allowed Claims, then they will receive the same treatment as provided above in this Article, as appropriate to the type of each Claim.

**ARTICLE IV**
**CLASSIFICATION OF CLAIMS AND INTERESTS**

Claims and Equity Interests under the Plan are classified as follows:

### 4.1    Class 1—Secured Claims of Prepetition Lenders; Paid from Plan Assets

Class 1 consists of Secured Claims of prepetition lenders (except those treated in Classes 3 and 5 and any portions of such Secured Claims which are Unsecured Claims pursuant to Section 506 of the Code, which are treated in Class 6).  Each individual Secured Claim in Class 1 is an individual sub-Class of Class 1, to wit:

| Class | Name of Creditor | Estimated Amount of Claim | Interest Rate | Disputed? |
|---|---|---|---|---|
| 1(a) | MetLife | $6,655,067.15 | 16% (7.5% non-default) | No |
| 1(b) | Summit | $43,652,766.22 | 12% | No |
| 1(c) | Carolyn Dilday and Dan Stadtler, Successor Co-Trustees of the Philip N. Stadtler & Lois C. Stadtler Trust UAD 3/4/1994 | $1,722,954.70 | 5% | No |
| 1(d) | Dorothy M. Arnaud, et al. (POC 27) | $633,422.91 | 10% | Yes |
| 1(e) | Dorothy M. Arnaud, et al. (POC 26) | $2,328,909.29 | 10% | Yes |
| 1(f) | West Valley Agricultural Services, LLC | $3,610,488.70 | 4.75% | No |

Each Secured Claim in Class 1 not identified above as a Disputed Claim shall be an Allowed Secured Claim.

**4.2    Class 2—Secured Claims of Governmental Units**

Class 2 consists of the Secured Claim of the Stanislaus County Tax Collector in the amount of $308,233.27.  The Secured Claim in Class 2 shall be an Allowed Secured Claim.

**4.3    Class 3—Secured Claims of Prepetition Lenders; Defaults To Be Cured**

Class 3 consists of Secured Claims of prepetition lenders (except those treated in Classes 1 and 5 and any portions of such Secured Claims which are Unsecured Claims pursuant to Section 506 of the Code, which are treated in Class 6).  Each individual Secured Claim in Class 3 is an individual sub-Class of Class 3, to wit:

| Class | Name of Creditor | Estimated Amount of Claim | Amount of Arrears | Disputed? |
|---|---|---|---|---|
| 3(a) | Chase Bank, N.A. | $173,330.00 | $0.00 | No |
| 3(b) | U.S. Bank, N.A. | $784,961.69 | $25,192.60 | No |
| 3(c) | Westlake Financial Services[1] | $0.00 | $0.00 | No |

---

[1] This claim was paid in full by the co-borrower.

Each Secured Claim in Class 3 not identified above as a Disputed Claim shall be an Allowed Secured Claim.

### 4.4     Class 4—Claim of LBA RV-Company XXVII, LP

Class 4 consists of the Claim of LBA RV-Company XXVII, LP ("LBA") consisting of two sub-classes: (i) a Class 4(a) Secured Claim in the nature of a right of first refusal against certain parcels of real property which are part of the Arambel Business Park as more particularly described in the Disclosure Statement and (ii) a Class 4(b) Unsecured Claim consisting certain other and ancillary rights as identified in the Proof of Claim filed by LBA (Claim No. 12, Page 2 of Addendum, ¶¶ 14–16), including rights under a development agreement between LBA, the Debtor in Possession, and the City of Patterson and certain rights to indemnity and reimbursement from the Debtor in Possession.  The Estate's obligations to LBA for its Class 4(b) Unsecured Claim is contingent upon the events and occurrences described in the agreements between the Debtor in Possession and LBA, as attached to the Proof of Claim filed by LBA.  In addition, LBA and the Reorganizing Debtor each assert the right to receive $750,000 currently held in escrow by Commonwealth Land Title Company pursuant to prepetition joint escrow instructions executed by Jeffery Edward Arambel and LBA.  However, because that dispute is in the nature of whether or not the funds are Property of the Estate , LBA's asserted right to the funds held in escrow is not treated as part of its Claim but rather is addressed in Section 7.9 of this Plan.  The Secured Claim in Class 4(a) shall be an Allowed Secured Claim and the Unsecured Claim in Class 4(b) shall be an Allowed Unsecured Claim.

### 4.5     Class 5—Secured Claims Satisfied by Surrender of Collateral

Class 5 consists of Secured Claims of prepetition lenders (except those treated in Classes 1 and 3 and any portions of such Secured Claims which are Unsecured Claims pursuant to Section 506 of the Code, which are treated in Class 6).  Each individual Secured Claim in Class 5 is an individual sub-Class of Class 5, to wit:

/ / /

| Class | Name of Creditor | Estimated Amount of Claim | Collateral |
|---|---|---|---|
| 5(a) | American AgCredit, FLCA ("American AgCredit") | American AgCredit completed a non-judicial foreclosure of its collateral prior to the Effective Date. | |
| 5(b) | Cazale Creditors | $1,229,382.00 | Cazale Ranch |
| 5(c) | Irrigation Design & Construction (POC 15) | $277,860.25 | Cazale Ranch |

The Secured Claims in Class 5 shall be Allowed Secured Claims.

**4.6      Class 6—General Unsecured Claims**

Class 6 consists of general Unsecured Claims (except those listed in Class 7), any portions of the Secured Claims which are Unsecured Claims pursuant to Section 506 of the Code, and any Rejection Claims.  This Class includes any and all Claims not more particularly described in this Plan.  The Debtor in Possession estimates general Unsecured Claims, including disputed portions of those Claims, to total $6,830,303.59.[2]

| Name of Creditor | Estimated Amount of Claim | Disputed? |
|---|---|---|
| AT&T Mobility II LLC | $1,193.28 | No |
| Benjamin Lopez | $2,363,723.00 | Yes |
| Berliner Cohen, LLP | $56,828.15 | No |
| BPM LLP | $7,698.03 | No |
| Carolyn Dilday and Dan Stadtler, Successor Co-Trustees of the Phlip N. Stadtler & Lois C. Stadtler Trust UAD 3/4/1994 | $2,740,000.00 | No |
| Castello, Marion & Orr, a General Partnership | $28,571.80 | No |
| Colby Bell | $1,098.00 | No |
| Commercial Trade, Inc. | $174,940.93 | No |
| Creditors Bureau USA, Assignee for The Burchell Nursery | $76,828.19 | No |
| Dave Wilson Nursery | $248,209.60 | No |
| Dept. of Industrial Relations | $49,999.00 | Yes |

---

[2] The Claim of the El Che Corporation was scheduled as disputed, the El Che Corporation did not timely file a proof of Claim, and the El Che Corporation has not yet filed a proof of Claim.  Hence, the Claim is disallowed.  *See* Fed. R. Bankr. P. 3002(a), 3003(c)(2).

| | | |
|---|---:|---|
| Flory Industries, Inc. | $17,060.44 | No |
| Fred Frias Union Service | $5,804.04 | No |
| GDR Engineering Inc. | $36,947.50 | No |
| Giddings, Corby, Hynes, Inc. | $21,351.97 | No |
| Grower's Link | $96.071.15 | Yes |
| Howk Systems | $93,660.00 | No |
| Irrigation Design & Construction (POC 28) | $500,000.00 | Yes |
| Joe Di Anna Harvesting Inc. | $40,000.00 | No |
| PG&E | $153,853.32 | No |
| Pillsbury Winthrop Shaw Pittman LLP | $127,431.92 | No |
| Raymond V. Castello or Wanda Castello | $14,285.74 | No |
| Turlock Irrigation District | $3,466.00 | No |
| U.S. Bank N.A. dba Elan Financial Services | $11,485.47 | No |
| V. Alonzo, Inc. | $65,000.00 | No |

Each Unsecured Claim in Class 6 not identified above as a Disputed Claim shall be an Allowed Claim.

### 4.7     Class 7—Insider Claims

Class 7 consists of Claims that are held by insiders of the Debtor in Possession.  The Debtor in Possession identifies the insider Claims as follows:

| Name of Creditor | Estimated Amount of Claim | Disputed? |
|---|---:|---|
| Laura Arambel (Loan) | $451,619.00 | No |
| Laura Arambel (Seller Financing) | $1,017,880.00 | No |
| Laura Arambel, Trustee of the Credit Trust under the Harold and Laura Arambel Family Trust Dated December 16, 2005 (Sale of Jointly Owned Property) | $2,631,040.48 | No |
| Sherry Arambel | $125,150.00 | No |

Each Claim in Class 7 not identified above as a Disputed Claim shall be an Allowed Claim or an Allowed Secured Claim, as applicable.

### 4.8     Class 8—Equity Interests

Class 8 consists of the Equity Interests of the Debtor in Possession.

/ / /

## ARTICLE V
## IMPAIRMENT OF CLAIMS

The following Classes are Unimpaired Classes: Class 4, Class 5, and Class 8.  Pursuant to Section 1126(f) of the Code, Class 4 (including all subclasses), Class 5 (including all subclasses), and Class 8 are conclusively presumed to have accepted the Plan, and the votes of persons holding Claims in Classes 4, 5, and 8 will, therefore, not be solicited.

The following Classes are Impaired Classes: Class 1 (including all subclasses), Class 2, Class 3 (including all subclasses), Class 6, and Class 7. Holders of Claims in Impaired Classes should review this Plan carefully to determine the exact treatment of such Claim under this Plan.

If any Impaired Class fails to accept the Plan in accordance with Section 1129(a)(8) of the Code, the Debtor in Possession hereby requests confirmation of the Plan pursuant to Section 1129(b) of the Code on the basis that the Plan is fair and equitable and does not discriminate unfairly as to the holders of Claims in Class 1 (including all subclasses), Class 2, Class 3 (including all subclasses), and Class 6.

## ARTICLE VI
## TREATMENT OF CLAIMS AND INTERESTS

Each Class of Allowed Claims shall be treated as follows:

**6.1     Class 1—Secured Claims of Prepetition Lenders; Paid from Plan Assets**

Creditors holding Allowed Secured Claims in Class 1 will be paid from the Proceeds of the sale of the applicable Plan Assets securing such Claims, through the refinancing of the Plan Assets, from unencumbered Plan Assets, or a combination of any of the forgoing.  The Reorganizing Debtor shall use commercially reasonable efforts to cause Allowed Secured Claims in Class 1 to be paid in full as soon as practicable after the Effective Date.  Creditors in Class 1 shall retain their interest in their collateral until paid in full.

The Reorganizing Debtor reaffirms all obligations owed to Allowed Secured Claims in Class 1 pursuant to the loan documents attached to proofs of Claim filed by holders of Allowed Secured Claims in Class 1, including, without limitation, the amounts due to MetLife and Summit, and the liens and security interests granted to MetLife and Summit as well as their priority.  Nothing

in this Plan shall limit the rights of Creditors in Class 1 to make protective advances as permitted in their loan documents. Except as expressly provided otherwise in this Plan, Allowed Secured Claims in Class 1 shall continue to be governed and secured by the terms and conditions of the prepetition agreements applicable to such Allowed Secured Claims, including, without limitation, prepayment premiums, applicable interest rates, and payment of lender fees and expenses. The Reorganizing Debtor will not be required to make regularly scheduled principal and interest payments or any other payments under the prepetition agreements applicable to Allowed Secured Claims in Class 1 that come due after the Effective Date, *provided that* (a) nothing in this Plan shall be deemed to forgive or waive the amount of principal, interest, or other amounts due to such Creditors, (b) late fees, default interest, and other fees and costs incurred as a consequence of the failure to make such payments will continue to accrue and be added to each applicable Allowed Secured Claim as provided in the applicable prepetition agreements and allowed under applicable non-bankruptcy law (up to the value of the collateral securing such Allowed Secured Claims), and (c) nothing in this Plan shall be deemed to waive, forgive, or suspend the Reorganizing Debtor's other obligations under the applicable prepetition agreements (such as the duty to maintain collateral, pay property or other taxes, insure collateral, or pay over Proceeds of collateral).

Creditors holding Allowed Secured Claims in Class 1 shall not seek relief from the automatic stay to exercise their rights related to their collateral until the earlier of (a) the date that is sixteen months after the Effective Date or (b) the occurrence and continuance of a Material Default under the Plan.

The following additional terms will apply to specific Claims within Class 1:

### 6.1.1    Class 1(a)—Metropolitan Life Insurance Company

The Allowed Secured Claim of MetLife is secured by, among other things, the real property described in the Proof of Claim (Claim No. 22) filed by MetLife in this Case and the attachments and exhibits thereto. All payments to MetLife made after the Petition Date on account of sale of its collateral have been previously authorized by orders of the Bankruptcy Court. Any continuing "Event of Default" under the loan documents attached to MetLife's Proof of Claim (the "MetLife Loan Documents") first occurring after the Effective Date of this Plan shall be deemed to

be a Material Default under the Plan.  Nothing in this Plan, the Confirmation Order, or the Plan Credit Agreement will alter or modify the terms of the Intercreditor Agreement between MetLife and Summit (as attached to MetLife's Proof of Claim).  Notwithstanding any other provision of this Plan (including, without limitation, Section 12.4) if there is a Material Default under the Plan or upon the date that is sixteen months after the Effective Date, MetLife shall, without the requirement of further order of the Bankruptcy Court but immediately after a notice is filed with the Bankruptcy Court and served upon those parties on the Post-Confirmation Service List, be (a) deemed to have been granted relief from the automatic stay of Section 362 of the Code with respect to its collateral which forms part of the Plan Assets and from any injunction imposed by the Code or this Plan in this Case or in any subsequent bankruptcy case filed by or against the Debtor in Possession or the Reorganizing Debtor, or involving MetLife's collateral; and (b) entitled to exercise any rights or remedies available to MetLife under the MetLife Loan Documents and applicable law.

### 6.1.2   Class 1(b)—Summit

The Allowed Secured Claim of Summit is secured by, among other things, the real property described in the Proof of Claim (Claim No. 23-1) filed by Summit in this Case and the attachments and exhibits thereto.  All payments to Summit made after the Petition Date on account of sale of its collateral have been previously authorized by orders of the Bankruptcy Court.  Any continuing "Event of Default" under the loan documents attached to Summit's Proof of Claim (the "Summit Loan Documents") first occurring after the Effective Date shall be deemed to be a Material Default under the Plan.  Nothing in this Plan, the Confirmation Order, or the Plan Credit Agreement will alter or modify the terms of the Intercreditor Agreement between MetLife and Summit (as attached to MetLife's Proof of Claim).  Notwithstanding any other provision of this Plan (including, without limitation, Section 12.4) if there is a Material Default under the Plan or upon the date that is sixteen months after the Effective Date, Summit shall, without the requirement of further order of the Bankruptcy Court but after notice filed with the Bankruptcy Court and served upon those parties on the Post-Confirmation Service List, be (a) deemed to have been granted relief from the automatic stay of Section 362 of the Code with respect to its collateral which forms part of the Plan Assets and from any injunction imposed by the Code or this Plan in this Case or in any subsequent bankruptcy

case filed by or against the Debtor in Possession or the Reorganizing Debtor, or involving Summit's collateral; and (b) entitled to exercise any rights or remedies available to Summit under the Summit Loan Documents and applicable law.

**6.2    Class 2—Secured Claims of Governmental Units**

The Creditor holding the Allowed Secured Claim in Class 2 will be paid (a) if such Creditor votes in favor of the Plan, in full as soon as practicable after the Effective Date from the Proceeds of the sale of the applicable Plan Assets securing such Claim, through the refinancing of the Plan Assets, from unencumbered Plan Assets, or a combination of any of the forgoing; or (b) if such Creditor does not vote in favor of the Plan, regular installment payments satisfying the requirements of Section 1129(a)(9)(D) of the Code to be paid using the Plan Funding Sources (other than the Plan Funding Loans, unless such Allowed Secured Claim constitutes a business expense as determined by the applicable Plan Funding Lender, in its sole and absolute discretion).  The Creditor in Class 2 shall retain its interest in its collateral until paid in full and shall be entitled to receive payment pursuant to Section 7.8.2 of the Plan.

**6.3    Class 3—Secured Claims of Prepetition Lenders; Defaults To Be Cured**

Creditors holding Allowed Secured Claims in Class 3 will be paid (a) all arrears (including attorneys' fees and late charges) owed as of the Effective Date, which payments shall be made on the Effective Date by use of the Plan Funding Sources (other than the Plan Funding Loans), and (b) by making all regular monthly payments that become due after the Effective Date, which payments shall be made by use of the Plan Funding Sources (other than the Plan Funding Loans).  Allowed Secured Claims in Class 3 shall continue to be governed and secured by the terms and conditions of the prepetition loan documents applicable to such Allowed Secured Claims with such amendments as are mutually agreeable among the interested parties.  To the extent arrears as of the Effective Date are determined to be other than as shown in Section 4.3 of the Plan, appropriate adjustments will be made to the payment.  Creditors in Class 3 shall retain their interest in their collateral until paid in full.  Creditors in Class 3 shall not seek relief from the automatic stay to exercise their rights related to their collateral unless a Material Default has occurred under the Plan.

/ / /

**6.4     Class 4—Claim of LBA RV-Company XXVII, LP**

The Allowed Secured Claim in Class 4(a) of LBA is not modified by the Plan.  The Allowed Unsecured Claim in Class 4(b) of LBA is not modified by the Plan.

**6.5     Class 5—Secured Claims Satisfied by Surrender of Collateral**

**6.5.1     Class 5(a)—Secured Claim of American AgCredit, FLCA**

The Allowed Secured Claim in Class 5(a) of American AgCredit is not modified by the Plan and has been satisfied by American AgCredit's foreclosure upon its collateral.

**6.5.2     Class 5(b)—Secured Claim of the Cazale Creditors**

The Allowed Secured Claim in Class 5(b) of the Cazale Creditors is not modified by the Plan.  On the Effective Date, Cazale Creditors are granted relief from the automatic stay to commence nonjudicial foreclosure proceedings of their collateral in accordance with the applicable prepetition loan documents and applicable non-bankruptcy law, and to obtain possession of their collateral following sale in accordance with applicable non-bankruptcy law.  Upon the conclusion of any foreclosure proceedings by the Cazale Creditors, the Reorganizing Debtor shall voluntarily surrender his possession of any foreclosed collateral.  The Allowed Secured Claim in Class 5(b) of the Cazale Creditors shall be satisfied in full by their recovery on their collateral.

**6.5.3     Class 5(c)—Secured Claim of Irrigation Design & Construction (POC 15)**

The Allowed Secured Claim in Class 5(c) of Irrigation Design & Construction (POC 15) is not modified by the Plan.  Prior to the Effective Date, Irrigation Design & Construction obtained relief from the automatic stay to foreclose on its lien against its collateral.  Irrigation Design & Construction has commenced nonjudicial foreclosure proceedings under applicable non-bankruptcy law.  Confirmation of the Plan does not modify the effectiveness of the Court's pre-confirmation order granting Irrigation Design & Construction relief from the automatic stay.  Upon the conclusion of any foreclosure proceedings by Irrigation Design & Construction, the Reorganizing Debtor shall voluntarily surrender his possession of any foreclosed collateral.  The Allowed Secured Claim in Class 5(c) of Irrigation Design & Construction shall be satisfied in full by its recovery on its collateral.

/ / /

**6.6     Class 6—General Unsecured Claims**

Allowed Claims in Class 6 shall receive periodic Pro Rata Distributions up to the full amount their Allowed Claims, plus simple interest at the Federal Judgment Rate. Such periodic Pro Rata Distributions shall be made from the Proceeds of the sale of the Plan Assets, through the refinancing of the Plan Assets, from unencumbered Plan Assets, from the use of Plan Funding Cash Collateral determined by the Plan Administrator to be Available Cash, or a combination of any of the forgoing. The Reorganizing Debtor shall use commercially reasonable efforts to cause Allowed Claims in Class 6 to be paid in full as soon as practicable after the payment in full of Allowed Secured Claims in Classes 1 and 2; provided, however, that Summit, both for itself and in its capacity as a Plan Funding Lender, shall allow the Reorganizing Debtor to use Plan Funding Cash Collateral, to the extent determined by the Plan Administrator to be Available Cash, to fund such periodic payments prior to the repayment in full of Summit's Allowed Secured Claim in Class 1 and Summit's Plan Funding Claim. Pursuant to the terms and conditions of the Cash Collateral Fund (as defined in the Plan Credit Agreement with Summit), Plan Funding Cash Collateral shall be made available to the Reorganizing Debtor as follows: upon the consummation of any sale or refinance of Summit's collateral authorized by a Final Order of the Bankruptcy Court, the cash Proceeds of any such sale or refinance otherwise due to Summit (after payment of all Claims having priority over Summit) shall be distributed: (a) first, to Summit on account of its Allowed Secured Claim in Class 1 until Summit has received a total of $2,000,000.00 on account of such Allowed Secured Claim; and (b) second, 90% to Summit on account of its Allowed Secured Claim in Class 1 and 10% to fund the Cash Collateral Fund until the Cash Collateral Fund has been funded in full up to the Plan Funding Maximum Cash Amount.

**6.7     Class 7—Insider Claims**

Allowed Claims in Class 7 shall receive periodic Pro Rata Distributions up to the full amount their Allowed Claims, plus simple interest at the Federal Judgment Rate. Such periodic Pro Rata Distributions shall be made from the Proceeds of the sale of the Plan Assets, through the refinancing of the Plan Assets, from unencumbered Plan Assets, or a combination of any of the forgoing. The

Reorganizing Debtor shall use commercially reasonable efforts to cause Allowed Claims in Class 7 to be paid in full as soon as practicable after the payment in full of Allowed Claims in Class 6.

### 6.8    Class 8—Unimpaired Equity Interest

Because all Creditors will be paid in full under the Plan, the Reorganizing Debtor shall retain his Equity Interests, unimpaired by the Plan, subject to the provisions of Article VII.

### ARTICLE VII
### MEANS FOR EXECUTION OF THE PLAN

The Plan shall be implemented on the Effective Date.  In addition to the provisions set forth elsewhere in this Plan regarding means of execution, the following shall constitute the principal means for implementation of the Plan.

### 7.1    Effective Date Transactions

Without limiting the generality of the foregoing, and without altering or amending the terms of the Plan in any manner, on (or, where appropriate, after) the Effective Date, the following actions shall occur:

    (a)    The transactions contemplated under the Plan shall be consummated;

    (b)    The Plan Credit Agreement and all related Loan Documents with Summit, in its capacity as a Plan Funding Lender, shall be executed; and

    (c)    The Plan Administrator shall assume its assigned duties and responsibilities under the Plan.

All payments contemplated to be made on the Effective Date (a) from funds on deposit in the Reorganizing Debtor Farm Expense Account or the Reorganizing Debtor Personal Expense Account, shall be made by the Reorganizing Debtor, provided, however, that if the Reorganizing Debtor fails to make such payments on the Effective Date, the Reorganizing Debtor shall transfer the funds necessary to make such payments to Plan Accounts and the Plan Administrator shall make such payments; and (b) from funds on deposit in Plan Accounts shall be made by the Plan Administrator.

/ / /

**7.2**     **Revesting of Property of the Estate**

**7.2.1**    **Property of the Estate Does Not Revest on the Effective Date**

The Reorganizing Debtor shall not be revested with the Property of the Estate on the Effective Date of the Plan. Accordingly, among other things, the automatic stay pursuant to Section 362 of the Code shall remain in effect with respect to Property of the Estate following the Effective Date of the Plan, except to the extent otherwise provided by the Plan, until such time as (a) such property is no longer Property of the Estate; (b) relief from stay is granted by Final Order of the Bankruptcy Court, or (c) the Bankruptcy Court enters a Final Decree and the Case is closed.

**7.2.2**    **Revesting of Property Upon Entry of Final Decree**

Upon entry of the Final Decree, except as otherwise provided in the Plan, the Reorganizing Debtor shall be revested with all property still held or owned by the Estate that was formerly Property of the Estate (including, without limitation, all remaining Claims belonging to Debtor in Possession or the Estate) free and clear of all liens, Claims, and interests, except as expressly provided by the Plan.

**7.3**     **Plan Administrator**

**7.3.1**    **Appointment of Plan Administrator**

Pursuant to Section 1142 of the Code, a Plan Administrator is hereby appointed to manage its specifically assigned duties and responsibilities under this Plan and administer all of the Plan Assets (other than the Farm Assets prior to the Termination Date) and the Proceeds, as a fiduciary of the Estate, and, subject to the specific provisions of this Plan and, except as expressly provided herein, shall have the authority to exercise all of the rights and powers of a debtor in possession granted pursuant to Section 1107 of the Code in connection with managing such duties and responsibilities and administering the Plan Assets (other than the Farm Assets prior to the Termination Date) and the Proceeds. In addition, the Plan Administrator shall have such other and further authority and powers as are set forth in this Plan and the Confirmation Order. The Plan Administrator, to the extent required to perform its duties and responsibilities, is hereby granted a power of attorney by the Reorganizing Debtor, revocable only upon entry of an order of the

Bankruptcy Court so directing, to execute such documents and perform such acts on behalf of the Reorganizing Debtor or the Estate as contemplated by this Plan.

Focus Management Group USA, Inc. ("Focus") is hereby appointed as the initial Plan Administrator. The appointment of Focus (or any successor to Focus) as the Plan Administrator may only be terminated: (a) by unanimous consent of the Reorganizing Debtor and the Oversight Committee; (b) "for cause" by order of the Bankruptcy Court, after a motion initiated by the Reorganizing Debtor or the Oversight Committee; (c) upon completion of its duties and responsibilities under the Plan; or (d) by the Plan Administrator providing notice of its intention to terminate its appointment to the Creditors and parties in interest on the Post-Confirmation Service List, provided, however, that, so long as there are funds in the Estate available (or made available) to pay any fees and costs incurred by the Plan Administrator, such termination pursuant to this clause (d) shall not be effective until a successor Plan Administrator shall have been appointed in accordance with the next sentence of this Section 7.3.1. In the event of a termination in the position of the Plan Administrator, a successor Plan Administrator shall be appointed by: (a) unanimous consent of the Reorganizing Debtor and the Oversight Committee, subject to the approval of the Bankruptcy Court; or (b) by order of the Bankruptcy Court after a motion initiated by the Reorganizing Debtor, the Oversight Committee, or the Plan Administrator.

### 7.3.2   Duties of Plan Administrator

On and after the Effective Date, the Plan Administrator shall be responsible for implementation of the Plan and the administration of the Plan Assets (other than the Farm Assets prior to the Termination Date). In carrying out its duties and responsibilities, the Plan Administrator shall exercise prudent business judgment and shall be a fiduciary of the Estate. Subject to the foregoing, the Plan Administrator shall use commercially reasonable efforts to (a) maximize Proceeds from the Plan Assets in order to implement the Plan; (b) maintain, preserve, or realize value of the Plan Assets for Creditors holding Allowed Claims; and (c) maintain, preserve, or realize the value of the Equity Interests of the Reorganizing Debtor in the Plan Assets. To the extent practicable, the Plan Administrator shall maintain books and records related to the Plan Assets, the Proceeds, and the Distributions made under the Plan pursuant to the Plan.

### 7.3.3    Specific Powers and Authority of Plan Administrators

The Plan Administrator shall be specifically empowered and authorized to do the following on behalf of the Reorganizing Debtor or, as applicable, the Estate:

(a) Execute, enter into, and perform under the Plan Credit Agreement and any related Loan Documents and request, incur, borrow, and expend Plan Funding Loans under and pursuant to the Plan Budget and other terms and conditions of the Plan Credit Agreement and other Loan Documents;

(b) Execute, enter into, and perform contracts, agreements, and other documents of all kinds related to the Plan Assets, and enter into business transactions outside the ordinary course of business related to the Plan Assets;

(c) Employ or retain Post-Confirmation Professionals of the Plan Administrator;

(d) Bring and defend actions in law or at equity related to the Plan Assets or the Proceeds, including, without limitation, filing motions with the Bankruptcy Court related to the Plan Assets or the Proceeds;

(e) Purchase liability and other insurance to protect the Plan Assets, the Plan Administrator and the other representatives or agents of the Estate;

(f) Open, maintain, manage, and close deposit accounts related to the Plan Assets and their Proceeds in the name of Estate or in the name of the Plan Administrator, in its capacity as such, provided that the Plan Administrator shall maintain control of such accounts ("Plan Accounts");

(g) Incur and pay or reimburse Plan Expenses related to the Plan Assets, the administration thereof by the Plan Administrator, or the Plan Administrator performing its duties and responsibilities under the Plan, as provided for in the Plan;

(h) Bring and defend objections to Claims; provided however, that the Plan Administrator and the Reorganizing Debtor, as applicable, will not object

to Unsecured Claims (including insider Claims) unless and until it is apparent that there is Available Cash to make Distributions on account of Unsecured Claims;

(i) Prepare or cause to be prepared all income tax returns and other returns for taxes for the Estate, and pay or cause to be paid all income taxes or other taxes of the Estate from the Plan Funding Sources;

(j) Make or cause to be made Distributions to Allowed Secured Claims and Allowed Claims in Classes 1, 2, and 6, pursuant to Sections 6.1, 6.2, and 6.6 of the Plan and the other terms of the Plan; and

(k) Do and perform all other acts as may be necessary or appropriate to performance of the Plan Administrator's duties and responsibilities under the Plan;

provided, however, that (i) the final disposition of any Plan Asset constituting real property, whether by sale, refinancing, abandonment, or otherwise, thereof shall require an order of the Bankruptcy Court approving such final disposition and such terms after a motion initiated by the Plan Administrator; and (ii) the foregoing shall not limit the rights and authority of the Reorganizing Debtor with regard to the Farm Assets prior to the Termination Date.

### 7.3.4   Information Sharing

The Reorganizing Debtor shall deliver to the Plan Administrator such financial and other information concerning the business and affairs of the Plan Assets as the Plan Administrator shall reasonably request from time to time.  Upon written request from the Plan Administrator, the Reorganizing Debtor shall deliver to the Plan Administrator evidence, satisfactory to the Plan Administrator, that the Plan Assets (including, without limitation, real property assets) are insured for the full replacement value thereof and that all insurance is maintained in full force and effect. The Reorganizing Debtor consents and hereby permits the Plan Administrator and any authorized representatives designated by the Plan Administrator (including, without limitation, the Plan Administrator's financial advisors, auditors, appraisers, and forensic advisors) to visit and inspect the offices, tangible assets, intangible assets, and real property assets related to the Plan Assets, and

to view and inspect all financial and accounting records, including, without limitation, contracts, and records of legal proceedings, to make copies and take extracts therefrom, and to discuss any of the Plan Assets, and finances and businesses related thereto, with the Reorganizing Debtor at such reasonable times during normal business hours and as often as may be reasonably requested.

### 7.3.5    Plan Assets – Cash and Proceeds

On or as soon as practicable after the Effective Date, the Plan Administrator shall establish Plan Accounts, and the Plan Assets consisting of cash shall be transferred to the Plan Accounts.  Thereafter, all cash Proceeds shall be deposited into Plan Accounts.

### 7.3.6    Reporting Requirements

The Plan Administrator shall provide the Oversight Committee (a) monthly reports (within 25 days after the end of the prior month) containing a full accounting related to the Plan Assets, the Proceeds, and any Distributions, including, without limitation, the prior month's cash flow, income statement, and balance sheet as of the end of the month and (b) on the first Business Day of each calendar week, a report of any offers or counteroffers made or received (written or verbal) related to the final disposition of any Plan Asset since the last weekly report, including relevant supporting documents.  The Plan Administrator shall provide such additional information as the Oversight Committee may reasonably require to keep itself fully informed of the Plan Administrator's performance of its duties and responsibilities under the Plan.

### 7.3.7    Removal "For Cause"

The Oversight Committee or the Reorganizing Debtor may seek to terminate the Plan Administrator "for cause" by filing a motion with the Bankruptcy Court.  For purposes of this Section of the Plan, "cause" shall mean (a) a Material Default under the Plan by the Plan Administrator, (b) a failure to diligently perform in good faith any of the Plan Administrator's duties and responsibilities under the Plan, (c) misconduct in connection with the performance of any of the Plan Administrator's duties and responsibilities under the Plan, including, without limitation, misappropriation of Plan Assets or the Proceeds thereof, (d) intentional or negligent misrepresentation (including by omission) of any material fact to the Oversight Committee, (e) a failure to terminate the Reorganizing Debtor's duties with regard to Plan Assets "for cause" when

such cause exists, (f) any other act or omission materially inconsistent with the terms and purposes of the Plan, (g) a breach of the Plan Administrator's fiduciary duties under the Plan, (h) any violation of the Code or other applicable law, or (i) a determination by the Bankruptcy Court that such termination is in the best interests of the Estate and all parties who hold an interest in the Estate. Upon termination as a Plan Administrator, the former Plan Administrator shall have no authority regarding the implementation of Sections 6.1, 6.2, and 6.6 of the Plan or the administration of the Plan Assets, including, without limitation, the management, control, and operation of the Plan Assets, and the Proceeds, which authority shall be vested solely in a successor Plan Administrator appointed pursuant to the terms of the Plan.

### 7.3.8   Plan Expenses on or after the Effective Date

Prior to the Effective Date, the proposed Plan Administrator, the Reorganizing Debtor, and the Plan Funding Lenders shall agree upon the Plan Budget for the sixteen month period beginning on the Effective Date, which Plan Budget may be adjusted from time to time by the Plan Administrator after consultation with Reorganizing Debtor and the Oversight Committee; provided, however, that any material amendment or modification to the Plan Administration Budget, at any time after the Effective Date, will require the prior written approval of the Oversight Committee; and any material amendment or modification to the Farm Expense Budget, at any time after the Effective Date, will require the prior written approval of the Reorganizing Debtor (but only before the Termination Date) and the Oversight Committee. The Plan Budget shall be funded with the Plan Funding Sources.  Unspent budgeted amounts may be spent by the Plan Administrator or the Reorganizing Debtor, as applicable, at any time from the date budgeted to the date of payment, so long as the cumulative amount for the budgeted item does not exceed the amount budgeted for the applicable line item from the Effective Date of the Plan to the date of the applicable payment.

On the Effective Date, the Plan Administrator shall establish the Administrative Fund, and the full amount of the Administrative Fund shall be funded with the proceeds of Plan Funding Loans.  The Plan Administrator shall pay all fees and expenses of the Plan Administrator and the Post-Confirmation Professionals retained by the Plan Administrator, from

the Administrative Fund. The Plan Administrator may replenish amounts spent from the Administrative Fund by use of the Plan Funding Sources, provided that the amount of any such replenishment is based on the Plan Administrator's reasonable good faith estimate of the projected fees and expenses of the Plan Administrator and the Post-Confirmation Professionals retained by the Plan Administrator necessary for the performance of the Plan Administrator's continuing obligations under this Plan.

### 7.3.9 Priority of Payment of the Plan Administrator's Expenses

All fees and expenses of the Plan Administrator and the Post-Confirmation Professionals retained by the Plan Administrator shall be paid from the Administrative Fund, and such right to payment shall be prior and superior to any other rights, including rights of the holders of Claims to receive any Distribution or payment of the Plan Assets. To secure the payment of all fees and expenses of the Plan Administrator and the Post-Confirmation Professionals retained by the Plan Administrator, the Plan Administrator is granted a first priority security interest in the Administrative Fund, which shall (i) be deemed automatically perfected without the need for any other documents, deposit account control agreements, filings or otherwise, and (ii) shall not be subordinate to any other lien, Claim or interest notwithstanding any other provision of this Plan, any order or any other documents to the contrary. The security interest granted pursuant to this provision shall survive any termination of a Plan Administrator. The rights of any successor Plan Administrator hereunder shall be subordinate to the rights of the initial or preceding Plan Administrators.

### 7.3.10  Compensation for Plan Administrator

The Plan Administrator shall be compensated for services and reimbursed for expenses from the Administrative Fund at the rates and on the terms to which the Plan Funding Lenders, the Reorganizing Debtor, and the Plan Administrator have agreed, which rates and terms are appended as Exhibit "3" to the Plan. Changes to such compensation rates and terms shall be subject to the approval of the Bankruptcy Court after a motion initiated by the Oversight Committee, the Reorganizing Debtor, or the Plan Administrator. The Plan Administrator shall file a monthly compensation report detailing total compensation and expense reimbursements to be paid to the Plan

Administrator for the prior month; provided, however, that the Plan Administrator shall not be required to file detailed time records as part of the report. The Oversight Committee and the Reorganizing Debtor shall have seven (7) Business Days after the filing of any monthly compensation report to object to the same. Absent any such objection, all compensation and expense reimbursements owed to the Plan Administrator as set forth on such monthly compensation report shall constitute Plan Expenses and shall be paid by the Plan Administrator in accordance with the terms and conditions of the Plan. In the event of any such objection, the Bankruptcy Court shall determine the compensation and expense reimbursements owed to the Plan Administrator with respect to such monthly compensation report by determining whether the fees and expenses are reasonable under the circumstances. The initial Plan Budget shall not constitute or be construed as a cap on the compensation, expenses or fees of the Plan Administrator or the Post-Confirmation Professionals retained by the Plan Administrator and such budget, including the Plan Administration Budget, may be modified as provided herein.

### 7.3.11 Limitation of Liability of Plan Administrator, Related Parties and Related Matters

#### (a)    Exculpation

Neither the Plan Administrator, nor any director, officer, affiliate, employee, employer, attorney, professional, Post-Confirmation Professional retained by the Plan Administrator, successor, assign, agent, or representative of the Plan Administrator (each, an "Exculpated Party" and collectively, the "Exculpated Parties") shall be liable for any losses, claims, damages, liabilities, obligations, settlements, proceedings, suits, judgments, causes of action, litigation, actions, or investigations (whether civil or administrative and whether sounding in tort, contract, or otherwise), penalties, costs, and expenses, including reasonable fees and disbursements (collectively referred to herein as "Losses"), whether or not in connection with litigation in which any Exculpated Party is a party or enforcing this Plan (including these exculpation provisions), incurred, caused by, relating to, based upon or arising out of (directly or indirectly) the Plan Administrator's execution, delivery, and acceptance of or the performance or nonperformance of its powers, duties and obligations under this Plan, or the Confirmation Order or as may arise by reason of any action, omission, or error of an

Exculpated Party in connection therewith; provided, however, that the foregoing limitation shall not apply to any Losses suffered or incurred by any holder of a Claim or Equity Interest that are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have directly resulted from the fraud, gross negligence or willful misconduct of such Exculpated Party.  Every act taken or omitted, power exercised, or obligation assumed by the Plan Administrator or any Exculpated Party pursuant to the provisions of this Plan shall be held to be taken or omitted, exercised, or assumed, as the case may be, by the Plan Administrator or any Exculpated Party acting for and on behalf of the Estate and not otherwise; provided, however, that none of the foregoing entities or persons are deemed to be responsible for any other such entities' or persons' actions or inactions.

Except as provided in the immediately preceding subsection, every person, firm, corporation, or other entity contracting or otherwise dealing with or having any relationship with the Plan Administrator or any Exculpated Party shall have recourse only to the Estate or insurance policy proceeds obtained by the Estate for payment of any liabilities or other obligations arising in connection with such contracts, dealings or relationships, and the Plan Administrator and the Exculpated Parties shall not be individually liable therefore.  Except as provided in the immediately preceding subsection, in no event shall the Plan Administrator be liable for indirect, punitive, special, incidental, or consequential damage or loss (including but not limited to lost profits) whatsoever, even if the Plan Administrator has been informed of the likelihood of such loss or damages and regardless of the form of action.

**(b)      Indemnification**

The Plan Administrator and any director, officer, affiliate, employee, employer, attorney, professional, and Post-Confirmation Professional retained by the Plan Administrator, successor, assign, agent, or representative of the Plan Administrator (each, an "Indemnified Party" ; and collectively, the "Indemnified Parties") shall be defended, held harmless, and indemnified from time to time by the Estate against any and all Losses, including, without limitation, the costs for counsel or others in investigating, preparing, defending, or settling any action or claim, whether or not in connection with litigation in which any Indemnified Party is a

party or enforcing this Plan (including these indemnity provisions), incurred, caused by, relating to, based upon or arising out of (directly or indirectly) the Plan Administrator's execution, delivery, and acceptance of or the performance or nonperformance of its powers, duties, and obligations under this Plan, or the Confirmation Order or as may arise by reason of any action, omission, or error of an Indemnified Party in connection therewith; provided, however, such indemnity shall not apply to any such Losses to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have directly resulted from the fraud, gross negligence, or willful misconduct of such Indemnified Party. Satisfaction of any obligation of the Estate arising pursuant to the terms of this Section shall be payable only from the assets of the Estate (or any insurance policy proceeds obtained by the Estate), shall be reserved at the time the invoices are submitted and amounts incurred and such right to payment shall be prior and superior to any other rights, including rights of Creditors under the Plan, to receive a Distribution of the Estate assets. The Estate shall promptly pay to the Indemnified Party the expenses set forth above after the settlement or conclusion of such matter. Upon written request, the Indemnified Party shall be entitled to proof within thirty (30) days that appropriate amounts have been reserved.

**(c)    Reliance by Plan Administrator on Documents or Advice of Counsel**

Except as otherwise provided in this Section 7.3.11, the Plan Administrator any director, officer, affiliate, employee, employer, attorney, Post-Confirmation Professional retained by the Plan Administrator, agent, or representative of the Plan Administrator, may rely, and shall be protected from liability for acting or failing to act, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document reasonably believed by the Plan Administrator in good faith to be genuine and to have been presented by an authorized party. Except as otherwise provided in this Section 7.3.11, the Plan Administrator shall not be liable for any action taken or omitted or suffered in reasonable, good faith reliance upon the advice of counsel or other Post-Confirmation Professional retained by the Plan Administrator in accordance with this Plan. Except as otherwise provided in this Section 7.3.11,

the Plan Administrator shall be indemnified by the Estate for or in respect of any action taken, suffered or omitted by it and in accordance with such advice or opinion.

**(d)     Insurance**

The Plan Administrator may purchase using the Plan Funding Sources and carry all insurance policies, and pay all insurance premiums and costs, the Plan Administrator deems reasonably necessary or advisable, including, without limitation, purchasing any errors and omissions insurance with regard to any Losses it may incur, arising out of or due to its actions or omissions, or consequences of such actions or omissions, other than as a result of its fraud or willful misconduct, with respect to the implementation and administration of this Plan.

**(e)     Survival**

The provisions of this Section 7.3.11 shall survive the termination of a Plan Administrator.

**7.4     Reorganizing Debtor Duties and Responsibilities**

**7.4.1   Duties of the Reorganizing Debtor with Regard to the Plan Assets**

On and from the Effective Date to and including the date that is sixteen months after the Effective Date, unless terminated earlier "for cause" by the Plan Administrator in accordance with the Plan (the earlier of such dates, the "Termination Date"), the Reorganizing Debtor shall serve and perform services with regard to the Plan as provided in this Plan.   The Reorganizing Debtor shall be a fiduciary of the Estate.  The Reorganizing Debtor shall cooperate with the Plan Administrator in the performance of its duties and responsibilities under the Plan.  Notwithstanding anything contained herein, subject to Bankruptcy Court approval, the Plan Administrator shall have final authority regarding any decisions related to the terms of final disposition of any Plan Assets constituting real property.   The Reorganizing Debtor shall be reimbursed for reasonable and documented out-of-pocket expenses incurred by the Reorganizing Debtor in the performance of his duties and responsibilities under the Plan to the extent a request for such reimbursement is approved in writing by the Plan Administrator in advance of the time that the Reorganizing Debtor incurs any such expense.  The foregoing amounts shall constitute Plan Expenses, shall be due and payable in arrears on the fifth Business Day of each calendar month, and shall be paid by the Plan

Administrator in accordance with the terms and conditions of the Plan. The amounts paid shall not be Property of the Estate, notwithstanding Section 1115 of the Code.

### (a)　　Farm Assets Specifically

On and from the Effective Date up to but excluding the Termination Date, the Reorganizing Debtor shall be fully and solely responsible for the day-to-day management, control, and operation of the Farm Assets in the ordinary course of business. To fund such efforts of the Reorganizing Debtor, the Reorganizing Debtor Farm Expense Account shall be established in the name of, and under the control of the Reorganizing Debtor, for purposes of paying costs and expenses included in the Farm Expense Budget. Until the Termination Date, the Reorganizing Debtor Farm Expense Account shall be funded on a monthly basis from the Plan Funding Sources in the lesser of (a) the monthly amount set forth in the Farm Expense Budget and (b) the monthly amount set forth in the Farm Expense Budget, less unspent budgeted funds on deposit in the Reorganizing Debtor Farm Expense Account. Under no circumstances shall the Reorganizing Debtor incur or pay amounts for costs or expenses in excess of the amounts budgeted for in the Farm Expense Budget. The Reorganizing Debtor shall have sole, full power and responsibility with regard to the employment and payment of all employees and independent contractors performing services with regard to the Farm Assets (other than the Plan Administrator), and shall be fully and solely responsible for paying all related employment and withholding taxes concerning such employees and independent contractors. In connection with the activities under this Plan, the Reorganizing Debtor shall keep the Plan Administrator reasonably informed regarding the day-to-day management, control, and operation of the Farm Assets in accordance with this Plan; and the Reorganizing Debtor will use best efforts to address any questions, concerns, or differences of opinion with the Reorganizing Debtor which the Plan Administrator may have arising from the Reorganizing Debtor's action or inaction, or the Farm Assets.

### (b)　　Plan Assets Generally

On and from the Effective Date up to but excluding the Termination Date, with respect to the monetization of the Plan Assets, the Reorganizing Debtor shall use his expertise and knowledge of the Plan Assets to price, market, and recommend terms of final disposition of the

Plan Assets. The Reorganizing Debtor shall, in consultation with the Plan Administrator, be responsible for establishing the initial sale prices and terms of the listing of each Plan Asset, and the negotiation of offers and counteroffers for the sale of Plan Assets. Such initial pricings and listings shall be established in such a way as to maximize the ultimate value of the Plan Assets. Thereafter, any changes to such prices or listings may be made by the Reorganizing Debtor in consultation with the Plan Administrator. Any offers or counteroffers (written or verbal) related to the final disposition of any Plan Asset, and the terms of any final disposition of any Plan Asset, must be approved by the Plan Administrator in advance. In the event of any disagreement between the Plan Administrator and the Reorganizing Debtor regarding any offers or counteroffers (written or verbal) related to the final disposition of any Plan Asset, or the terms of final disposition of any Plan Asset, the Plan Administrator's decision shall control the issue; provided, however, that that the final disposition of any Plan Asset constituting real property, whether by sale, refinancing, abandonment, or otherwise, and the terms thereof shall require an order of the Bankruptcy Court approving such final disposition and such terms after a motion initiated by the Plan Administrator or, with the consent of the Plan Administrator, the Reorganizing Debtor. For the avoidance of doubt, the Reorganizing Debtor will not receive any commission from the final disposition of any Plan Asset.

### 7.4.2   Reporting Requirements

On Wednesday of each calendar week, for the preceding calendar week, the Reorganizing Debtor shall provide the Plan Administrator with the Reorganizing Debtor Weekly Reporting.

Within seven (7) days after the end of each calendar month, for the preceding calendar month, the Reorganizing Debtor shall provide the Plan Administrator with a monthly report containing a full accounting related to the Plan and the Reorganizing Debtor Monthly Reporting.

On the last Business Day of each calendar week, the Reorganizing Debtor shall provide the Plan Administrator with a report of any offers or counteroffers (written or verbal) related to the final disposition of any Plan Asset since the last weekly report to the Plan Administrator, including relevant supporting documents.

The Reorganizing Debtor shall provide such additional information as the Plan Administrator may reasonably require to keep itself fully informed of the Reorganizing Debtor's performance of his duties and responsibilities under the Plan, and any matter relating to the Plan Assets.

### 7.4.3  Termination of Duties of Reorganizing Debtor in Connection with the Plan Assets "For Cause"

The Plan Administrator shall terminate the duties of the Reorganizing Debtor under this Plan "for cause" when such cause exists.  For purposes of this Section of the Plan, "cause" shall mean (a) a Material Default under the Plan of the Reorganizing Debtor, (b) a failure to diligently perform in good faith any of the Reorganizing Debtor's duties and responsibilities under the Plan, (c) misconduct in connection with the performance of any of the Reorganizing Debtor's duties and responsibilities under the Plan, including, without limitation, misappropriation of Plan Assets or the Proceeds thereof, (d) intentional or negligent misrepresentation (including by omission) of any material fact to the Plan Administrator, (e) interference with the Plan Administrator's performance of its duties and responsibilities under the Plan, (f) a failure to abide by any final decision of the Plan Administrator regarding offers or counteroffers (written or verbal) or the terms of final disposition of any Plan Asset, provided, however, that the Reorganizing Debtor may challenge or object to any final disposition of any Plan Asset, or the terms thereof, in connection with a motion to approve the final disposition of any Plan Asset, (g) any other act or omission materially inconsistent with the terms and purposes of the Plan, (h) a breach of the Reorganizing Debtor's fiduciary duties under the Plan, (i) any violation of the Code or other applicable law, or (j) a determination by the Bankruptcy Court that such termination is in the best interests of the Estate and all parties who hold an interest in the Estate after notice and a hearing.

Subject to Section 7.4.4 of this Plan, upon the Termination Date, the Reorganizing Debtor shall have no authority regarding implementation of the Plan or the administration of the Plan Assets or the Proceeds, including, without limitation, the authority granted to the Reorganizing Debtor under Section 7.4.1 of this Plan, which authority shall thereafter be vested solely in the Plan Administrator.  The Reorganizing Debtor may challenge his removal "for cause" by bringing a

motion before the Bankruptcy Court, and the Bankruptcy Court may order his reappointment under this Plan to a date through and including the Termination Date.

### 7.4.4   Duties of the Reorganizing Debtor with Regard to the Personal Assets

On and from the Effective Date, the Reorganizing Debtor shall be fully and solely responsible for the Personal Assets.  Prior to the Effective Date, the proposed Plan Administrator, the Reorganizing Debtor, and the Plan Funding Lenders shall agree upon the Personal Expense Budget for the sixteen month period beginning on the Effective Date, which Personal Expense Budget may be adjusted from time to time in accordance with the terms of this Plan. On the Effective Date, the Reorganizing Debtor Personal Expense Account shall be established in the name of, and under the control of the Reorganizing Debtor, for purposes of paying costs and expenses included in the Personal Expense Budget.  Until the Termination Date, the Reorganizing Debtor Personal Expense Account shall be funded on a monthly basis from the Plan Funding Sources (other than the Plan Funding Loans) in the lesser of (a) the monthly amount set forth in the Personal Expense Budget and (b) the monthly amount set forth in the Personal Expense Budget, less unspent budgeted funds on deposit in the Reorganizing Debtor Personal Expense Account.  Under no circumstances shall the Reorganizing Debtor incur or pay amounts for costs or expenses in excess of the amounts budgeted for in the Personal Expense Budget.

### 7.5   Oversight Committee

Each Creditor with an Allowed Secured Claim in Class 1; the Creditor with an Allowed Secured Claim in Class 2; to the extent appointed by the Plan Administrator and such appointment is accepted by such person, a representative Creditor with an Allowed Claim in Class 6; and each Plan Funding Lender shall constitute the Oversight Committee.  The Oversight Committee shall act by a vote of more than 50% of the number of members that are Class 1, Class 2, and Class 6 Creditors plus the unanimous consent of the Plan Funding Lenders.  In the event of a tie in the vote of Class 1, Class 2 and Class 6 members, the Plan Funding Lenders (acting unanimously) may break the tie.  In the event of a tie between the Plan Funding Lenders, either Plan Funding Lender may apply to the Bankruptcy Court to break the tie.  For the avoidance of doubt, a Plan Funding Lender that is also a Class 1 Creditor may vote in both capacities.  Each member of the Oversight Committee shall not be

liable for any act or omission taken or omitted to be taken by such member in its capacity as a member of the Oversight Committee. Upon the repayment in full of the Allowed Claims of any member in any of Classes 1, 2, or 6, the member of the Oversight Committee from such repaid Class shall no longer serve on the Oversight Committee. Upon repayment in full of a Plan Funding Lender's Plan Funding Claims and Allowed Secured Claims, such Creditor shall no longer serve on the Oversight Committee.

### 7.6    Sales of Plan Assets – Real Property

Sales of Plan Assets constituting real property shall be made pursuant to Section 363 of the Code (including Sections 363(f) and (h)) and shall be brought before the Bankruptcy Court for approval by a motion initiated by the Plan Administrator. All parties-in-interest shall retain the right to object to any such motion on any bases permitted by the Code or applicable case law. Unless the Bankruptcy Court orders otherwise, a Creditor in Class 1 or 2 with an Allowed Secured Claim shall have the right to credit bid up to the amount of its Allowed Secured Claim in connection with any sale of a Plan Asset that constitutes its collateral, provided that such credit bid shall also include a cash portion in the amount necessary, if any, to pay in full (a) all Allowed Secured Claims against the same collateral having priority over such Creditor's Allowed Secured Claim and (b) any Plan Expenses directly related to the consummation of such transaction.

### 7.7    Plan Funding Loans

#### 7.7.1    Plan Credit Agreement

Summit, in its capacity as a Plan Funding Lender, shall provide a junior secured credit facility to the Reorganizing Debtor comprised of a non-revolving line of credit in the maximum aggregate principal amount of up to the Plan Funding Loans Maximum Amount to be used solely to fund the Plan, pursuant to the terms and conditions of the Plan, the Plan Credit Agreement and other Loan Documents. The proceeds of all Plan Funding Loans shall be deposited into Plan Accounts. The proceeds of the Plan Funding Loans shall not be used for personal, family, or household purposes.

If other available Plan Funding Sources are insufficient to fund the Plan Budget, MetLife, in its capacity as a Plan Funding Lender, may provide a senior secured credit facility or

advance to the Reorganizing Debtor comprised of a non-revolving line of credit or advance in the maximum aggregate principal amount of up to the Plan Funding Loans Maximum Amount to be used solely to fund the Plan, pursuant to the terms and conditions of the Plan and the Plan Credit Agreement.  Nothing in the Plan shall limit MetLife's ability to make protective advances under the MetLife Loan Documents, provided that advances in excess of the Plan Funding Loans Maximum Amount and advances not deposited in the Plan Accounts shall not be considered a Plan Funding Loan.  The proceeds of all Plan Funding Loans shall be deposited into Plan Accounts.  The proceeds of the Plan Funding Loans shall not be used for personal, family, or household purposes.  Upon repayment in full of all obligations to MetLife, MetLife shall cease to be a Plan Funding Lender.

### 7.7.2    Essential Terms of Plan Funding Loans

The Plan Funding Loans shall accrue interest at rate not to exceed 10% per annum, paid-in-kind monthly.  The scheduled maturity date of the Plan Funding Loans shall be the date that is sixteen months after the Effective Date.  The Plan Funding Loans shall be repaid through a balloon payment of all principal, including paid-in-kind interest, on their maturity.  Subject to the below paragraph, proceeds of the sale of collateral securing a Plan Funding Loan shall first be applied to the repayment of the Plan Funding Loan or other advance and only after such loan or advance has been paid in full to any unpaid Class 1 Claims of the Plan Funding Lender.

Summit, for itself and in its capacity as a Plan Funding Lender, shall allow the Reorganizing Debtor to use Plan Funding Cash Collateral, to the extent determined by the Plan Administrator to be Available Cash, to fund periodic payments on account of Allowed Claims in Class 6, prior to the repayment in full of Summit's Allowed Secured Claim in Class 1 and Summit's Plan Funding Claim.  Pursuant to the terms and conditions of the Cash Collateral Fund (as defined in the Plan Credit Agreement with Summit), Plan Funding Cash Collateral shall be made available to the Reorganizing Debtor as follows: upon the consummation of any sale or refinance of Summit's collateral authorized by a Final Order of the Bankruptcy Court, the cash Proceeds of any such sale or refinance otherwise due to Summit (after payment of all Claims having priority over Summit) shall be distributed: (a) first, to Summit on account of its Allowed Secured Claim in Class 1 until Summit has received a total of $2,000,000.00 on account of such Allowed Secured Claim; and (b) second,

90% to Summit on account of its Allowed Secured Claim in Class 1 and 10% to fund the Cash Collateral Fund until the Cash Collateral Fund has been funded in full up to the Plan Funding Maximum Cash Amount.

### 7.7.3 Collateral for Plan Funding Loans

Summit's Plan Funding Claim, including, without limitation, all Plan Funding Loans made by Summit, shall be, and is hereby secured by, perfected liens and security interests in favor of Summit, in its capacity as a Plan Funding Lender, on and in the Plan Assets and the Proceeds, subject and subordinate only to (a) existing Allowed Secured Claims against the Plan Assets and the Proceeds and (b) the liens of the Plan Administrator granted pursuant to this Plan.

MetLife's Plan Funding Claim, including, without limitation, all Plan Funding Loans made by MetLife, shall be, and is hereby secured by, perfected liens and security interests in favor of MetLife, in its capacity as a Plan Funding Lender, on and in the collateral securing the Allowed Secured Claim of MetLife with the same priority as the liens and security interests on and in such collateral securing the Allowed Secured Claim of MetLife.

In consideration of the Reorganizing Debtor's use of the Other Cash Collateral and the Plan Funding Cash Collateral in connection with, and pursuant to the terms and conditions of, the Cash Collateral Fund, Summit shall receive, and is hereby granted, perfected replacement liens and security interests in favor of Summit on and in the Plan Assets and the Proceeds, subject and subordinate only to (a) existing Allowed Secured Claims against the Plan Assets and the Proceeds and (b) the liens of the Plan Administrator granted pursuant to this Plan, which replacement liens and security interests shall secure Summit's Allowed Secured Claim in an amount equal to the extent of such use of the Other Cash Collateral and the Plan Funding Cash Collateral (the "Replacement Liens").

On the Confirmation Date, the liens and security interests securing the Plan Funding Claim, and the Replacement Liens, shall be deemed valid, binding, enforceable, and perfected with respect to all of the Plan Assets and the Proceeds. The Plan Funding Lenders and Summit shall not be required to file any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien or any similar document or take any other action (including, without limitation,

possession of or control of any of the Plan Assets or the Proceeds or the obtaining of any consent of any Third Party) in order to validate the perfection of such liens and security interests. If a Plan Funding Lender or Summit chooses to file or record any such mortgages, deeds of trust, security deeds, notices of lien or UCC-1 financing statements, or take any other action to validate the perfection of any of the liens and security interests securing the Plan Funding Claim, or the Replacement Liens, the Reorganizing Debtor and the Plan Administrator are authorized and directed to execute any documents or instruments as the Plan Funding Lender or Summit shall reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded as of the Confirmation Date. In addition, although a Plan Funding Lender's liens and security interests, and the Replacement Liens, on the Plan Accounts shall be deemed perfected without the need for any further action, the Reorganizing Debtor and the Plan Administrator are authorized and directed to enter into such control agreements with a Plan Funding Lender or Summit and the financial institutions at which the Plan Accounts are located, as a Plan Funding Lender or Summit may require. The Plan Funding Lenders and Summit may, in their respective discretion, file a certified copy of the Confirmation Order in any filing office in any jurisdiction in which any of the Plan Assets or the Proceeds are deemed to be located, and each filing office is directed to accept such certified copy of the Confirmation Order for filing and recording. Without limiting the generality of the foregoing, to the extent that Summit or MetLife is the secured party under any of the Summit Loan Documents or the MetLife Loan Documents, as applicable, including, without limitation, any security agreement, mortgage, leasehold mortgage, landlord waiver, financing statement, or account control agreements, or listed as lender loss payee or additional insured under any of the Reorganizing Debtor's insurance policies, the Plan Funding Lender shall also be deemed to be the secured party under such Summit Loan Documents or such MetLife Loan Documents, as applicable, and a lender loss payee or additional insured under the Reorganizing Debtor's insurance policies, shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement), and shall be authorized to act in that capacity.

All liens and security interests, all Replacement Liens, and any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien, or any similar document,

obtained and provided to the Plan Funding Lenders or Summit in connection with the Plan have been issued and delivered pursuant to the Plan. Pursuant to Section 1146 of the Code, such liens and security interests, such Replacement Liens, and any filing or recording of any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien, or any similar document, shall be free from any stamp, transfer, recording, or similar tax.

### 7.7.4   Intercreditor Agreement

To the extent that the Plan Funding Claim is secured by collateral, or the Replacement Liens attach to collateral, which in either case is also collateral for the Allowed Secured Claim of MetLife or the Allowed Secured Claim of Summit, the Plan Funding Claim and such Replacement Liens shall be subject to the terms of the Intercreditor Agreement between MetLife and Summit (as attached to MetLife's Proof of Claim).

### 7.7.5   Release in Favor of Summit and MetLife

In consideration of the Plan Funding Lenders making the Plan Funding Loans and the Plan Funding Cash Collateral, and Summit making the Filbin Available Cash and the Other Cash Collateral, available to the Reorganizing Debtor in order to fund the payments to be made under the Plan and the Plan Expenses to be incurred in connection with the Plan, the Debtor in Possession, the Reorganizing Debtor, and the Estate hereby forever waive and release Summit and MetLife (including, without limitation, in their capacities as a Plan Funding Lender) and their respective past and present parents, subsidiaries, affiliates, related funds, participants, insurers, indemnitors, officers, directors (or persons with similar authority), shareholders or other equity holders, trustees, agents, employees, consultants, experts, advisors, attorneys, and each of their respective predecessors, successors, heirs and assigns, from any and all Claims, counterclaims, causes of action, defenses and setoff rights, whether arising at law or in equity, including, without limitation, any re-characterization, subordination, avoidance or other Claim arising under or pursuant to Section 105 or Chapter 5 of the Code or under any other similar provisions of applicable state or federal law. The foregoing release shall be binding on all parties-in-interest in the Case, including, without limitation, any trustee or committee hereafter appointed or elected for the Estate in this Case or in any superseding chapter 7 case.

### 7.7.6    Other Terms and Conditions

The Plan Credit Agreements and other Loan Documents for the Plan Funding Loans shall be in substantially the form attached hereto as Exhibit "4" or as attached to the MetLife Proof of Claim.  Any continuing "Event of Default" under a Plan Credit Agreement and other Loan Documents first occurring after the Effective Date of this Plan shall be deemed to be a Material Default under the Plan.  Notwithstanding any other provision of this Plan (including, without limitation, Section 12.4) if there is a Material Default under the Plan or upon the date that is sixteen months after the Effective Date, the Plan Funding Lenders shall, without the requirement of further order of the Bankruptcy Court but immediately after a notice is filed with the Bankruptcy Court and served upon those parties on the Post-Confirmation Service List, be (a) deemed to have been granted relief from the automatic stay of Section 362 of the Code with respect to its collateral which forms part of the Plan Assets and from any injunction imposed by the Code or this Plan in this Case or in any subsequent bankruptcy case filed by or against the Debtor in Possession or the Reorganizing Debtor, or involving such Plan Funding Lender's collateral; and (b) entitled to exercise any remedies available to the Plan Funding Lenders under the Loan Documents and applicable law.

### 7.8    Distributions and Payments Under the Plan

### 7.8.1    General Provisions

The Reorganizing Debtor shall make all Distributions and payments due under the Plan on the Effective Date, and the Plan Administrator shall confirm that such payments were made by the Reorganizing Debtor.  The Reorganizing Debtor shall make all Distributions and payments due under the Plan related to the Personal Assets and, prior to the Termination Date, the Farm Assets.  Except as provided by Section 7.4.1 of this Plan, the Plan Administrator shall make all other Distributions and payments under the Plan.

### 7.8.2    Distributions and Payments from Plan Assets and Proceeds

After the Effective Date, and except as provided by Section 7.4.1 and Section 7.4.4, all cash consisting of Plan Assets, all cash Proceeds, including, without limitation, the Plan Funding Cash Collateral, and all proceeds of the Plan Funding Sources shall be deposited into Plan Accounts

from which all Distributions and payments to be made by the Plan Administrator under the Plan shall be made by the Plan Administrator as follows:

#### (a)     Payment of Plan Expenses

The Plan Administrator shall pay Plan Expenses in accordance with the Plan Budget, and the other terms and conditions of this Plan, and may do so without further order of the Bankruptcy Court.

#### (b)     Payment of Disposition Expenses and Allowed Secured Claims

Subject to Section 7.7.2, in connection with a final disposition of any Plan Asset that is real property approved by the Bankruptcy Court, the Plan Administrator shall first pay disposition expenses with respect to the sale (consisting of reasonable, documented, and customary closing costs related to any such final disposition, withholdings for income taxes attributable to such disposition, and U.S. Trustee Fees attributable to such disposition (all of which shall be deemed Plan Expenses)), pursuant to the order of the Bankruptcy Court approving such final disposition, then post-Effective Date protective advances secured by such Plan Asset, then Plan Funding Claims secured by such Plan Asset, then Allowed Secured Claims in order of their priority on such Plan Asset to the extent of the Proceeds of such final disposition.  In addition, on the first Business Day of each calendar month, the Plan Administrator shall pay Allowed Secured Claims in Class 1 and in Class 2 on a Pro Rata basis to the extent of unencumbered Available Cash and may do so without further order of the Bankruptcy Court.

#### (c)     Payment of Allowed Claims in Class 6

On the first Business Day of each calendar month, and only after all Allowed Secured Claims in Classes 1 and 2 and the Plan Funding Claims have been paid in full, the Plan Administrator shall pay Allowed Claims in Class 6 on a Pro Rata basis to the extent of Available Cash and may do so without further order of the Bankruptcy Court.

### 7.8.3   Distribution Addresses

Unless a Creditor has provided the Reorganizing Debtor and the Plan Administrator with written notice of a different address, Distributions will be sent to Creditors at their addresses as set forth in their proofs of Claim filed with the Bankruptcy Court.  If no proof of Claim is filed with

respect to a particular Claim, Distributions on account of such Claim will be mailed to the applicable Creditor at its address as set forth in the Schedules.

### 7.8.4    De Minimis Distributions

Notwithstanding any other provision of the Plan, Distributions of less than $25.00 need not be made on account of any Allowed Claim; provided that Distributions that would otherwise be made but for this provision shall carry over until the next Distribution date until the cumulative amount to which any holder of an Allowed Claim is entitled to more than $25.00, at which time the cumulative amount of such Distributions will be paid to such holder.

### 7.8.5    Withholding Taxes

Pursuant to Section 346(f) of the Code, the Reorganizing Debtor and the Plan Administrator shall be entitled to deduct any applicable federal, state or local withholding taxes from any cash payments made with respect to Allowed Claims, as appropriate. The Reorganizing Debtor and the Plan Administrator shall be permitted to withhold a Distribution to any Creditor that has not provided information requested by the Reorganizing Debtor and the Plan Administrator for the purpose of fulfilling his or her obligations hereunder. The Reorganizing Debtor and the Plan Administrator, as applicable, shall comply with all reporting obligations imposed by any governmental unit with respect to withholding and related taxes. This Section 7.8.4 is not a surcharge of the collateral of any secured Creditor and is not a basis for the Reorganizing Debtor and the Plan Administrator to surcharge any collateral of any secured Creditor.

### 7.8.6    Unclaimed Distributions

Any cash Distributions that remain unclaimed or unnegotiated for 120 days following Distribution or are returned for reasons other than the absence of a current or correct address (unless a current or correct address cannot be determined after reasonable inquiry) shall become the Property of the Estate and distributed in accordance with this Section 7.8.

### 7.8.7    Disputed Claim Reserve

The Plan Administrator will create a Plan Account for use as a reserve for Disputed Claims. Each time the Plan Administrator makes a Distribution to the holders of Allowed Claims, the Plan Administrator will deposit into a reserve the aggregate Pro Rata amount that would have

been distributed to the holders of Disputed Claims. If a Disputed Claim becomes an Allowed Claim, the Plan Administrator shall promptly distribute to the Creditor from the reserve an amount equal to all Pro Rata Distributions that would have otherwise been due to such Creditor to date under the Plan, calculated using the amount of such Creditor's Allowed Claim. Any funds no longer needed in reserve shall be distributed in accordance with this Section 7.8.

### 7.8.8   Insurance Policies

To the extent any insurance policies exist in which Jeffery Edward Arambel, in his capacity as the prepetition debtor or the Debtor in Possession, his personnel, or the Estate have an insurable or other interest in or right to make a claim, such policies shall remain available before and after the Effective Date, in addition to covering the Plan Administrator, and its Post-Confirmation Professionals, as applicable, on and after the Effective Date, to satisfy any and all Claims held by, or asserted against, the Estate, the Reorganizing Debtor, or the Reorganizing Debtor's current or former personnel that may be covered by such policies.

### 7.9   LBA Adversary Proceeding

LBA and the Reorganizing Debtor each assert the right to receive $750,000 currently held in escrow by Commonwealth Land Title Company, pursuant to prepetition joint escrow instructions executed by Jeffery Edward Arambel and LBA. After the Effective Date, and subject to approval of Plan Administrator (*provided*, however, that approval of the Plan Administrator shall not be required if the professionals employed to prosecute the adversary proceeding are paid from a source other than the Plan Funding Sources), the Reorganizing Debtor shall commence an adversary proceeding to resolve his disputes with the LBA with respect to the funds held by Commonwealth Land Title Company and any other claims or defenses the Debtor in Possession and the Reorganizing Debtor may hold against LBA (or its predecessors and successors), including (but not limited to) the relative rights of the Reorganized Debtor and LBA to the $750,000 currently held in escrow, whether or not such funds are Property of the Estate, declaratory relief concerning the enforcement of the agreements with LBA, breach of contract, and breach of the implied obligation of good faith and fair dealing, amongst other possible claims under state and federal law, all of which are specifically retained. The Bankruptcy Court reserves jurisdiction to resolve such disputes. To the extent the

Reorganizing Debtor receives any monetary amount in connection with this adversary proceeding (whether by Final Order, by settlement with the LBA, or otherwise), all such amounts shall be Property of the Estate and Plan Assets, transferred by the Reorganizing Debtor to a Plan Account, and available for Distribution by the Plan Administrator in accordance with Section 7.8 of this Plan. Any monetary amount received on account of the adversary proceeding is the collateral of MetLife and Summit as it is traceable to a sale of a parcel from within the Arambel Business Park.

**7.10     [Reserved]**

**7.11     Execution and Delivery of Documents**

The Reorganizing Debtor and the Plan Administrator are authorized to execute and deliver such agreements, instruments, and documents as are necessary or appropriate to promote and implement the Plan or to carry out the purposes of the Plan.

**7.12     Objections to Claims and Estimation of Claims**

Subject to Section 7.3.3 of this Plan, any objection to Disputed Claims by the Plan Administrator, the Reorganizing Debtor, or other parties in interest must be filed before the date that is sixteen months following the Effective Date, unless such period is extended by the Bankruptcy Court for cause shown on motion filed within such original or extended objection period.  Any and all objections to Disputed Claims pending as of the Confirmation Date and not resolved by this Plan or by other order of the Bankruptcy Court are specifically reserved by the Plan and shall not be barred by any theory of *res judicata* solely by Confirmation of the Plan.

**7.13     Claim Bar Dates**

The last day for filing proofs of Claim in the Case shall be the Bar Date fixed by the Court before Confirmation of the Plan, except for Administrative Claims and Rejection Claims.  The deadline for filing and serving requests for the allowance of Administrative Claims (other than Professional Fees and U.S. Trustee Fees) shall be the Administrative Claim Bar Date.  The deadline for filing proofs of Rejection Claim in the Case shall be the Rejection Claim Bar Date.

**7.14     Retention and Enforcement of Claims**

Pursuant to Section 1123(b)(3) of the Code, the Reorganizing Debtor may, on and after the Confirmation Date, maintain and enforce any Claims of the Debtor in Possession or the

Estate (except to the extent such Claims have been or will be settled or released on or before the Effective Date). To the extent the Reorganizing Debtor receives any monetary amount in connection with retained Claims, all such amounts shall be Property of the Estate and Plan Assets, transferred by the Reorganizing Debtor to a Plan Account, and available for Distribution by the Plan Administrator in accordance with Section 7.8 of this Plan.

### 7.15    Jurisdictional Limitations on Claims re: Plan Implementation

All Claims related to the post-Confirmation conduct of the Reorganizing Debtor, the Plan Administrator, or the Post-Confirmation Professionals must be filed in and determined by the Bankruptcy Court. No concurrent jurisdiction shall exist for the determination or enforcement of any such Claims.

### 7.16    Court and United States Trustee Fees; Post-Confirmation Reports; Final Decree

#### 7.16.1  Accrued U.S. Trustee Fees Paid at Confirmation

On or before the Effective Date, all fees due to the Clerk of the Court and all U.S. Trustee Fees shall be paid in full by the Reorganizing Debtor from the Plan Funding Sources (other than the Plan Funding Loans, unless such U.S. Trustee Fee constitutes a business expense as determined by Summit as a Plan Funding Lender, in its sole and absolute discretion).

#### 7.16.2  Post-Confirmation U.S. Trustee Fees Paid Quarterly

Quarterly U.S. Trustee Fees shall be budgeted for and paid by the Plan Administrator as Plan Expenses and thereafter by the Reorganizing Debtor for each calendar quarter (including any fraction thereof) until the Case is closed by entry of a Final Decree, converted, or dismissed. Upon the closing of the Case, no further U.S. Trustee Fees shall be due, except for any calendar quarter (including any fraction thereof) during which the Case may be reopened.

#### 7.16.3  Post-Confirmation Quarterly Reports

Following the Effective Date, the Plan Administrator, shall prepare and submit to the Bankruptcy Court and the Office of the United States Trustee, post-Confirmation reports in the form suggested by the Office of the United States Trustee for Region 17, the purpose of which is to explain the progress made toward full administration of the confirmed Plan. The first post-Confirmation report shall be due within thirty (30) days following the end of the first calendar

quarter from the Effective Date and shall be filed on a quarterly basis thereafter within thirty (30) days after the end of each calendar quarter, unless otherwise agreed to by the Office of the United States Trustee and the Reorganizing Debtor, after consultation with the Plan Administrator, until the Case is closed by entry of a Final Decree, converted, or dismissed.

### 7.16.4  Content of Post-Confirmation Quarterly Reports

The aforementioned post-Confirmation reports shall include a statement of receipts and disbursements from the Plan Assets, the Proceeds, and the Plan Funding Sources, with the ending cash balances of the Plan Accounts, for the entire quarter. The post-Confirmation reports shall also include information sufficiently comprehensive to enable the Bankruptcy Court to determine: (1) whether the Confirmation Order is final; (2) whether deposits required by the Plan, if any, have been made and distributed; (3) whether property to be transferred under the Plan, if any, has been transferred; (4) whether the Plan Administrator has assumed management of the Plan Assets; (5) whether Disbursements have commenced; (6) whether quarterly U.S. Trustee Fees due to the United States Trustee have been paid; and (7) whether all motions, contested matters, and adversary proceedings have been finally resolved.

### 7.16.5  [Reserved]

### 7.16.6  Service of Post-Confirmation Quarterly Reports

A copy of each aforementioned post-Confirmation report shall be served upon each person and entity on the Reorganizing Debtor and the members of the Oversight Committee.

### 7.16.7  Final Decree

After the Plan and the Estate is fully administered, the Reorganizing Debtor shall file an application for a Final Decree, and serve the application on the United States Trustee, together with a proposed Final Decree. The United States Trustee shall have fourteen (14) calendar days to object to the Bankruptcy Court's entry of the Final Decree.

### 7.17  Conditions Precedent; Notice of Effective Date

Confirmation of this Plan is conditioned upon entry of a Confirmation Order in form and substance acceptable to the Debtor in Possession, the Plan Funding Lenders, and the Plan

Administrator. Upon satisfaction of such condition, on the Effective Date, the Reorganizing Debtor shall have the power and authority to file a notice of effective date with the Bankruptcy Court.

## ARTICLE VIII
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1    Leases and Executory Contracts Expressly Assumed

The Reorganizing Debtor expressly assumes all unexpired leases where the Debtor in Possession is a landlord, all contracts to provide water services to the Debtor in Possession (including agreements, if any, with Del Puerto Water District, Patterson Irrigation District, and West Stanislaus Irrigation District), and all Executory Contracts entered into before the Petition Date which have been assumed pursuant to a prior order of the Bankruptcy Court or which are subject to a motion already filed with the Bankruptcy Court. Any assumed Executory Contracts shall remain in full force and effect, be unimpaired by the Plan except as specifically modified by the Plan or the Confirmation Order, and be binding on the parties thereto. The Reorganizing Debtor believes, and, therefore, asserts, that no cures under Section 365 of the Code are required for the Reorganizing Debtor to assume the unexpired leases to be assumed by the Reorganizing Debtor, pursuant to the Plan. If any counterparty to any such unexpired lease claims that a cure is required, such counterparty must assert such rights on or before the hearing on the Confirmation of this Plan or be forever barred from asserting such rights.

### 8.2    Other Executory Contracts Rejected

All Executory Contracts entered into before the Petition Date which have not been assumed pursuant to a prior order of the Court, which are not subject to a motion already filed by the Debtor in Possession with the Bankruptcy Court, or which are expressly assumed in this Plan, are rejected upon Confirmation of this Plan. Among the rejected Executory Contracts is an agreement with Irrigation Design and Construction related to certain irrigation equipment (Proof of Claim No. 28). Rejection Claims must be filed with the Bankruptcy Court no later than the Rejection Claim Bar Date. Failure to timely file Rejection Claims shall result in their disallowance without notice or order of the Bankruptcy Court. Allowed Rejection Claims shall be paid as Class 6 Claims.

/ / /

# ARTICLE IX
## POST-CONFIRMATION EMPLOYMENT AND COMPENSATION OF PROFESSIONALS

After the Effective Date, the Reorganizing Debtor and the Plan Administrator may employ, without notice, hearing, or order of the Bankruptcy Court, Post-Confirmation Professionals, provided that all costs and expenses incurred by a Professional employed by the Reorganizing Debtor prior to the Effective Date shall remain subject to Bankruptcy Court approval and shall not be paid until allowed by an order of the Bankruptcy Court. Upon such allowance of fees incurred prior to the Effective Date, the Plan Administrator is authorized to pay for such services as Plan Expenses in accordance with the terms and conditions of this Plan.

Any and all Post-Confirmation Professionals of the Plan Administrator shall be employed by the Plan Administrator, in its capacity as such, pursuant to this Plan, in its discretion, and shall not be subject to retention by the Bankruptcy Court or the retention and fee application process, provided under, inter alia, Sections 327 and 331 of the Code and applicable law.

For periods on or after the Effective Date the Plan Administrator and the Reorganizing Debtor shall each file a monthly compensation report detailing total compensation and expense reimbursements to be paid to each of their Post-Confirmation Professionals for the prior month; provided, however, that the report shall not include detailed time records for the Post-Confirmation Professionals. The Plan Administrator, Oversight Committee, and the Reorganizing Debtor shall have seven (7) Business Days after the filing of any monthly compensation report to object to the same. Absent any such objection, all compensation and expense reimbursements owed to the Post-Confirmation Professional as set forth on such monthly compensation report shall constitute Plan Expenses and shall be paid by the Plan Administrator in accordance with the terms and conditions of the Plan, without further notice or order of the Bankruptcy Court. In the event of any such objection, the Bankruptcy Court shall determine the compensation and expense reimbursements owed to the Post-Confirmation Professional with respect to such monthly compensation report. For purposes of any such determination, the standard for approval and payment shall be whether such request is reasonable under the circumstances.

## ARTICLE X
## DISCHARGE

### 10.1    Discharge of Debts

Pursuant to Section 1141(d)(5) of the Code, except as otherwise provided in this Plan, the Reorganizing Debtor shall, upon satisfaction of the conditions stated Section 1141(d)(5) of the Code, be discharged from any and all Debt that arose before the Confirmation Date and any Debt of any kind specified in Sections 502(g), 502(h), or 502(i) of the Code, whether or not: (1) a Proof of Claim based on such Debt is filed or deemed filed under Section 501 of the Code; (2) such Claim is allowed under Section 502 of the Code; or (3) the holder of such Claim accepts the Plan.

### 10.2    Judgments Obtained on Discharged Debts are Void

Pursuant to Section 524(a)(1) of the Code, the aforesaid discharge voids any judgments at any time obtained to the extent that such judgment is a determination of the liability of the Reorganizing Debtor with respect to any Debt discharged whether or not discharge of such Debt is waived.

### 10.3    Discharge Injunction

Except as otherwise provided in the Plan, pursuant to Section 524 of the Code, the said discharge operates as an injunction against the commencement or a continuation of an action, the employment of process or the commission of an act to collect, recover or offset any discharged Debt whether or not discharge of such Debt is waived.

## ARTICLE XI
## MODIFICATION OF PLAN

### 11.1    Pre-Confirmation Modification

Pursuant to Section 1127(a) of the Code, the Plan may be modified upon motion of the Debtor in Possession or corrected by the Debtor in Possession before the Effective Date, without notice and a hearing and without additional disclosure pursuant to Section 1125 of the Code, provided that, after notice to the United States Trustee and all parties that have filed and served a request for special notice in the Case, the Bankruptcy Court finds that such modification does not materially or adversely affect any Creditor or any Class of Creditors.

**11.2     Post-Confirmation Immaterial Modification**

At any time before thirty (30) calendar days after the Effective Date, the Plan Administrator or the Reorganizing Debtor, after consultation with the Oversight Committee, may seek Bankruptcy Court authorization to remedy any defect or omission, reconcile any inconsistencies in the Plan or in the Confirmation Order, or effect such other changes, modifications, or amendments as may be necessary to carry out the purposes and intent of the Plan, provided the Court finds that such changes, modifications, or amendments do not materially or adversely affect any Creditor or any Class of Creditors.

**11.3     Post-Confirmation Material Modification**

The Plan may be modified at any time after Confirmation, after a noticed hearing and order of the Court pursuant to Section 1127(b) or (e) of the Code, by the Plan Administrator or the Reorganizing Debtor, after consultation with the Oversight Committee, provided, however, that any material amendment or modification obtained without the prior written consent the Plan Funding Lenders and Summit shall constitute a Material Default under the Plan.

**ARTICLE XII**
**REMEDIES IF REORGANIZING DEBTOR DEFAULTS IN PERFORMING THE PLAN**

**12.1     Creditor Action Restrained**

The confirmed Plan is binding on every Creditor whose Claim is provided for in the Plan. Therefore, no Creditor may take any action to enforce either pre-Confirmation obligations or obligations due under the Plan so long as there has not been a Material Default under the Plan, except as otherwise provided in this Plan.

**12.2     Obligations to Each Class Separate**

Obligations under this Plan are separate with respect to each Class and sub-Class of Creditors.  Except as otherwise provided in this Plan, default in performance of an obligation due to members of one Class or sub-Class shall not by itself constitute a default with respect to members of other Classes.  For purposes of this Article, the holders of all Administrative Claims shall be considered to be a single Class, and each Third Party to an Executory Contract shall be considered to be a separate Class.

### 12.3 Additional Material Defaults

If the Reorganizing Debtor or the Plan Administrator fails to make any payment or to perform any material obligation required under the Plan for more than ten (10) calendar days after the time specified in the Plan for such payment or other performance, any Creditor affected by the default, the Oversight Committee, or any Plan Funding Lender may serve a written notice of default upon the persons and entities on the Post-Confirmation Service List. If the Reorganizing Debtor or the Plan Administrator fails within thirty (30) calendar days after the date of service of the notice of default either: (a) to cure the default, (b) obtain an order from the Court modifying the Plan after Confirmation (which thirty (30) day time period may be extended by order of the Bankruptcy Court pending confirmation of any such modified plan), or (c) obtain an order from the Bankruptcy Court determining that no default occurred (which thirty (30) day time period may be extended by order of the Bankruptcy Court pending any such determination), then the Reorganizing Debtor shall be in Material Default under the Plan.

### 12.4 Remedies Upon Material Default

In addition to any and all other remedies set forth in this Plan, upon the occurrence of a Material Default, any Creditor affected by the default, the Oversight Committee, or any Plan Funding Lender may request appropriate relief by filing a motion with the Bankruptcy Court and setting it for hearing. This relief may consist of, without limitation, dismissal of the Case, conversion of the Case to a case under chapter 7 of the Code, or relief from the automatic stay or discharge injunction to pursue rights against collateral.

### 12.5 Claims Not Affected by Plan

Upon Confirmation of the Plan, and subject to Section 13.3 of this Plan, any Creditor whose Claims are left unimpaired under the Plan may, notwithstanding Sections 12.1 through 12.4 above, immediately exercise all of its contractual, legal, and equitable rights, except rights based on defaults of the type that need not be cured under Section 1124(2)(A) and (D) of the Code.

/ / /

**12.6    Effect of Conversion to Chapter 7**

If the Case is at any time converted to one under chapter 7 of the Code, all Property of the Estate shall vest in the chapter 7 bankruptcy estate to the same extent provided for in Section 348(f) of the Code upon conversion as if this Case had been one pending under chapter 13 of the Code.

**ARTICLE XIII**
**GENERAL PROVISIONS**

**13.1    Jurisdiction**

After Confirmation of this Plan, the Bankruptcy Court shall retain jurisdiction to the fullest extent legally permissible under the Plan for all purposes consistent with the Plan and the Code, which purposes include, but are not limited to (and which are in addition to all other purposes identified in the other provisions of the Plan):

**13.1.1** The classification or allowance of a Claim of any Creditor and the reexamination of Claims which have been temporarily allowed for purposes of voting and the determination of such objections as may be filed against Creditors' Claims;

**13.1.2** The determination of all questions and disputes regarding title to the Property of the Estate, and the determination of all causes of action, controversies, disputes, or conflicts, including the right to participate in any Distribution from the Estate, whether or not subject to an action pending as of the Effective Date, between the Reorganizing Debtor and any other party, between the Plan Administrator and any other party, including, but not limited to, any right of the Reorganizing Debtor or the Plan Administrator to recover assets pursuant to the provisions of the Code;

**13.1.3** The correction of any defect, curing of any omission, or the reconciliation of any inconsistency in the Plan or in the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan;

**13.1.4** The determination of the allowability, validity, and priority of Claims against the Reorganizing Debtor or the Estate, whether such Claims are asserted before or after the Effective Date;

**13.1.5** The modification or amendment of the Plan after Confirmation pursuant to the Bankruptcy Rules or the Code and the other terms and conditions of this Plan;

**13.1.6** The enforcement and interpretation of the terms and provisions of the Plan, the Loan Documents, or the Confirmation Order;

**13.1.7** The entry of any order concluding or terminating the Case;

**13.1.8** The entry of orders regarding the discharge of Debts; or

**13.1.9** The administration of the Case and implementation and consummation of the Plan.

**13.2**    **Interpretation**

To the extent that the terms of the Plan are inconsistent with the terms of any agreement or instrument concerning any Claim or Equity Interest, or any other matter, the terms of the Plan shall control.

**13.3**    **Binding Effect**

Upon Confirmation of the Plan, the Debtor in Possession, the Reorganizing Debtor, the Plan Administrator, all Creditors, and interest holders, whether or not the Claim of such Creditor is impaired under the Plan and whether or not such Creditor or Equity Interest holder has accepted the Plan, shall be bound by the provisions of the Plan pursuant to Section 1141(a) of the Code.

**13.4**    **Applicable Law**

The Plan is to be governed by and construed under the Code and the laws of the State of California as they may be applicable.

**13.5**    **Severability**

If any provision in the Plan is determined to be unenforceable by the Bankruptcy Court, the determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan; and the Bankruptcy Court shall have the power to alter and interpret such provision to make it valid and enforceable to the maximum extent practicable, consistent with the original purpose of the provision and such provision shall then be applicable as altered or interpreted.  The Confirmation Order shall constitute a judicial determination and shall provide that

each provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 13.6    Implementation Orders

At any time, the Bankruptcy Court may make such orders or give such direction as may be appropriate under Section 1142 of the Code.

### 13.7    Notices

Any notice to the Plan Administrator shall be in writing, and will be deemed to have been given three days after the date sent by first-class mail, postage prepaid and addressed as follows:

> Focus Management Group
> Attn: Michael Doland
> 5001 W. Lemon Street
> Tampa, FL 33609
>
> <u>With a Copy To:</u>
>
> Burr & Forman LLP
> Attn: Richard A. Robinson
> 1201 N. Market Street
> Wilmington, DE  19801

Any notice to the Reorganizing Debtor shall be in writing, and will be deemed to have been given three days after the date sent by first-class mail, postage prepaid and addressed as follows:

> Jeffery Edward Arambel
> 433 Roxanne Drive
> Patterson, CA  95363
>
> <u>With a Copy To:</u>
>
> Macdonald Fernandez LLP
> Attn: Matthew J. Olson
> 914 Thirteenth Street
> Modesto, CA  95354

### 13.8    Rules of Construction

The rules of construction provided in Section 102 of the Code shall apply to the words and phrases of this Plan.  Headings and captions are utilized in this Plan for convenient reference only and shall not constitute a part of this Plan for any other purpose.

### 13.9    Exhibits

All exhibits attached to this Plan are, by this reference, hereby incorporated into the Plan.

**13.10  Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Code, the issuance, transfer, or exchange of notes or issuance of debt or equity securities under this Plan, the creation of any mortgage, deed of trust, or other security interest, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan shall not be subject to any stamp, real estate transfer, mortgage recording, sales, or other similar tax, irrespective of whether the underlying property is owned by the Estate or a Third Party.  All transactions specifically provided for by the Plan, including but not limited to sale(s) of Plan Assets administered by the Plan Administrator, shall be deemed to have been made under, in furtherance of, or in connection with the Plan and, therefore, shall not be subject to any stamp, real estate transfer, mortgage recording, sales, or other similar tax.

DATED:  July 19, 2019

*Jeffery Edward Arambel*
Jeffery Edward Arambel

DATED:  July 19, 2019

MACDONALD FERNANDEZ LLP

By: _____
Matthew J. Olson,
Attorneys for Debtor in Possession,
JEFFERY EDWARD ARAMBEL

63

# EXHIBIT 1

**Exhibit "1"**

**Arambel Personal Assets**

1. The following real properties:

| APN | Acreage | Property Reference Name |
|---|---|---|
| 047-040-023 | 0.18 | 433 ROXANNE |
| 021-074-006 | 0.44 | 49 ECHO |

2. All personal property located on or in the real properties listed in item 1.
3. The following vehicles:
    a. 2005 Chevrolet K2500 HD Silverado
    b. 2006 Nissan 250z
    c. 2010 Chevrolet Colorado
4. Miscellaneous Household Goods and Furnishings and Art Objects
5. All Audio, Video, and Computer Equipment
6. A .44 Pistol and .30-06 Rifle
7. All clothing
8. All Jewelry
9. All dogs and cats
10. Miscellaneous Gardening/Power Tools, Golf Clubs, Mower, Patio Chairs
11. All other items listed in Part 3 of Schedule A/B (as amended).

# EXHIBIT 2

**Exhibit "2"**

**Arambel Business Park Assets**

1. The following real properties:

| APN | Acreage |
|---|---|
| 021-022-018 | 51.90 |
| 021-022-027 | 39.04 |
| 021-022-028 | 65.92 |
| 021-022-033 | 38.32 |
| 021-022-034 | 39.53 |
| 021-022-041 | 40.28 |
| 021-022-042 | 39.29 |
| 021-022-043 | 39.67 |
| 021-022-044 | 39.67 |
| 021-022-045 | 39.68 |
| 021-022-046 | 39.67 |
| 021-022-055 | 10.86 |
| 021-022-059 | 68.39 |
| 021-022-061 | 32.29 |
| 021-022-062 | 74.05 |
| 021-025-022 | 20.00 |

# EXHIBIT 3

**Focus Management Group USA Inc.**
**TAMPA HEADQUARTERS**
5001 W. Lemon Street, Tampa, FL 33609
**O** 813-281-0062   **F**      813-281-0063
**www.focusmg.com**



Re:    **Proposed Plan of Reorganization dated May [__], 2019 (the "Proposed Plan") in connection with the Bankruptcy Case of Jeffrey Edward Arambel, Chapter 11 Case No. 18-90029-E-11, pending in the U.S. Bankruptcy Court for the Eastern District of California**

       Focus Management Group USA, Inc. ("Focus") hereby agrees, that upon confirmation of the Proposed Plan (the "Confirmed Plan"), to provide services as Plan Administrator, and related services, under and subject to the terms of the Confirmed Plan. The terms of the Confirmed Plan shall be incorporated herein in their entirety and shall reflect, to the extent applicable, the scope of the services to be performed by Focus, and the protections that are being afforded to Focus in connection with the engagement. Focus shall be a third-party beneficiary of the terms of the Confirmed Plan providing protections to the Plan Administration and its professional (including, without limitation Section 7.3 of the Confirmed Plan). Focus shall be compensated for its services at the following rates: $475.00 per hour for Managing Director and $400.00 per hour for all other Focus Professionals plus reasonable documented expenses. Rates will be subject to increase by Focus on annual basis at the start of each year. Please indicate your acceptance to terms, by signing in the space provided below.

Regards,

Focus Management Group USA, Inc.

**ACCEPTED AND AGREED ON BEHALF OF THE BANKRUPTCY ESTATE**:

_____
Jeffrey Edward Arambel, Debtor and
Debtor-in-Possession

# EXHIBIT 4

**JUNIOR SECURED LOAN AND SECURITY AGREEMENT**

**DATED AS OF _____, 2019**

**BETWEEN**

**SBN V AG I LLC,**

**AS LENDER,**

**AND**

**JEFFREY E. ARAMBEL, REORGANIZING DEBTOR FOR THE BANKRUPTCY ESTATE OF JEFFREY E. ARAMBEL IN *IN RE ARAMBEL*, E.D. CAL. BANKR. NO. 18-90029, AS BORROWER**

## JUNIOR SECURED
## LOAN AND SECURITY AGREEMENT

This Junior Secured Loan and Security Agreement (as amended, modified or supplemented from time to time, this "**Agreement**") is made as of_____, 2019, by and between SBN V Ag I LLC, a Delaware limited liability company ("**Lender**"), and Jeffery E. Arambel, Reorganizing Debtor for the Bankruptcy Estate of Jeffery E. Arambel in In Re Arambel, E.D. Cal. Bankr. No. 18-90029 ("**Borrower**").

## RECITALS

A.      On January 17, 2018 (the "**Petition Date**"), Jeffery E. Arambel, as a debtor, filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (as now and hereafter in effect or any successor statutes, the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Eastern District of California (the "**Bankruptcy Court**"), Case No. 18-90029-E-11 (the "**Chapter 11 Case**").

B.      From and after the Petition Date, Jeffery E. Arambel has continued to operate his business and manage his properties as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

C.      Jeffrey E. Arambel, as a debtor-in-possession in the Chapter 11 Case, is the proponent of that certain Plan of Reorganization, dated _____, 2019, filed with the Bankruptcy Court at Docket No. [*] (as amended or modified in accordance with its terms, the "**Plan**").

D.      Borrower has requested that Lender provide a junior secured credit facility comprised of a non-revolving line of credit facility in the maximum aggregate principal amount of up to $1,000,000.00 (the "**Maximum Line of Credit Amount**") to fund disbursements under the Plan Budget and certain cash payments specified under the Plan to be paid from Plan Funding Loans, all on the terms and conditions set forth herein (the "**Loan Facility**").

E.      Borrower has also requested that Lender, in its capacity as a Pre-Petition secured creditor of Borrower (in such capacity, "**Pre-Petition Lender**"), allow Borrower to use proceeds of the Pre-Petition Collateral, which constitute "cash collateral" of Pre-Petition Lender within the meaning of § 363(a) of the Bankruptcy Code (the "**Cash Collateral**"), in the maximum amount of up to $3,500,000.00 (the "**Maximum Cash Collateral Amount**") to fund certain cash payments specified under the Plan to be paid from Plan Funding Cash Collateral, all on the terms and conditions set forth herein.

F.      On the Petition Date, Filbin Land & Cattle Co., Inc. ("**Filbin**"), as a debtor, filed a voluntary petition for relief under the Bankruptcy Code with the Bankruptcy Court, Case No. 18-90030-E-11 (the "**Filbin Bankruptcy Case**").

G.      Borrower, as the owner of all Equity Interests in Filbin, has also requested that Pre-Petition Lender, in its capacity as a creditor of Filbin, allow Borrower to use cash in an aggregate amount of up to the Filbin Maximum Cash Amount from the Summit Reserve (as defined in the Filbin Plan of Reorganization) directed by Pre-Petition Lender, pursuant to Section

2.5 of the Filbin Plan of Reorganization, to fund disbursements under the Plan Budget and the Personal Expense Budget and certain cash payments specified under the Plan to be paid from Filbin Available Cash, all on the terms and conditions set forth herein.

H.     Lender is willing to provide the Loan Facility, and Pre-Petition Lender is willing to consent to the use of the Cash Collateral and the Filbin Available Cash, only if, among other things, (i) all of the Obligations hereunder and under the other Loan Documents are secured by valid and perfected security interests and liens on the Plan Assets to the extent set forth herein and in the Plan and the Confirmation Order; (ii) the Loan Facility, the use of the Cash Collateral and the Filbin Available Cash, and the Loan Documents are authorized and approved by the Confirmation Order to be entered by the Bankruptcy Court; (iii) Pre-Petition Lender shall have received valid and perfected replacement security interests and liens on the Plan Assets to the extent set forth herein and in the Plan and the Confirmation Order, securing an Allowed Secured Claim (as defined in the Plan) in favor of Pre-Petition Lender equal to the extent of any use of Cash Collateral; and (iv) the Plan, the Plan Budget, the Personal Expense Budget, and the Confirmation Order are acceptable in form and substance to Lender and Pre-Petition Lender (together, "**Summit**").

NOW, THEREFORE, in consideration of the foregoing premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

AGREEMENT

1.     **DEFINITIONS.**

    **1.01     Certain Defined Terms**.     Except as otherwise expressly provided in this Agreement, the following terms shall have the meanings given them in this **Section 1.01**:

    "**Account**", "**Account Debtor**", "**Chattel Paper**", "**Commercial Tort Claims**", "**Deposit Accounts**", "**Documents**", "**Electronic Chattel Paper**", "**Equipment**", "**Farm Products**", "**Fixtures**", "**General Intangibles**", "**Goods**", "**Instruments**", "**Inventory**", "**Investment Property**", "**Letter-of-Credit Right**", "**Proceeds**", "**Security**", "**Security Certificate**", and "**Tangible Chattel Paper**" shall have the respective meanings assigned to such terms in the Uniform Commercial Code.

    "**Affiliate**" means any Person (a) which directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, Borrower or (b) ten percent (10%) or more of the voting control or equity interests of which is beneficially owned or held by Borrower.

    "**Agreement**" has the meaning specified in the Recitals hereof.

    "**Applicable Law**" means all existing and future laws, orders, ordinances, rules and regulations of or by a Governmental Authority.

    "**Availability**" means, at any time, the amount, if any, by which the Maximum Line of Credit Amount exceeds the aggregate original principal balance of the Line of Credit Advances.

"**Bankruptcy Code**" has the meaning specified in the Recitals hereof.

"**Bankruptcy Court**" has the meaning specified in the Recitals hereof.

"**Board**" means the Board of Governors of the Federal Reserve System of the United States of America.

"**Borrower**" has the meaning specified in the Recitals hereof.

"**Cash Collateral**" has the meaning specified in the Recitals hereof.

"**Cash Collateral Fund**" has the meaning specified in **Section 2.01(a)** hereof.

"**Chapter 11 Case**" has the meaning specified in the Recitals hereof.

"**Closing Date**" means the Effective Date.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations thereunder, all as in effect from time to time.

"**Collateral**" means the Plan Assets.

"**Crop Assignment**" has the meaning specified in **Section 4.09** hereof.

"**Default Period**" means the period of time commencing on the day an Event of Default occurs and continuing through the date the Event of Default has been cured or waived.

"**Embargoed Person**" means (a) any country or territory that is the target of a sanctions program administered by OFAC or (b) any Person that (i) is or is owned or controlled by a Person publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by OFAC, (ii) is the target of a sanctions program or sanctions list (A) administered by OFAC, or (B) under the Iran Sanctions Act, as amended, section 1245 of the National Defense Authorization Act for Fiscal Year 2012 or Executive Order 13590 "Authorizing the Imposition of Certain Sanctions with respect to the Provision of Services, Technology or Support for Iran's Energy and Petro-chemical Sectors," effective November 21, 2011 (collectively, "**Sanctions**") or (iii) resides, is organized or chartered, or has a place of business in a country or territory that is the subject of a sanctions program administered by OFAC.

"**Enforcement Costs**" means all reasonable fees, costs and expenses described in **Section 3.04** hereof paid or incurred by or on behalf of Lender.

"**Environmental Laws**" means all federal, state, district, local and foreign laws, rules, regulations, ordinances, and consent decrees relating to health, safety, hazardous substances, pollution and environmental matters, as now or at any time hereafter in effect, applicable to Borrower's business or facilities owned or operated by Borrower, including laws relating to emissions, discharges, releases or threatened releases of pollutants, contamination, chemicals, or hazardous, toxic or dangerous substances, materials or wastes into the environment (including

ambient air, surface water, ground water, land surface or subsurface strata) or otherwise relating to the generation, manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials.

"**Equity Interests**" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"**Event of Default**" shall have the meaning specified in **Section 10.01** hereof.

"**Financial Information**" has the meaning specified in **Section 7(e)** hereof.

"**Fiscal Year**" means each twelve (12) month accounting period of Borrower, which ends on December 31 of each year.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the Accounting Standards Codification of the Financial Accounting Standards Board, or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Hazardous Materials**" means any hazardous, toxic or dangerous substance, materials and wastes, including hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Law (including any that are or become classified as hazardous or toxic under any Environmental Law).

"**Indemnified Party**" shall have the meaning specified in **Section 12.01** hereof.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of capital stock or other

securities of another Person, (b) a loan, advance or capital contribution to guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor guarantees indebtedness of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit; provided, that for purposes of covenant compliance, the amount of any Investment shall be the amount actually invested without adjustment for subsequent increases or decreases in the value of such Investment.

"**Judgment**" means a judgment, order, writ, injunction, decree, or rule of any court, arbitrator, or Governmental Authority.

"**Lender**" has the meaning specified in the introductory paragraph hereof.

"**Lien**" means any security interest, mortgage, deed of trust, pledge, lien, charge, judgment lien, assignment, financing statement, encumbrance, title retention agreement or analogous instrument or device, including the interest of each lessor under any capitalized lease and the interest of any bondsman under any payment or performance bond, in, of or on any assets or properties of a Person, whether now owned or subsequently acquired and whether arising by agreement or operation of law, all whether perfected or unperfected.

"**Line of Credit**" shall have the meaning specified in **Section 2.02(a)** hereof.

"**Line of Credit Advances**" shall mean loan advances to Borrower to fund disbursements under the Plan Budget and certain cash payments specified under the Plan to be paid from Plan Funding Loans (but in no event for personal, family or household purposes).

"**Line of Credit Note**" shall have the meaning specified in **Section 2.02(c)** hereof.

"**Loan Documents**" means this Agreement, the Line of Credit Note, and all other agreements, instruments and documents, including guaranties, deeds of trust, mortgages, pledges, powers of attorney, consents, assignments, contracts, notices, security agreements, leases, financing statements and all other writings heretofore, now or from time to time hereafter executed by or on behalf of Borrower or any other Person and delivered to Lender or to any parent, affiliate or subsidiary of Lender in connection with the Obligations or the transactions contemplated hereby, as each of the same may be amended, restated, modified or supplemented from time to time.

"**Loan Facility**" has the meaning specified in the Recitals hereof.

"**Loans**" means all loans and advances made by Lender to or on behalf of Borrower hereunder.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Maturity Date**" means _____, 20___ (the date that is sixteen (16) months following the Effective Date).

"**Maximum Cash Collateral Amount**" has the meaning specified in the Recitals hereof.

"**Maximum Line of Credit Amount**" has the meaning specified in the Recitals hereof.

"**Obligations**" means, in each case, whether now in existence or hereafter arising: (a) the principal of and interest on the Loans, (b) all amounts evidenced by the Line of Credit Note, (c) Enforcement Costs, and (d) all other fees and commissions (including attorneys' fees and expenses), charges, indebtedness, loans, liabilities, financial accommodations, obligations, covenants and duties owing by Borrower to Lender pursuant to the Loan Documents of every kind, nature and description, direct or indirect, primary or secondary, absolute or contingent, due or to become due, contractual or tortious, liquidated or unliquidated, whether several, joint, or joint and several, and whether or not evidenced by any note.

"**OFAC**" means the United States Office of Foreign Assets Control.

"**Party**" refers only to a named party to a Loan Document, as the context requires.

"**Patriot Act**" means Title III of Pub. L. 107 56 (signed into law October 26, 2001).

"**Person**" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or foreign or United States government (whether federal, state, county, city, municipal or otherwise), including any instrumentality, division, agency, body or department thereof.

"**Petition Date**" has the meaning specified in the introductory paragraph hereof.

"**Plan**" has the meaning specified in the Recitals hereof.

"**Pledged Collateral**" means, collectively, Pledged Debt and Pledged Equity Interests.

"**Pledged Debt**" means all debt owed or owing to Borrower by any Person, and all Instruments, Chattel Paper or other documents, if any, representing or evidencing such debt.

"**Pledged Equity Interests**" means all Equity Interests owned or held by or on behalf of Borrower in any Person, and all Security Certificates, Instruments and other documents, if any, representing or evidencing such Equity Interests.

"**Post-Petition**" means the time period beginning immediately upon the filing of the Chapter 11 Case.

"**Prepay**" means to make a Prepayment.

"**Prepayment**" means a payment of all or a portion of the unpaid principal balance of a Loan prior to the date when due, whether voluntary, by reason of acceleration, or otherwise.

"**Pre-Petition**" shall mean the time period prior to the filing of the Chapter 11 Case.

"**Pre-Petition Collateral**" shall mean any and all assets of Borrower securing the Pre-Petition Obligations.

"**Pre-Petition Credit Agreements**" means, collectively, (a) that certain Amended and Restated Loan and Security Agreement, dated as of June 6, 2016, entered into by and among Borrower and Lender, among others, as amended, restated, supplemented or modified from time to time; (b) that certain Amended and Restated Loan and Security Agreement, dated as of June 6, 2016, entered into by and among Borrower and Lender, among others, as amended, restated, supplemented or modified from time to time; and (c) that certain Guaranty, dated April 17, 2017, entered into by Borrower for the benefit of Lender in connection with that certain Loan and Security Agreement, dated April 17, 2017, entered into by and between Lender and JEA2, LLC, a California limited liability company.

"**Pre-Petition Indebtedness**" means any or all indebtedness of Borrower incurred prior to the Petition Date and outstanding on the Petition Date.

"**Pre-Petition Lender**" has the meaning specified in the Recitals hereof.

"**Pre-Petition Loan Documents**" has the meaning assigned to the term "Loan Documents" in the Pre-Petition Credit Agreements.

"**Pre-Petition Loans**" means the aggregate Loans (as such term is defined in the Pre-Petition Credit Agreements) outstanding on the Petition Date.

"**Pre-Petition Obligations**" means all Obligations (as such term is defined in the Pre-Petition Credit Agreements).

"**Pre-Petition Payments**" means any payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Pre-Petition Indebtedness or other Pre-Petition obligations or claims (including trade payables and payments in respect of reclamation claims) of Borrower.

"**Real Estate**" means that portion of the Collateral (or the Pre-Petition Collateral) which is real property, as opposed to personal property.

"**Regulation U**" means Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder and thereof.

"**Replacement Lien**" shall have the meaning specified in **Section 2.01(c)** hereof.

"**Subsidiary**" means any corporation of which more than fifty percent (50%) of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time stock of any other class of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned by Borrower, or any partnership, joint venture or limited liability company of which more than fifty percent (50%) of the outstanding equity interests are at the time, directly or indirectly, owned by Borrower or any partnership of which Borrower is a general partner.

"**Summit**" has the meaning specified in the Recitals hereof.

"**Termination Date**" means the earliest of (a) the Maturity Date and (b) the date the Lender accelerates payment of the Obligations and terminates any remaining Availability under the Maximum Line of Credit Amount, and Pre-Petition Lender terminates Borrower's authorization to use Cash Collateral, pursuant to **Section 10.02** hereof.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code as in effect in the State of California.

### 1.02    Other Definitional Terms; Rules of Interpretation.

The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP. All terms defined in the Uniform Commercial Code and not otherwise defined herein have the meanings assigned to them in the Uniform Commercial Code. References to Articles, Sections, subsections, Exhibits, Schedules and the like, are to Articles, Sections and subsections of, or Exhibits or Schedules attached to, this Agreement unless otherwise expressly provided. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". Unless the context in which used herein otherwise clearly requires, "or" has the inclusive meaning represented by the phrase "and/or". Defined terms include in the singular number the plural and in the plural number the singular. Reference to any agreement (including the Loan Documents), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof (and, if applicable, in accordance with the terms hereof and the other Loan Documents), except where otherwise explicitly provided, and reference to any promissory note includes any promissory note which is an extension or renewal thereof or a substitute or replacement therefor. Reference to any law, rule, regulation, order, decree, requirement, policy, guideline, directive or interpretation means as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect on the determination date, including rules and regulations promulgated thereunder.

### 1.03    Defined Terms Under the Plan.

Capitalized terms used but not defined herein that are defined in the Plan have the meanings given to them under the Plan.

## 2.    USE OF CASH COLLATERAL AND LOANS.

### 2.01    Use of Cash Collateral and Filbin Available Cash.

(a)    Subject to the terms and conditions of the Loan Documents (including, without limitation, the conditions precedent set forth in **Section 11.01**), on the Effective Date and prior to the Termination Date, Pre-Petition Lender hereby consents to Borrower's use of Cash Collateral in an amount of up to the Maximum Cash Collateral Amount to fund certain cash payments specified under the Plan to be paid from Plan Funding Cash Collateral, pursuant to the terms and conditions of the Plan (the "**Cash Collateral Fund**").

(b)     The Cash Collateral Fund will be funded and maintained, pursuant to the following terms and conditions: upon the consummation of any sale or refinance of Pre-Petition Collateral authorized by a Final Order of the Bankruptcy Court entered after the date hereof pursuant to the terms and conditions of the Plan, the Cash Collateral proceeds of any such sale or refinance otherwise due to Pre-Petition Lender (after payment of all Claims having priority over Pre-Petition Lender) shall be distributed as follows: (i) first, to Pre-Petition Lender on account of its Allowed Secured Claim in Class 1 until Pre-Petition Lender has received a total of $2,000,000.00 on account of such Allowed Secured Claim; and (ii) second, 90% to Pre-Petition Lender on account of its Allowed Secured Claim in Class 1 and 10% to a Plan Account of Borrower to fund the Cash Collateral Fund until the Cash Collateral Fund has been funded in full up to the Maximum Cash Collateral Amount.  Subject to the terms and conditions of the Loan Documents, the positive balance of the Cash Collateral Fund shall be used to fund certain cash payments specified under the Plan to be paid from Plan Funding Cash Collateral, pursuant to the terms and conditions of the Plan.

(c)     In consideration of Borrower's use of Cash Collateral in connection with, and pursuant to the terms and conditions of, the Cash Collateral Fund, Pre-Petition Lender shall receive perfected replacement liens and security interests in favor of Pre-Petition Lender in and on the Collateral, which replacement liens and security interests shall secure Pre-Petition Lender's Allowed Secured Claim in an amount equal to the extent of such use of Cash Collateral (a "**Replacement Lien**").

(d)     Subject to the terms and conditions of the Loan Documents (including, without limitation, the conditions precedent set forth in **Section 11.01**), on the Effective Date and prior to the Termination Date, Pre-Petition Lender shall direct Filbin Available Cash, to fund disbursements under the Plan Budget and the Personal Expense Budget and certain cash payments specified under the Plan to be paid from Filbin Available Cash, pursuant to Section 2.5 of the Filbin Plan of Reorganization and the terms and conditions of the Plan.

### 2.02    Non-Revolving Line of Credit.

(a)     Subject to the terms and conditions of the Loan Documents (including, without limitation, the conditions precedent set forth in **Section 11.01**), from time to time on or after the date that the conditions to closing are satisfied and prior to the Termination Date, Lender hereby establishes for the benefit of Borrower a non-revolving line of credit facility (the "**Line of Credit**"), pursuant to which Lender shall make Line of Credit Advances in a maximum aggregate original principal amount not in excess of the Maximum Line of Credit Amount, provided further that no Line of Credit Advance shall be in an amount in excess of the applicable Availability at the time such Line of Credit Advance is to be made by Lender.  Subject to such limitations, the outstanding principal balance of Line of Credit Advances may change from time to time, to be increased by future Line of Credit Advances which may be made by Lender to or for the benefit of Borrower and to be reduced by repayments; provided, however, that the Line of Credit is a straight line of credit, not a revolving line of credit, and principal amounts repaid may not be re-advanced.

(b)      The proceeds of all Line of Credit Advances shall be used by Borrower to fund disbursements under the Plan Budget and certain cash payments specified under the Plan to be paid from Plan Funding Loans (but in no event for personal, family or household purposes).

(c)      On the Closing Date, Borrower shall execute and deliver a promissory note to Lender in a principal amount equal to the Maximum Line of Credit Amount ("**Line of Credit Note**"). The Line of Credit Note shall evidence Borrower's unconditional obligation to repay Lender for all Line of Credit Advances made under the Line of Credit, with interest thereon as herein provided. Each Line of Credit Advance under the Line of Credit shall be deemed evidenced by the Line of Credit Note, which is deemed incorporated herein by reference and made part hereof. The Line of Credit Note shall be in form and substance satisfactory to Lender.

### 2.03    <u>Requests for Line of Credit Advances</u>.

(a)      Each request for a Line of Credit Advance shall be made in the following manner: Borrower shall give Lender prior written notice, no later than 12:00 noon (Denver, Colorado time) at least five (5) Business Days prior to the date of each Line of Credit Advance requested by Borrower, in which notice Borrower shall specify (i) the amount of the proposed borrowing, (ii) the proposed borrowing date, and (iii) the proposed use of funds pursuant to the Plan Budget and the Plan, together with a representation and warranty that such proposed use of funds and the amount thereof is in accordance with the Plan Budget and the Plan; <u>provided</u>, <u>however</u>, that (1) no Line of Credit Advance shall be made unless Lender, in its reasonable discretion, determines that such Line of Credit Advance, including the amount and timing thereof and the proposed use of such funds, are in accordance with the Plan Budget and the Plan, and (2) no such request may be made during a Default Period. Each such notice shall be duly completed in Lender's then current Line of Credit Advance draw request form and subject to Lender's reasonable requirements for supporting documentation, invoices and lien waivers, as applicable. As an accommodation to Borrower, Lender may permit electronic requests for Line of Credit Advances to Lender by Borrower in which case an advance request form is not required. Requests for Line of Credit Advances may not be made more frequently than on a monthly basis. Unless Borrower specifically directs Lender in writing not to accept or act upon electronic communications from Borrower, Lender shall have no liability to Borrower for any loss or damage suffered by Borrower as a result of Lender's honoring of any requests communicated to it electronically and purporting to have been sent to Lender by Borrower and Lender shall have no duty to verify the origin of any such communication or the authority of the Person sending it.

(b)      Borrower hereby irrevocably authorizes Lender to disburse the proceeds of each Line of Credit Advance requested by Borrower to such Plan Account of Borrower as Borrower may direct Lender in writing from time to time.

### 2.04    <u>Repayments</u>.

The Obligations shall be repaid as follows:

     (a)    <u>Repayment of Line of Credit Advances</u>. Borrower shall repay the Line of Credit Advances and all related Obligations on the Termination Date. If any such payment due date is not a Business Day, then such payment may be made on the next succeeding Business Day and such extension of time shall be included in the computation of the amount of interest due hereunder.

     (b)    <u>Optional Prepayment of Loans</u>. Borrower may elect to partially Prepay the Loans in minimum principal amounts of $100,000 (unless, for a given Prepayment, a lesser amount is agreed to in writing by Lender) from time to time and to Prepay the Loans in full at any time, with each such Prepayment to be accompanied by a payment of the accrued and unpaid interest on the principal amount prepaid.

## 3.   <u>INTEREST AND CHARGES</u>.

### 3.01   <u>Interest Rate</u>.

The Loans shall bear interest on the principal amount thereof outstanding from time to time and accruing from the date of each such Loan at the rate of ten percent (10.00%) per annum.

### 3.02   **[Reserved]**.

### 3.03   <u>Interest Payments</u>.

Borrower shall not be required to make any monthly installments of principal or interest on the Line of Credit. On the Termination Date, the entire unpaid principal balance of the Line of Credit, all accrued unpaid interest thereon, and any and all other sums due hereunder shall be due and payable in full. Whenever any payment to be made hereunder shall be stated to be due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest and fees due under this Agreement.

### 3.04   <u>Costs and Expenses</u>.

Borrower shall reimburse Lender for all reasonable costs and expenses, including expenses and fees of third-party service providers, legal expenses and reasonable attorneys' fees, incurred by Lender in connection with the (a) documentation and consummation of this transaction and any other transactions between Borrower and Lender, including Uniform Commercial Code and other public record searches, recordations and filings, overnight courier or other express or messenger delivery, appraisal costs, surveys, title insurance and environmental audit or review costs, (b) collection, protection or enforcement of any rights in or to the Collateral, (c) collection of any Obligations, (d) the realization upon, disposition or sale of, any or all of the Collateral, (e) administration, monitoring, processing and servicing of the Loans, the Loan Documents, and the Collateral, or (f) enforcement of any of Lender's rights under this Agreement or any other Loan Document (including any costs and expenses of any third party provider engaged by Lender for such purposes).

**3.05**     **Maximum Interest**.

It is the intent of the parties that the rate of interest and other charges to Borrower under the Loan Documents shall be lawful; therefore, if for any reason the interest or other charges payable under this Agreement are found by a court of competent jurisdiction, in a final determination, to exceed the limit which Lender may lawfully charge Borrower, then the obligation to pay interest and other charges shall automatically be reduced to such limit and, if any amount in excess of such limit shall have been paid, then such amount shall be applied to the outstanding principal amount of the Loans until repaid in full and thereafter refunded to Borrower.

**3.06**     **Computation of Interest**.

All interest accruing on the outstanding principal amount of the Loans hereunder outstanding from time to time shall be calculated on the basis of actual number of days elapsed in a 360-day year.

**4.**     **COLLATERAL**.

**4.01**     **Grant of Security Interest to Lender**.

As security for the payment of all Loans now or in the future made by Lender to Borrower hereunder and for the payment or other satisfaction of all other Obligations, Borrower hereby grants to Summit a continuing Lien on and security interest in, and in consideration of Borrower's use of Cash Collateral in connection with, and pursuant to the terms and conditions of, the Cash Collateral Fund, a continuing Replacement Lien on and security interest in, the following Plan Assets of Borrower, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located, with a Lien priority subject and subordinate only to existing Allowed Secured Claims against such Collateral: (a) all Accounts and all Goods whose sale, lease or other disposition by Borrower has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, Borrower; (b) all Chattel Paper, Instruments, Documents and General Intangibles (including all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contract rights, payment intangibles, security interests, security deposits and rights to indemnification); (c) all Inventory, Goods (other than Inventory), including Equipment, and all vehicles, Fixtures, and farm products consisting of crops, supplies, used or produced in Borrower's farming operations or development activities; (d) all rights to payment, including any rights under any state or federal agricultural programs (including FSA payments, rights to payment in kind for crops or other farm products, revolving fund credits, dividends and retainages); (e) all rights with respect to any statutory or common law lien regarding any of the Collateral, to establish a trust under 7 U.S.C. § 181 et seq. or 7 U.S.C. § 499A et seq., and to secure the purchase price of crops and other farm products under California Food and Agriculture Code § 55631 et seq., as all such rights are now in effect or hereafter enacted, promulgated or amended; (f) all proceeds of any crop insurance price support payment or other government program; (g) all Investment Property; (h) all Deposit Accounts, bank accounts, deposits and cash; (i) all Letter-of-Credit Rights; (j) Commercial Tort Claims; (k) any

other property of Borrower now or hereafter in the possession, custody or control of Summit or any agent or any parent, affiliate or subsidiary of Summit or any participant with Lender in the Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise); (l) all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property, including proceeds of all insurance policies insuring the foregoing property, and all of Borrower's books and records relating to any of the foregoing and to Borrower's business; (m) all water, water rights and entitlements, appurtenant or otherwise, other rights to water and to receive water of every kind or nature, including but not limited to ground water, rights to remove and extract ground water, rights with respect to surface water, whether appropriative, riparian or otherwise, water allocation, distribution, delivery or storage rights, now or at any time hereafter owned or acquired by Borrower; (n) all rights to payments arising out of or in any way connected with Borrower's sale, exchange, storage, transport, delivery, carrying, ownership, use, nonuse, or other disposition of water and water related rights; and (o) any proceeds or property recovered in connection with the successful prosecution or settlement of any claims pursuant to §§ 502(d), 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code.

### 4.02　**Real Estate**.

As security for the payment of all Loans now or in the future made by Lender to Borrower hereunder and for the payment or other satisfaction of all other Obligations, Borrower hereby grants to Summit a continuing Lien on and security interest in, and in consideration of Borrower's use of Cash Collateral in connection with, and pursuant to the terms and conditions of, the Cash Collateral Fund, a continuing Replacement Lien on and security interest in, the Real Estate of Borrower, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located, to the extent such Real Estate constitutes a Plan Asset, with a Lien priority subject and subordinate only to existing Allowed Secured Claims against such Collateral.

### 4.03　**Possessory Collateral**.

Upon Borrower's receipt of any portion of the Collateral evidenced by an agreement, Instrument or Document, including any Tangible Chattel Paper and any Investment Property consisting of certificated securities and upon Lender's request, Borrower shall deliver the original thereof to Summit together with an appropriate endorsement or other specific evidence of assignment thereof to Summit (in form and substance acceptable to Summit). If an endorsement or assignment of any such items shall not be made for any reason, Summit is hereby irrevocably authorized, as Borrower's attorney and agent-in-fact, to endorse or assign the same on Borrower's behalf.

### 4.04　**Electronic Chattel Paper**.

To the extent that Borrower obtains or maintains any Electronic Chattel Paper, Borrower shall create, store and assign the record or records comprising the Electronic Chattel Paper in such a manner that (a) a single authoritative copy of the record or records exists which is unique, identifiable and except as otherwise provided in clauses (d), (e) and (f) below, unalterable, (b) the authoritative copy identifies Summit as the assignee of the record or records, (c) the

authoritative copy is communicated to and maintained by Summit or its designated custodian, (d) copies or revisions that add or change an identified assignee of the authoritative copy can only be made with the participation of Summit, (e) each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy and (f) any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision.

**4.05**    **Reserved**.

**4.06**    **Pledged Collateral**.

       (a)     <u>Registration in Nominee Name; Denominations</u>. Borrower hereby agrees that Summit shall have the right (in its sole and absolute discretion) to hold, where applicable, Pledged Collateral in Summit's own name as pledgee, the name of its nominee (as pledgee or as sub-agent) or the name of Borrower, endorsed or assigned, where applicable, in blank or in favor of Lender.

       (b)     <u>Reserved</u>.

       (c)     <u>Reserved</u>.

       (d)     <u>Control</u>. If at any time any Pledged Equity Interests do not constitute Securities or if any Pledged Equity Interests constituting Securities are not evidenced by a Security Certificate, Borrower shall take such actions and execute such documents, at Borrower's expense, as is necessary to establish Summit's control thereof or otherwise perfect the security interest therein.

**4.07**    **Assignment of Insurance**.

As additional security for the payment and performance of the Obligations and in consideration of Borrower's use of Cash Collateral in connection with, and pursuant to the terms and conditions of, the Cash Collateral Fund, Borrower hereby assigns to Summit any and all monies (including proceeds of insurance and refunds of unearned premiums) due or to become due under, and all other rights of Borrower with respect to, any and all policies of insurance now or at any time hereafter covering the Collateral or any evidence thereof or any business records or valuable papers pertaining thereto, and Borrower hereby directs the issuer of any such policy to pay all such monies directly to Summit.

**4.08**    **Preservation of Collateral and Perfection of Security Interests**.

Borrower shall, at Summit's request, at any time and from time to time, authenticate, execute and deliver to Summit such financing statements, documents and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed necessary or desirable by Summit) and do such other acts and things or cause third parties to do such other acts and things as Summit may deem necessary or desirable, in its sole discretion, in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Summit to secure payment of the Obligations and in order to facilitate the collection of the Collateral. Borrower irrevocably hereby makes, constitutes and appoints Summit (and all

Persons designated by Summit for that purpose) as Borrower's true and lawful attorney and agent-in-fact to execute and file such financing statements, documents and other agreements and instruments and do such other acts and things as may be necessary to preserve and perfect Summit's security interest in the Collateral. Borrower further agrees that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement shall be sufficient as a financing statement. Borrower further ratifies and confirms the prior filing by Summit of any and all financing statements which identify Borrower as debtor, Summit as secured party and any or all Collateral as collateral. Upon the request of Summit, Borrower agrees to execute and deliver to Summit Grants of Security Interest in Trademarks and Patents and Grants of Security Interest in Copyrights in forms reasonably acceptable to Summit.

        **4.09**     <u>**Assignment of Crop Proceeds**</u>.

        Borrower shall (a) provide assignments in form and substance mutually acceptable to Borrower and Summit of crop proceeds to Summit for all crops delivered to processors, packers or shippers as the identities of such processors, packers or shippers become known to Borrower, but in all events prior to such deliveries, (b) shall permit Lender to perform scheduled crop inspections each quarter throughout the crop season, including harvest, at Borrower's expense, and (c) permit Lender to perform unannounced crop inspections at Lender's sole discretion (the "**Crop Assignment**").

**5.**      <u>**FINANCIAL AND OTHER INFORMATION**</u>

        Upon reasonable request of Lender, Borrower shall deliver to Lender financial information of Borrower in form and substance reasonably satisfactory to Lender.

**6.**      <u>**TERMINATION**</u>.

        Lender shall not make any additional Loans or other credit extensions on or after the Termination Date, Borrower shall not be authorized to use any Cash Collateral or any Filbin Available Cash for any purpose on or after the Termination Date, and this Agreement shall terminate on the date thereafter that the Obligations are paid in full and the positive balance of the Cash Collateral Fund is paid to Pre-Petition Lender on account of its Allowed Secured Claim in Class 1. The termination of this Agreement shall not affect Summit's or Borrower's rights, or any of the Obligations or the Pre-Petition Obligations having their inception on or prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations and Pre-Petition Obligations have been fully and indefeasibly paid, disposed of, concluded or liquidated. The security interests, Liens, and rights granted to Summit herein and in the other Loan Documents shall continue in full force and effect until all of the Obligations and the Pre-Petition Obligations have been indefeasibly paid and performed in full. All representations, warranties, covenants, waivers, and agreements contained herein shall survive termination of this Agreement until all Obligations and Pre-Petition Obligations are indefeasibly paid and performed in full.

7. **REPRESENTATIONS AND WARRANTIES**.

   **7.01   General Matters**.

   Borrower represents and warrants to Lender as follows:

   (a)   [reserved];

   (b)   upon entry of the Confirmation Order, the execution, delivery and performance by Borrower of each Loan Document is within the powers and authority of Borrower and have been duly authorized; and the Loan Documents have been duly executed and delivered by Borrower;

   (c)   upon entry of the Confirmation Order, the Loan Documents do not conflict with any Applicable Law;

   (d)   upon entry of the Confirmation Order, each Loan Document is a legal, valid and binding agreement of Borrower, enforceable against Borrower in accordance with its terms, and any instrument or agreement required hereunder or thereunder, when executed and delivered to Lender, will be similarly legal, valid, binding and enforceable;

   (e)   all financial statements and other reports, documents, instruments, information and forms of evidence concerning Borrower, the Collateral, or any other fact or circumstance (the "**Financial Information**"), delivered to Lender in connection with this Agreement, are accurate, correct and sufficiently complete in all material respects to provide Lender true and accurate knowledge of their subject matter, including, without limitation, all material contingent liabilities;

   (f)   [reserved];

   (g)   Borrower has good and marketable title to, or a valid leasehold interest in, all of its property and assets as reflected in the Financial Information provided to Lender;

   (h)   upon entry of the Confirmation Order, the Loan Documents are effective to create, in favor of Summit, legally valid and enforceable security interests in or other Liens on such right, title and interest Borrower shall from time to time have in the Collateral; and Borrower has authorized all filing and recording by Lender required for the perfection of the security interests by filing or recording and, if requested by Lender, has properly delivered to Lender all Collateral that requires perfection of the security interests by possession;

   (i)   [reserved];

   (j)   [reserved];

   (k)   [reserved];

   (l)   to the best of Borrower's knowledge, Borrower and the Real Estate are in compliance with all Applicable Laws (including all Environmental Laws), and there is no claim,

action, proceeding or investigation pending or to Borrower's knowledge threatened against Borrower or the Real Estate with respect to a violation of any Applicable Law (including any Environmental Law);

(m)     Borrower has not treated, stored, used or released any Hazardous Material in, on or at any of the properties or facilities owned or leased by Borrower (except for inventories of substances that are used or to be used in the ordinary course of business of Borrower (which inventories have been stored and used and wastes disposed of in material compliance with all applicable Environmental Laws)), asbestos-containing materials, or PCB-containing equipment located in, on or at any of the properties or facilities owned or leased by Borrower;

(n)     Borrower has previously delivered to Lender each environmental audit, assessment or investigation report in the possession or control of Borrower which have been prepared by any party during the 5-year period preceding the Closing Date relating to environmental conditions or compliance with Environmental Laws on any of the properties or facilities owned or leased by Borrower;

(o)     Borrower is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986;

(p)     Borrower is not an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended;

(q)     Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no part of the proceeds of any Loan will be used, either directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock or to refund indebtedness originally incurred for such purpose; or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board;

(r)     no default or Event of Default has occurred and is continuing;

(s)     Borrower will use all amounts loaned under the Line of Credit Advances to fund disbursements under the Plan Budget and certain cash payments specified under the Plan to be paid from Plan Funding Loans (but in no event for personal, family or household purposes);

(t)     [reserved];

(u)     [reserved];

(v)     Borrower's submission to Lender of any report, record, certificate or other information pertaining to the condition or operations, financial or otherwise, of Borrower, from time to time, whether or not required under this Agreement, will be deemed accompanied by a representation by Borrower that the report, record or information is complete and accurate in all material respects as to the condition or operations of Borrower, including, without limitation, all

material contingent liabilities and does not omit to state any material fact necessary to make the information contained therein misleading;

(w)     to the extent applicable, Borrower is in compliance with (i) the Patriot Act in all material respects and (ii) any applicable Anti-Money Laundering Laws or any applicable Sanctions requirements of law that in each case are binding on Borrower; and Borrower is not an Embargoed Person;

(x)     no part of the proceeds of the Loans will be used, directly or, to the knowledge of management of Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended; and

(y)     Borrower will not directly or indirectly use any proceeds of the Loans or lend, contribute or otherwise make available such proceeds to any Person for the purpose of financing the activities of or with any Person or in any country or territory that, at the time of funding, is an Embargoed Person.

**7.02    Bankruptcy Matters**.

Borrower represents and warrants to Lender as follows:

(a)     the Chapter 11 Case was commenced on the Petition Date in accordance with Applicable Law and proper notice thereof was given and proper notice, to the extent given or required to be given prior to the date hereof, was given for (i) the motion seeking approval of the Disclosure Statement, the Plan and the Confirmation Order and (ii) the hearing for the approval of the Disclosure Statement, the Plan and the Confirmation Order;

(b)     from and after the entry of the Confirmation Order and pursuant to and to the extent provided in the Plan and the Confirmation Order, the Obligations will be secured by a valid and perfected Lien on and security interest in, and the Pre-Petition Obligations will be secured by a valid and perfected Replacement Lien on and security interest in, all of the Collateral, subject and subordinate only to existing Allowed Secured Claims against the Collateral; and

(c)     the Plan and the Confirmation Order are in full force and effect and have not been reversed, stayed, modified or amended without Lender's consent.

**8.    AFFIRMATIVE COVENANTS**.

Until payment and satisfaction in full of all Obligations and termination of this Agreement, Borrower covenants and agrees as follows:

**8.01    Books and Records**.

Borrower shall maintain proper books of record and accounts, including full, true, and correct entries of all dealings and transactions relating to its business and activities, on a cash or an accrual basis, at the option of Borrower, in all material respects in conformity with Borrower's past accounting practices.

**8.02    Notices**.

Borrower shall furnish to Lender, promptly upon receipt, copies of all notices, orders, or other communications regarding (i) any enforcement action by any Governmental Authority relating to health, safety, the environment, or any Hazardous Materials with regard to Borrower's property activities, or operations, or (ii) any claim against Borrower regarding Hazardous Materials. All of the foregoing notices shall be provided by Borrower to Lender in writing and shall describe the steps being taken by Borrower with respect thereto.

**8.03    Maintenance of Assets**.

Subject to the Plan Budget, Borrower shall maintain and preserve, and make any repairs, renewals, or replacements to keep, Borrower's properties in good working condition.

**8.04    Compliance with Laws**.

Borrower shall comply in all respects with all Applicable Laws. Borrower shall obtain and maintain in full force and effect and comply in all material respects with all necessary permits and government approvals.

**8.05    Inspections**.

Borrower shall, at any reasonable time and from time to time, permit Lender or any of its agents or representatives to examine and make copies of and abstracts from the records and books of Borrower, Borrower's independent accountants, and any other person or entity dealing with Borrower and to inspect any of the Collateral.

**8.06    Insurance**.

(a)    Borrower shall maintain, or cause to be maintained, public liability insurance; all risk property damage insurance policies covering tangible property comprising the Collateral for the full insurable value on a replacement cost basis; workers' compensation insurance as required by law; crop insurance satisfactory to Lender on the types of crops grown by Borrower, including, without limitation, peaches, apricots, almonds, and cherries; and such additional insurance as required by Lender from time to time.

(b)    If any Real Estate is located in an area now or hereafter designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Borrower agrees to obtain and maintain Federal Flood Insurance, if available, within forty-five (45) days after notice is given by Lender that the Real Estate is located in a special flood hazard area, for the full unpaid principal balance of the Obligations plus any Prior Liens on the property,

up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the Loans.

(c)     All policies of insurance required under the Loan Documents must be issued by companies approved by Lender, and must be acceptable to Lender as to amounts, forms, risk coverages, expiration dates, and loss payable and cancellation provisions with deductibles of a maximum of $10,000 on improvements and fixtures located on the Real Estate and $1,000 on all Collateral which is other tangible personal property. In addition, each required policy must stipulate that coverage will not be cancelled or diminished without a minimum of ten (10) days prior written notice to Lender and without disclaimer of the insurer's liability for failure to provide such notice; contain a First Loss Payable Endorsement and any other endorsements as Lender may require and must name Lender as an additional insured and lender loss payee so that all proceeds of such property or casualty insurance shall be payable to Lender to the extent of its respective interest.

(d)     Borrower agrees to deliver to Lender, on or before the Closing Date, evidence of the required insurance as provided herein, with an effective date on or before the Closing Date. If Borrower fails to provide any required insurance or fails to continue any required insurance in force, Lender may do so at Borrower's expense. At the option of Lender, Borrower shall reimburse Lender, on demand, for the cost of any such insurance paid by Lender or such cost shall be added to the Obligations. BORROWER ACKNOWLEDGES THAT IF LENDER SO PURCHASES ANY REQUIRED INSURANCE, THE INSURANCE WILL PROVIDE LIMITED PROTECTION AGAINST PHYSICAL DAMAGE TO THE COLLATERAL, UP TO AN AMOUNT EQUAL TO THE LESSER OF (1) THE UNPAID BALANCE OF THE OBLIGATIONS, PLUS ANY PRIOR LIENS ON THE COLLATERAL, OR (2) THE VALUE OF THE COLLATERAL; HOWEVER, BORROWER'S EQUITY IN THE COLLATERAL MAY NOT BE INSURED. IN ADDITION, THE INSURANCE MAY NOT PROVIDE ANY PUBLIC LIABILITY OR PROPERTY DAMAGE INDEMNIFICATION AND MAY NOT MEET THE REQUIREMENTS OF ANY FINANCIAL RESPONSIBILITY LAWS.

(e)     For purpose of insurance coverage on the Collateral, Borrower authorizes Lender to provide to any Person all information Lender deems appropriate, whether regarding the Collateral, the Loans, the other Obligations or other financial accommodations, or both.

### 8.07    Use of Proceeds.

Borrower shall use the proceeds of the Line of Credit Advances solely for the purposes specified in **Section 2.02(b)** hereof.

### 8.08    Patriot Act, Bank Secrecy Act and Office of Foreign Assets Control.

As required by federal law and the Lender's policies and practices, Lender may need to obtain, verify and record certain customer identification information and documentation in connection with opening or maintaining accounts, or establishing or continuing to provide services and Borrower agrees to provide such information. In addition, and without limiting the foregoing sentence, Borrower shall ensure that Borrower (a) is not and shall not be listed on the

Specially Designated Nationals and Blocked Person List or other similar lists maintained by OFAC, the Department of the Treasury or included in any Executive Orders, (b) does not use or permit the use of the proceeds of the Loans to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, and (c) complies with all applicable Bank Secrecy Act laws and regulations, as amended.

**8.09    Other Acts**.

Upon request by Lender, Borrower shall cooperate with Summit for the purposes of, and perform all acts which may be necessary or advisable to establish, perfect and/or monitor any Lien granted under this Agreement or the other Loan Documents, or to carry out the intent of the Loan Documents.

**8.10    Bankruptcy Covenants**.

(a)    Borrower shall comply with all covenants, terms and conditions and otherwise perform all obligations set forth in the Plan and the Confirmation Order in all respects and within the deadlines set forth therein.

(b)    Borrower will use commercially reasonable efforts to obtain the approval of the Bankruptcy Court of this Agreement and the other Loan Documents.

(c)    Borrower shall give the proper notice for (i) the motions seeking approval of this Agreement and the other Loan Documents and (ii) the hearings for the approval of such matters set forth in clause (i).

**8.11    Crop Insurance Claims**.

Borrower shall use his best efforts to expeditiously pursue all available claims against Borrower's crop insurance policies, including, without limitation, claims for the 2016 and 2017 crop years, and bring such claims to final resolutions. Borrower shall report to Lender on the 15th and 30th of each month following the Closing Date regarding his efforts to pursue and resolve such claims, which report shall be reasonably detailed.

**9.    NEGATIVE COVENANTS**.

Until payment and satisfaction in full of all Obligations and termination of this Agreement, Borrower agrees as follows:

**9.01    Other Debt**.

Borrower shall have no outstanding liabilities and obligations for indebtedness, and shall not incur any direct or contingent liabilities, or guarantee the liabilities of others, except the following if not otherwise prohibited under the Loan Documents: (a) liabilities and obligations to Summit or any of its affiliates; (b) normal trade credit not more than ninety (90) days past due or being contested in good faith by appropriate proceedings; (c) indebtedness incurred by Borrower as an individual primarily for consumer purposes; (d) Plan Funding Loans; (e) Post-Petition real property taxes; (f) Pre-Petition Obligations and other Pre-Petition Indebtedness, including any

Post-Petition amounts on such Pre-Petition Obligations and other Pre-Petition Indebtedness which may accrue or become due following the Petition Date; and (g) liabilities and obligations under or permitted by the Plan.

**9.02    Other Liens**.

Borrower shall not create, assume, or suffer to exist any Liens on the rights, title, or interests in the Collateral, except: (a) Liens under or permitted by the Plan; (b) Liens in favor of Summit or any of its affiliates; or (c) Liens for real property taxes.

**9.03    Sale of Assets**.

Borrower shall not sell, transfer, or otherwise dispose of, or permit the sale, transfer, or other disposition of, any Collateral, except for (a) sales or transfers of Farm Products in the ordinary course of business; and (b) sales, refinances, or other dispositions of Plan Assets pursuant to and in accordance with the terms and conditions of the Plan.

**9.04    Investments**.

Borrower shall not make Investments, except the following to the extent not otherwise prohibited by the Loan Documents: (a) Pre-Petition Investments; or (b) Post-Petition Investments in certificates of deposit, obligations of the state or federal government, or readily marketable securities.

**9.05    Loans to Others**.

Borrower shall not make loans to others, except the following to the extent not otherwise prohibited by the Loan Documents: (a) Pre-Petition extensions of credit; or (b) extensions of credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business to Persons other than family members, Subsidiaries, and Affiliates.

**9.06    Arm's Length Dealing**.

Borrower shall not enter into any transaction of any kind with any family member, Subsidiary or Affiliate, whether or not in the ordinary course of business, other than with prior written notice to Lender and on fair and reasonable terms substantially as favorable to Borrower as would be obtainable by Borrower at the time in a comparable arm's length transaction with a Person other than a family member, Subsidiary or Affiliate.

**9.07    Use of the Loans**.

Borrower shall not use the Loans (a) for personal, family or household purposes; (b) to purchase or carry Margin Stock or to invest in other Persons for the purpose of carrying Margin Stock or to reduce or retire any indebtedness incurred for that purpose; or (c) in any other manner not expressly authorized under this Agreement and the other Loan Documents.

502273187 v2

**9.08    Bankruptcy Covenants**.

(a)    Borrower shall not violate or breach any covenants, terms and conditions or otherwise fail to perform any obligations set forth in the Plan or the Confirmation Order in any respects, including, without limitation, failing to meet the deadlines set forth therein.

(b)    Except with respect to Plan Funding Loans from or advances by MetLife pursuant to the terms and conditions of the Plan and the applicable Plan Credit Agreement, Borrower shall not incur, create, assume, suffer to exist or permit any Lien securing any obligation that is *pari passu* with or senior to the Claims of Summit against Borrower with respect to the Obligations and the Pre-Petition Obligations or apply to the Bankruptcy Court for authority to do so.

**10.    DEFAULT AND REMEDIES**.

**10.01    Events of Default**.

The occurrence of any one or more of the following events shall constitute an "**Event of Default**" by Borrower hereunder:

(a)    Any payment required under the Loan Documents is not made when due, declared due, or demanded by Lender; or

(b)    The Financial Information or any representation or warranty in the Loan Documents is materially incorrect or misleading when made or provided; or

(c)    Borrower does not:  (i) maintain (or cause to be maintained) all policies of insurance required under the Loan Documents (including, without limitation, crop insurance) and pay (or cause payment of) all premiums for that insurance on or prior to the date when due; (ii) subject to the Plan Budget, maintain the Collateral (or cause the Collateral to be maintained) in good condition and repair, all in accordance with the terms and conditions of the Loan Documents; (iii) subject to the Plan Budget, prevent waste, spoliation, or destruction from occurring with respect to any material portion of the crops; (iv) comply with the Crop Proceeds Assignment; or (v) perform as or when required under any covenant under this Agreement; or

(d)    [reserved]; or

(e)    [reserved]; or

(f)    [reserved]; or

(g)    Any Material Default under the Plan; or

(h)    Any "Event of Default" as that term is defined in the Loan Documents other than this agreement which is not cured within any applicable cure or grace period; or

(i)    [reserved]; or

(j)　　[reserved]; or

(k)　　[reserved]; or

(l)　　[reserved]; or

(m)　　The Lien created by the Loan Documents ceases to be a perfected Lien on fee title to the Real Estate vested in Borrower, except as specifically contemplated by the Plan; or

(n)　　Any Loan Document ceases to be in full force and effect or is declared void by a Governmental Authority or any Party thereto shall claim such unenforceability or invalidity, or any security interest in the Collateral created by the Loan Documents shall fail or cease to be, or shall be asserted in writing that it is not a valid and perfected security interest in the securities, assets or properties covered thereby; or

(o)　　The occurrence of any of the following in the Chapter 11 Case without the prior written consent of Summit:

(i)　　the dismissal of the Chapter 11 Case or the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or

(ii)　　the entry of an order which has not been withdrawn, dismissed or reversed (a) appointing an interim or permanent trustee in the Chapter 11 Case or (b) amending, supplementing, staying, reversing, vacating or otherwise modifying any of this Agreement or any of the other Loan Documents, or Lender's rights, benefits, privileges or remedies under any of the foregoing.

**10.02　Remedies**.

(a)　　Upon the occurrence of any Event of Default, all Obligations may, at the option of Lender, and without demand, notice or legal process of any kind, be declared, and immediately shall become, due and payable. Upon the occurrence of any Event of Default, Borrower shall not be authorized to use any Cash Collateral or any Filbin Available Cash for any purpose, and upon demand of Pre-Petition Lender, Borrower shall immediately transfer the positive balance of the Cash Collateral Fund to Pre-Petition Lender for payment of its Allowed Secured Claim in Class 1.

(b)　　During a Default Period, Lender may exercise from time to time any rights and remedies available to it under the Uniform Commercial Code and any other Applicable Law in addition to, and not in lieu of, any rights and remedies expressly granted in the Loan Documents and all of Lender's rights and remedies shall be cumulative and non-exclusive to the extent permitted by law.

(c)　　Lender shall have the right, but not the obligation, to continue to extend the Line of Credit Advances during any Default Period without waiving any Event of Default or the default remedies of Lender and on such terms and conditions as Lender elects in its sole and absolute discretion.

(d)    In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the other Loan Documents, or otherwise available at law or in equity, upon or at any time during a Default Period or after the occurrence and during the continuance of any event which with the giving of notice or the passage of time, or both, would become an Event of Default, Lender may, in its sole and absolute discretion, (i) withhold or cease making Loans or other credit extensions or (ii) decrease or terminate the Maximum Line of Credit Amount.

## 11.    **CONDITIONS PRECEDENT**.

### 11.01    **Conditions Precedent to Closing**.

The obligations of Lender to enter into this Agreement, the effectiveness of this Agreement, the obligations of Lender to make the Loans pursuant to the terms and conditions hereof, and the consent of Pre-Petition Lender to the use of Filbin Available Cash and Cash Collateral in connection with, and pursuant to the terms and conditions of, the Cash Collateral Fund, are subject to the satisfaction or waiver on or before the Closing Date of the following conditions precedent:

(a)    Lender shall have received this Agreement, the Line of Credit Note, and any other Loan Documents required by Lender, in each case duly executed and delivered by the appropriate Party or Parties thereto and in form and substance satisfactory to Lender;

(b)    Lender shall have received a Plan Budget and a Personal Expense Budget in form and substance satisfactory to Lender;

(c)    Entry by the Bankruptcy Court of the Confirmation Order, and the Effective Date shall have occurred;

(d)    the arranging and making of the Loans on the terms and conditions herein provided shall not violate any Applicable Law or governmental regulation and shall not subject Lender to any tax, penalty, liability or other onerous condition under or pursuant to any Applicable Law or governmental regulation;

(e)    the representations and warranties contained in Section 7 above and in the other Loan Documents shall be true on and as of the Closing Date, both immediately before and immediately after giving effect to the closing of the financing contemplated hereby; and there shall exist on the Closing Date no Event of Default and no other event or condition that, with the giving of notice or the passing of time or both, would result in an Event of Default, in each case both immediately before and immediately after giving effect to the closing of the financing contemplated hereby; and

(f)    Borrower shall have executed and delivered to Lender all such other documents, instruments and agreements which Lender determines are reasonably necessary to consummate the transactions contemplated hereby.

**11.02    Conditions Precedent to All Loans**.

Lender's obligation to make each Line of Credit Advance, the Pre-Petition Lender's agreement to direct Filbin Available Cash, and the consent of Pre-Petition Lender to the use of Cash Collateral in connection with, and pursuant to the terms and conditions of, the Cash Collateral Fund, shall be subject to the further conditions precedent that:

(a)      the representations and warranties contained in **Section 7** shall be correct on and as of the date of such Loan or such use of Cash Collateral or Filbin Available Cash as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date (in which case such representations and warranties are correct as of such earlier date);

(b)      no event shall have occurred and be continuing, or would result from such Loan or such use of Cash Collateral or Filbin Available Cash, which would constitute an Event of Default or which with the giving of notice or the passage of time, or both, would become an Event of Default; and

(c)      each of the Plan and the Confirmation Order shall be in full force and effect and shall have not been reversed or stayed.

**12.    GENERAL PROVISIONS**.

**12.01    Indemnification**.

Borrower agrees to defend (with counsel satisfactory to Summit), protect, indemnify and hold harmless Summit, each affiliate or subsidiary of Summit, and each of their respective shareholders, members, officers, directors, managers, employees, attorneys and agents (each an "**Indemnified Party**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature (including the disbursements and the reasonable fees of counsel for each Indemnified Party in connection with any investigative, administrative or judicial proceeding, whether or not the Indemnified Party shall be designated a party thereto), which may be imposed on, incurred by, or asserted against, any Indemnified Party (whether direct, indirect or consequential and whether based on any federal, state or local laws or regulations, including securities laws and regulations, Environmental Laws and commercial laws and regulations, under common law or in equity, or based on contract or otherwise) in any manner relating to or arising out of this Agreement or any other Loan Document, or any act, event or transaction related or attendant thereto, the making or issuance and the management of the Loans and the other credit extensions under the Loan Documents or the use or intended use of the proceeds of the Loans or other credit extensions under the Loan Documents; provided, however, that Borrower shall not have any obligation hereunder to any Indemnified Party with respect to matters caused by or resulting from the willful misconduct or gross negligence of such Indemnified Party. To the extent that the undertaking to indemnify set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, Borrower shall satisfy such undertaking to the maximum extent permitted by Applicable Law. Any liability, obligation, loss, damage, penalty, cost or expense covered by this indemnity shall be paid to each Indemnified Party on demand, and,

failing prompt payment, shall, together with interest thereon at the highest rate then applicable to Loans hereunder from the date incurred by each Indemnified Party until paid by Borrower, be added to the Obligations of Borrower and be secured by the Collateral.  The provisions of this **Section 12.01** shall survive the satisfaction and payment of the other Obligations and the termination of this Agreement.

12.02   <u>Notice</u>.

All written notices and other written communications with respect to this Agreement shall be sent by ordinary, certified or overnight mail, by telefacsimile or e-mail, or delivered in person, to the address, telefacsimile number or e-mail address specified for Lender or Borrower, as applicable, on <u>Schedule 12.02</u>.  All notices shall be deemed received upon actual receipt thereof or refusal of delivery.

12.03   <u>Governing Law; Construction; Forum Selection</u>.

(a)    **THE LOAN DOCUMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE STATE OF CALIFORNIA AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS, INCLUDING THE LEGALITY OF THE INTEREST RATE AND OTHER CHARGES, BUT EXCLUDING PERFECTION OF THE SECURITY INTERESTS IN COLLATERAL LOCATED OUTSIDE OF THE STATE OF CALIFORNIA, WHICH SHALL BE GOVERNED AND CONTROLLED BY THE LAWS OF THE RELEVANT JURISDICTION IN WHICH SUCH COLLATERAL IS LOCATED**.  If any provision of this Agreement shall be held to be prohibited by or invalid under Applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or remaining provisions of this Agreement.

(b)    To induce Lender to accept this Agreement, Borrower irrevocably agrees that, subject to Lender's sole and absolute election, ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THE LOAN DOCUMENTS OR THE COLLATERAL MAY BE LITIGATED IN THE BANKRUPTCY COURT, AND BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.

12.04   <u>Modification of Agreement</u>.

The Loan Documents may be modified, altered or amended only by an agreement in writing signed by Borrower and Summit.

12.05   <u>Headings of Subdivisions</u>.

The headings of subdivisions in this Agreement are for convenience of reference only, and shall not govern the interpretation of any of the provisions of this Agreement.

### 12.06   Power of Attorney.

Borrower acknowledges and agrees that its appointment of Summit as its attorney and agent-in-fact for the purposes specified in this Agreement is an appointment coupled with an interest and shall be irrevocable until all of the Obligations are satisfied and paid in full and this Agreement is terminated.

### 12.07   Confidentiality.

Lender hereby agrees that any and all information relating to Borrower which is (a) furnished by Borrower to Lender (or to any affiliate of Lender), and (b) non-public, confidential or proprietary in nature (and is identified as such in a writing from Borrower delivered to Lender), shall be kept confidential by Lender in accordance with Applicable Law; provided, however, that such information and other credit information relating to Borrower may be distributed by Lender to Lender's directors, managers, officers, employees, attorneys, affiliates, assignees, participants, auditors, agents and regulators, and upon the order of a court or other Governmental Authority having jurisdiction over Lender, to any other party.  In addition, such information and other credit information may be distributed by Lender to potential participants or assignees of any portion of the Obligations, provided, that such potential participant or assignee agrees to follow the confidentiality requirements set forth herein. Borrower and Lender further agree that this provision shall survive the termination of this Agreement.

### 12.08   [reserved].

### 12.09   Counterparts; Electronic Execution.

The Loan Documents and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, shall be deemed an original, but all of which counterparts together shall constitute but one agreement.  Delivery of an executed counterpart of a signature page of this Agreement or any of the Loan Documents by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

### 12.10   WAIVER OF JURY TRIAL; OTHER WAIVERS.

(a)      BORROWER AND LENDER HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THE LOAN DOCUMENTS, THE OBLIGATIONS, THE COLLATERAL, ANY ALLEGED TORTIOUS CONDUCT BY BORROWER OR LENDER OR WHICH, IN ANY WAY, DIRECTLY OR INDIRECTLY, ARISES OUT OF OR RELATES TO THE RELATIONSHIP BETWEEN BORROWER AND LENDER.

(b)      WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, IF THE

ABOVE WAIVER OF THE RIGHT TO A TRIAL BY JURY IS NOT ENFORCEABLE, THE PARTIES HERETO AGREE THAT ANY AND ALL DISPUTES OR CONTROVERSIES OF ANY NATURE CONCERNING THIS AGREEMENT AND THE MATTERS CONTEMPLATED HEREBY (EACH, A "**CLAIM**"), INCLUDING ANY AND ALL QUESTIONS OF LAW OR FACT RELATING THERETO, SHALL BE RESOLVED BY THE BANKRUPTCY COURT WITHOUT A JURY.  IF THE BANKRUPTCY COURT DECLINES JURISDICTION AND AT THE WRITTEN REQUEST OF ANY PARTY TO THIS AGREEMENT, EACH CLAIM, INCLUDING ANY AND ALL QUESTIONS OF LAW OR FACT RELATING THERETO, SHALL BE DETERMINED BY JUDICIAL REFERENCE PURSUANT TO THE CALIFORNIA CODE OF CIVIL PROCEDURE ("**REFERENCE**").  IN SUCH EVENT, THE PARTIES SHALL SELECT A SINGLE NEUTRAL REFEREE, WHO SHALL BE A RETIRED STATE OR FEDERAL JUDGE.  IN THE EVENT THAT THE PARTIES CANNOT AGREE UPON A REFEREE, THE REFEREE SHALL BE APPOINTED BY THE COURT.  THE REFEREE SHALL REPORT A STATEMENT OF DECISION TO THE COURT.  NOTHING IN THIS PARAGRAPH SHALL LIMIT THE RIGHT OF ANY PARTY AT ANY TIME TO EXERCISE ANY AVAILABLE SELF-HELP REMEDIES, FORECLOSE AGAINST ANY COLLATERAL OR OBTAIN PROVISIONAL REMEDIES. THE BORROWERS SHALL BEAR ALL THE FEES AND EXPENSES OF THE REFEREE UNLESS THE REFEREE ORDERS OTHERWISE.   THE REFEREE SHALL ALSO DETERMINE ALL ISSUES RELATING TO THE APPLICABILITY, INTERPRETATION, AND ENFORCEABILITY OF THIS PARAGRAPH.

(c)     IN NO EVENT SHALL LENDER BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.

(d)     Borrower hereby waives demand, presentment, protest and notice of nonpayment, and further waives the benefit of all valuation, appraisal and exemption laws.

(e)     Borrower hereby waives the benefit of any law that would otherwise restrict or limit Lender or any affiliate of Lender in the exercise of its right, which is hereby acknowledged and agreed to, to set-off against the Obligations, without notice at any time hereafter, any indebtedness, matured or unmatured, owing by Lender or such affiliate of Lender to Borrower, including any Deposit Account at Lender or such affiliate.

(f)     [Reserved].

(g)     Lender's failure, at any time or times hereafter, to require strict performance by Borrower of any provision of the Loan Documents shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith. Any suspension or waiver by Lender of an Event of Default under this Agreement or any default under any of the other Loan Documents shall not suspend, waive or affect any other Event of Default under this Agreement or any other default under any of the other Loan Documents, whether the same is prior or subsequent thereto and whether of the same or of a different kind or character.  No delay on the part of Lender in the exercise of any right or remedy under any Loan Document shall preclude other or further exercise thereof or the exercise of any right or remedy. None of the undertakings, agreements, warranties, covenants and representations of Borrower contained in the Loan Documents and no Event of Default under this Agreement or default under

any of the other Loan Documents shall be deemed to have been suspended or waived by Lender unless such suspension or waiver is in writing, signed by a duly authorized officer of Lender and directed to Borrower specifying such suspension or waiver.

### 12.11    Pre-Petition Loan Documents.

Borrower hereby agrees that (a) this Agreement and the other Loan Documents are separate and distinct from the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents and (b) the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents are in full force and effect. Borrower further agrees that by entering into this Agreement, Pre-Petition Lender does not waive any Default or Event of Default under the Pre-Petition Loan Documents or any of its Liens, Claims, priorities, rights and remedies thereunder.

### 12.12    Intercreditor Agreement.

To the extent that the Obligations are secured by Collateral, or the Replacement Liens attach to Collateral, which in either case is also collateral for the Allowed Secured Claim of MetLife, the Obligations and such Replacement Liens shall be subject to the terms of the Intercreditor Agreement between MetLife and Summit (as attached to MetLife's Proof of Claim).

### 12.13    Parties Including Trustees; Bankruptcy Court Proceedings.

This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon Borrower, the Estate, and any trustee, other Estate representative or any successor in interest of Borrower in the Chapter 11 Case or any subsequent trustee appointed if the case is converted to one under Chapter 7 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Lender and its respective assigns, transferees and endorsees. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of Borrower to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lender file financing statements or otherwise perfect its Liens under Applicable Law. Borrower may not assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of Lender. Any such purported assignment, transfer, hypothecation or other conveyance by Borrower without the prior express written consent of Lender shall be void. Borrower hereby consents to Lender's sale, assignment, transfer or other disposition, at any time and from time to time hereafter, of the Loan Documents or of any portion thereof, or participations therein, including Lender's rights, titles, interest, remedies, powers or duties and agrees that it shall execute and deliver such documents as Lender may request in connection with any such sale, assignment, transfer or other disposition. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of Borrower and Lender with respect to the transactions contemplated hereby and, except as otherwise provided

herein, no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

*[signature page to follow]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

**BORROWER:**

JEFFERY E. ARAMBEL,
Reorganizing Debtor for the Bankruptcy
Estate of Jeffery E. Arambel in In Re
Arambel, E.D. Cal. Bankr. No. 18-90029

_____

**LENDER:**

SBN V Ag I LLC, a Delaware limited
liability company

By:_____
Name:_____
Title:_____

Signature Page to Junior Secured Debtor-in-Possession Loan and Security Agreement

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                          )

County _____              )

On _____ before me, _____,
_____*Date*_____                            *Here Insert Name and Title of the Officer*

personally appeared _____
_____*Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribe to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the Instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____
*Signature of Notary Public*

*Place Notary Seal Above*

Signature Page to Junior Secured Debtor-in-Possession Loan and Security Agreement

502273187 v2

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _____ )

County _____ )

On _____ before me, _____,
        *Date*                               *Here Insert Name and Title of the Officer*

personally appeared _____
                                         *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribe to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the Instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____
                          *Signature of Notary Public*

*Place Notary Seal Above*

Signature Page to Junior Secured Debtor-in-Possession Loan and Security Agreement

**EXHIBIT A – PLAN BUDGET AND PERSONAL EXPENSE BUDGET**

<u>SCHEDULE 12.02</u>

CERTAIN ADDRESSES FOR NOTICES

<u>Notice Address for Lender</u>:

SBN V Ag I LLC
c/o Summit Investment Management LLC
1700 Lincoln Street, Suite 2150
Denver, CO 80203
Email: jdeines@summit-investment.com

With a copy to:

Reed Smith LLP
1717 Arch Street
Philadelphia, PA 19103
Attn:   Brian M. Schenker, Esq.
Email: bschenker@reedsmith.com

<u>Notice Address for Borrower</u>:

Jeffery E. Arambel
433 Roxanne Drive
Patterson, CA 95363
Email: jeffarambel@comcast.net

With a copy to:

Macdonald Fernandez LLP
221 Sansome Street, Third Floor
San Francisco, CA 94104
Attn: Reno Fernandez
Email: Reno@MacFern.com

502273187 v2

# PROMISSORY NOTE
## (Line of Credit)

Reference is made to that certain Junior Secured Loan and Security Agreement, dated as of \_\_\_\_\_ _____, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the **"Agreement"**), by and between the Maker referred to below and SBN V Ag I LLC, a Delaware limited liability company. Capitalized terms used herein and not otherwise defined herein shall have the respective meanings given to such terms in the Agreement. This Promissory Note (the **"Note"**) is the "Line of Credit Note" referred to in the Agreement.

FOR VALUE RECEIVED and intending to be legally bound, the undersigned, JEFFERY E. ARAMBEL, Reorganizing Debtor for the Bankruptcy Estate of Jeffery E. Arambel in In Re Arambel, E.D. Cal. Bankr. No. 18-90029 (the **"Maker"**), hereby promises to pay to SBN V Ag I LLC, a Delaware limited liability company, or its successors or assigns (the **"Holder"**), the principal sum in United States dollars equal to $1,000,000.00 or such lesser sum which represents the principal balance outstanding under the Line of Credit established pursuant to the provisions of the Agreement.

The principal balance hereunder shall be paid in accordance with the terms of the Agreement. Maker further agrees to pay interest on the outstanding principal balance hereunder from time to time at the per annum rates set forth in the Agreement.

Payments on this Note are to be made in lawful money of the United States of America in accordance with the written instructions of the Holder.

This Note may be prepaid from time to time at the election of the Maker provided that each such prepayment is in a minimum principal amount of $100,000.

This Note shall be deemed to be one of the Loan Documents (as defined in the Agreement) and shall be secured by and have the other benefits provided by the other Loan Documents (as defined in the Agreement). The Obligations evidenced by this Note are secured by the Collateral.

If an Event of Default under the Agreement has occurred and is continuing, the principal of this Note, along with all accrued and unpaid interest, may be declared or otherwise become due and payable in the manner, at the price and with the effect provided in the Agreement.

This Note and the rights and remedies of the Holder are subordinated and subject to the rights of Metropolitan Life Insurance Company ("MetLife"), its successors and assigns, as set forth in that certain Intercreditor Agreement dated as of February 26, 2014 between Rabobank, N.A. (Holder's assignor) and MetLife, recorded on February 28, 2014 as Document 2014-0012423-00 in the records of the Recorder of Stanislaus County, California.

If the Holder is paid in full under the terms of the Agreement, this Note shall expire under its terms and no payment shall be due.

The Maker hereby waives protest, demand, notice of nonpayment and all other notices in connection with the delivery, acceptance, performance or enforcement of this Note.

This Note shall be construed and enforced in accordance with, and the rights of the Maker and the Holder of this Note shall be governed by, the law of the State of California excluding choice-of-law principles of the law of such state that would permit the application of the laws of a jurisdiction other than such state. The provisions of this Note are to be deemed severable and the invalidity or unenforceability of any provision shall not affect or impair the remaining provisions of this Note which shall continue in full force and effect. No modification hereof shall be binding or enforceable against the Holder unless approved in writing by the Holder.

_____

**Jeffery E. Arambel, Reorganizing Debtor for the Bankruptcy Estate of Jeffery E. Arambel in In Re Arambel, E.D. Cal. Bankr. No. 18-90029**

502273147 v2

Space Above for Recorder's Use

## <u>DEED OF TRUST WITH ASSIGNMENT OF RENTS,<br>SECURITY AGREEMENT AND FIXTURE FILING</u>

THIS DOCUMENT SERVES AS A FINANCING STATEMENT FILED AS A FIXTURE FILING UNDER SECTION 9502 OF THE CALIFORNIA UNIFORM COMMERCIAL CODE.

This DEED OF TRUST WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "**Deed of Trust**") is made as of _____, 2019, by Jeffery E. Arambel, Reorganizing Debtor for the Bankruptcy Estate of Jeffery E. Arambel in In Re Arambel, E.D. Cal. Bankr. No. 18-90029, as trustor and debtor, to Stewart Title Company ("**Trustee**"), as trustee, located at 809 Sylvan, Suite 101, Modesto, California 95350, and in favor of SBN V Ag I LLC, a Delaware limited liability company ("**Beneficiary**"), as beneficiary and secured party. (Jeffery E. Arambel, Reorganizing Debtor for the Bankruptcy Estate of Jeffery E. Arambel in In Re Arambel, E.D. Cal. Bankr. No. 18-90029 (the "**Bankruptcy Case**"), is referred to herein as "**Grantor**".)

Capitalized terms used in this Deed of Trust without definition have the meanings ascribed to them by that certain Junior Secured Loan and Security Agreement, dated as of even date herewith (as amended, modified or supplemented from time to time, "**Credit Agreement**"), by Grantor, as "**Borrower**" and Beneficiary as "**Lender**". "**Note**" means that certain Promissory Note (Line of Credit) in the maximum original principal amount of $1,000,000.00 executed by Borrower in favor of Lender, as amended, modified or supplemented from time to time. "**Loan Documents**" means the Credit Agreement, the Note, the Deed of Trust, and all other agreements, instruments and documents, including deeds of trust, mortgages, pledges, powers of attorney, consents, assignments, contracts, notices, security agreements, leases, financing statements and all other writings heretofore, now or from time to time hereafter executed by or on behalf of Borrower or any other Person and delivered to Lender or to any parent, affiliate or subsidiary of Lender in connection with the obligations or the transactions contemplated by the Credit Agreement, as each of the same may be amended, modified or supplemented from time to time; provided, however, that "Loan Documents" shall not include any guaranties.

## ARTICLE 1 - GRANT IN TRUST AND SECURED OBLIGATIONS

**1.01    <u>Grant in Trust</u>**. To secure repayment of the indebtedness evidenced by the Note and payment and performance of all other Secured Obligations (defined in <u>Section 1.02</u>), Grantor hereby irrevocably and unconditionally grants, conveys, transfers and assigns to Trustee, in trust for the benefit of Beneficiary, with POWER OF SALE and right of entry and possession, all estate, right, title and interest which Grantor now has or may later acquire in and to the following

property (all or any part of such property, or any interest in all or any part of it, together with the Personalty (as hereinafter defined) being hereinafter collectively referred to as the "**Property**"):

(a) the real property and any interest in the real property located in STANISLAUS COUNTY, CALIFORNIA, and described in <u>Exhibit A</u> attached hereto and incorporated herein by this reference (the "**Land**");

(b) all buildings, structures, improvements, fixtures, attachments, appliances, equipment, machinery and other articles now or hereafter erected on, affixed or attached to, or located in or on the Land, including all watering and irrigation apparatus, pumps, motors, generators, pipes, center pivot irrigators and sprinklers, windmills, and fences (the "**Improvements**");

(c) all easements, rights-of-way and rights appurtenant to the Land or used in connection with the Land or as a means of access thereto ("**Easements**");

(d) all equipment, machinery, fixtures and other tangible personal property of every kind and description, whether stored on the Land or elsewhere, including all goods, materials, supplies, tools, books, records, chattels, furniture, machinery and equipment or which is in all cases (i) directly related to the operation of the Property or acquired in connection with any construction or maintenance of the Land or the Improvements or (ii) affixed or installed, or to be affixed or installed, in any manner on the Land or the Improvements;

(e) the ground water on, under, pumped from or otherwise available to the Property or any drainage, retention, ditch, canal, reservoir, or other water rights, whether as a result of overlying groundwater rights, contractual rights, or otherwise and whether riparian, appropriative, or otherwise; the right to remove or extract any such ground water including any permits, rights or licenses granted by any Governmental Authority and any rights granted or created by any easement, covenant, agreement or contract with any Person; and any rights to which the Property or Grantor is entitled with respect to surface water, whether such rights are appropriative, riparian, prescriptive or otherwise and whether or not pursuant to historical use, contractual agreement, permit or other governmental authorization; any water right, water allocation for water not yet delivered, distribution right, delivery right, any proscriptive, contractual, easement or other rights necessary or convenient to convey any water to the Property, water storage right, or other water-related entitlement appurtenant to or otherwise applicable to the Property by virtue of the Property being situated within the boundaries of any governmental water district irrigation district or other local agency or within the boundaries of any private water company, mutual water company, or other non-governmental entity and any shares, or any rights under such shares, of any private water company, mutual water company, or other non-governmental entity pursuant to which Grantor or the Property may receive water (collectively, "**Water Rights**");

(f) all other existing and future hereditaments and appurtenances to the Land;

(g) all minerals, oil, gas, and other hydrocarbon substances, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and other interests and estates in, under and on the Land and other oil, gas and mineral

interests with which any of the foregoing interests or estates are pooled or unitized (the "**Mineral Rights**");

(h)        timber now or hereafter standing or cut;

(i)        the right, in the name and on behalf of Grantor, upon notice to Grantor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Trustee or Beneficiary in the Property;

(j)        leases, subleases, licenses, occupancy agreements, concessions and other agreements, granting a possessory interest in and to, or the right to extract, mine, reside in, sell, or use the Property (collectively, the "**Leases**");

(k)        all utility contracts, maintenance agreements, management agreements, service contracts and other agreements directly related to the operation and maintenance of the Property;

(l)        all bushes, groves, trees, plants, vines and other plantings, upon or under the Land ("**Plantings**");

(m)        any shares, or any rights under such shares, of any private water company, mutual water company, or other non-governmental entity pursuant to which Grantor or the Property may receive water (collectively, the "**Water Stock**") and any other certificated and uncertificated securities, securities entitlements, securities accounts and commodities accounts;

(n)        working drawings, instructional manuals, and rights in processes directly related to the operation of the Property;

(o)        all rights to the payment of money, accounts deposited by Grantor with third parties (including an utility deposits), contract rights, general intangibles (including any insurance proceeds and condemnation awards or compensation), instruments, architectural and engineering plans, specifications and drawings, and as-built drawings, which arise from or relate to the Land;

(p)        all building materials, equipment or work in process, whether stored on the Land or elsewhere, which have been or later will be acquired for the purpose of being delivered to, incorporated into or installed in or about the Land or improvements;

(q)        all general intangibles and rights relating to the Property, including, without limitation, all permits, licenses and claims to or demands for the voluntary or involuntary conversion of any of the Land, the Improvements or the other property described above into cash or liquidated claims, proceeds of any insurance policies, present and future, payable because of loss sustained to all or any part of any Property, whether or not such insurance policies are required by Beneficiary, and all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any damage or injury to the Land, the Improvements or the other property described above or any part of them, or breach of warranty in connection with the construction of the

Improvements, including causes of action arising in tort, contract, fraud or concealment of a material fact;

(r)     all permits and licenses relating or pertaining to the use or enjoyment of the Property;

(s)     proceeds of and any unearned premiums on any insurance policies covering the Property, including the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property and irrespective as to whether or not such policies are required by Beneficiary (the "**Insurance Claims**");

(t)     all awards made for the taking by condemnation or the power of eminent domain, or by any proceeding or purchase in lieu thereof, of the whole or any part of the Land and Improvements (the "**Condemnation Awards**"); and

(u)     all substitutions, replacements, additions, accessions and proceeds for or to any of the foregoing, and all books, records and files relating to any of the foregoing, including, without limitation, computer readable memory and data and any computer software or hardware reasonably necessary to access and process such memory and data.

**1.02     Secured Obligations**. Grantor makes the grant, conveyance, transfer and assignment set forth in Section 1.01, makes the irrevocable and absolute assignment set forth in Article 2, and grants the security interest set forth in Article 3, to secure payment and performance of the following obligations (the "**Secured Obligations**") in any order of priority that Beneficiary may choose:

(a)     all obligations, including, without limitation, all indebtedness, liabilities and obligations of Borrower to Lender arising pursuant to the Note or any of the other Loan Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several;

(b)     all indebtedness, liabilities and obligations of any Person under the other Loan Documents;

(c)     all obligations of Grantor under this Deed of Trust;

(d)     all future advances and other obligations that Grantor or any successor in ownership of all or part of the Property may agree to pay and/or perform (whether as principal, surety or guarantor) for the benefit of Beneficiary, when a writing evidences the parties' agreement that the advance or obligation be secured by this Deed of Trust; and

(e)     any of the foregoing that arises after the filing of a petition by or against Grantor under any Insolvency Proceeding.

**1.03     Future Secured Obligations**. The Secured Obligations include future advances made by Beneficiary, at its option, and for any purpose, and all other future Secured Obligations. Those future advances and other future Secured Obligations are secured to the same extent as if made or incurred on the date of the execution of this Deed of Trust, and have priority as to third

persons with or without actual notice from the time this Deed of Trust is filed for record as provided by law. If this Deed of Trust secures a line of credit or there is a future advance, the total amount of indebtedness secured by this Deed of Trust may decrease or increase from time to time. The unpaid balance of any line of credit secured by this Deed of Trust may at certain times be zero. This Deed of Trust will remain in full force and effect notwithstanding any zero balance. Grantor shall not file for record any notice limiting the maximum amount secured by this Deed of Trust (a "**Maximum Amount Notice**"). A Maximum Amount Notice will be an Event of Default (defined herein). Nothing in this <u>Section 1.03</u> will constitute a commitment to make additional or future advances or enter into future derivatives transactions in any amount.

  **1.04** <u>**Notice of Terms of Secured Obligation Documents**</u>. All persons who have or acquire an interest in the Property will be deemed to have received notice of, and will be bound by, the terms of the Credit Agreement, the Note and the other Loan Documents, and each other agreement or instrument made or entered into in connection with each of the Secured Obligations (the Loan Documents and those other agreements or instruments, the "**Secured Obligation Documents**"). These terms include any provisions in the Secured Obligation Documents which permit borrowing, repayment and re-borrowing, or which provide that the rate of interest on one or more of the Secured Obligations may vary from time to time.

## ARTICLE 2 - ASSIGNMENT OF RENTS

  **2.01** <u>**Assignment**</u>. Grantor irrevocably and unconditionally assigns Beneficiary all rents and other benefits derived from the Leases, and all other issues, profits, royalties, bonuses, income and other proceeds of the Property, whether now due, past due or to become due, including all prepaid rents, security deposits and other supporting obligations (the "**Rents**"). Beneficiary may collect Rents with or without taking possession of the Property. Beneficiary, by its acceptance of this Deed of Trust does not assume any duty or obligation under the Leases. THIS IS AN ABSOLUTE ASSIGNMENT, NOT AN ASSIGNMENT FOR SECURITY ONLY.

  **2.02** <u>**Grant of License**</u>. Beneficiary confers upon Grantor a license to collect and retain the Rents as they become due and payable, so long as there is no Event of Default (the "**License**"). If an Event of Default has occurred, Beneficiary shall have the right, which it may choose to exercise in its sole discretion, to terminate the License without notice to or demand upon Grantor, and without regard to the adequacy of Beneficiary's security under this Deed of Trust.

  **2.03** <u>**Collection and Application of Rents**</u>. Subject to the License granted to Grantor under <u>Section 2.02</u>, Beneficiary has the right, power and authority to collect any and all Rents. Beneficiary may apply all amounts received by it pursuant to this assignment to pay Secured Obligations, expenses of leasing, operating, maintaining and managing the Property, taxes, charges, claims, assessments, any other liens, and premiums for insurance, in such amounts and in such order as Beneficiary deems appropriate. Grantor hereby appoints Beneficiary its attorney-in-fact to perform any and all of the following acts, if and at the times when Beneficiary in its sole discretion may so choose:

   (a)  Demand, receive and enforce payment of any and all Rents;

(b)       Give receipts, releases and satisfactions for any and all Rents; or

(c)       Sue either in the name of Grantor or in the name of Beneficiary for any and all Rents.

Beneficiary's right to the Rents does not depend on whether or not Beneficiary takes possession of the Property as permitted under Section 8.02(c). In Beneficiary's sole discretion, it may choose to collect Rents either with or without taking possession of the Property. If an Event of Default occurs while Beneficiary is in possession of all or part of the Property and is collecting and applying Rents as permitted under this Deed of Trust, Beneficiary, Trustee and any receiver shall nevertheless be entitled to exercise and invoke every right and remedy afforded any of them under this Deed of Trust and at law or in equity, including the right to exercise the power of sale granted under Section 1.01 and Section 8.02(g).

2.04   **Notice**. All lessees under any and all Leases are hereby irrevocably authorized and notified by Grantor to rely upon and to comply with (and are fully protected in so doing) any notice or demand by Beneficiary for the payment to Beneficiary of any rental or other sums which may at any time become due under the Leases, or for the performance of any of lessees' undertakings under the Leases, and lessees shall have no right or duty to inquire as to whether any Event of Default has actually occurred or is then existing hereunder.

2.05   **Proceeds**. Beneficiary has the right to apply all amounts received by it pursuant to this assignment to pay any of the following in such amounts and in such order as Beneficiary deems appropriate: (a) any and all Secured Obligations, together with all costs and attorneys' fees; (b) all expenses of leasing, operating, maintaining and managing the Property, including without limitation, the salaries, fees, commissions and wages of a managing agent and such other employees, agents or independent contractors as Beneficiary deems necessary or desirable; (c) all taxes, charges, claims, assessments, any other liens, and premiums for all insurance Beneficiary deems necessary or desirable; or (d) the cost of a alterations, renovations, repairs or replacements, and all expenses incident to taking and retaining possession of the Property.

2.06   **Beneficiary Not Responsible**. Regardless of whether or not Beneficiary, in person or by agent, takes actual possession of the Land and Improvements, Beneficiary is not and will not be deemed to be:

(a)       A "mortgagee in possession" for any purpose;

(b)       Responsible for performing any of the obligations of Grantor under any lease;

(c)       Responsible for any waste committed by lessees or any other parties, any dangerous or defective condition of the Property, or any negligence in the management, upkeep, repair or control of the Property; or

(d)       Liable in any manner for the Property or the use, occupancy, enjoyment or operation of all or any part of it.

## ARTICLE 3 - GRANT OF SECURITY INTEREST

**3.01**    <u>**Grant of Security Interest**</u>. Grantor grants to Beneficiary a security interest in, and pledges and assigns to Beneficiary, all of Grantor's right, title and interest in and to the Property, to the extent characterized as personal property (the "**Personalty**").

**3.02**    <u>**Financing Statements**</u>. Grantor hereby authorizes Beneficiary to file one or more financing statements and such other documents as Beneficiary may from time to time require to perfect or continue the perfection of Beneficiary's security interest in any Personalty. Grantor must pay all fees and costs that Beneficiary may incur in filing such documents in public offices and in obtaining such record searches as Beneficiary may reasonably require.

**3.03**    <u>**Possession and Use of Collateral**</u>. Except as otherwise provided in this Deed of Trust or the Credit Agreement, so long as no Event of Default exists hereunder, Grantor may possess, use, transfer and dispose of any of the Personalty in the ordinary course of Grantor's business.

**3.04**    <u>**Security Agreement**</u>. This Deed of Trust constitutes a security agreement under the UCC covering all Personalty.

**3.05**    <u>**Addresses of Debtor and Secured Party**</u>. The address of Grantor adjacent to its signature below is the mailing address of Grantor as debtor under the UCC. The address for Trustee specified in the first paragraph of this Deed of Trust is the address for Trustee as secured party under the UCC; and the address for Beneficiary specified in <u>Article 9</u> is the address for Beneficiary as secured party under the UCC.

## ARTICLE 4 - FIXTURE FILING

**4.01**    <u>**Fixture Filing; Description of Fixtures**</u>. This Deed of Trust constitutes a fixture filing under the UCC and covers any Property which now or later may become a Fixture to the Land or any Improvement. "**Fixtures**" include all articles of personal property now or hereafter attached to or placed upon said real properly, appurtenances and improvements, together with all goods and other property, which are or at any time become so related to the Property that an interest in them arises under real estate law.

## ARTICLE 5 - RIGHTS AND DUTIES OF THE PARTIES

**5.01**    <u>**Representations and Warranties**</u>. Grantor represents and warrants that, except as previously disclosed to Beneficiary in a writing making reference to such representation or warranty, that:

(a)    the Property does not represent the proceeds of unlawful activity under any state, federal or foreign law;

(b)    to the best of Grantor's knowledge the Property includes all property and rights which may be reasonably necessary or desirable to enable Grantor to use, enjoy and operate the Land and the Improvements for the present uses thereof;

(c)     to the best of Grantor's knowledge none of the Land or Improvements is subject to any Lien, offset or claim except as listed on a title report obtained by Beneficiary prior to the Closing and share with Grantor or as disclosed in connection with Grantor's Bankruptcy Case (those Liens, offsets or claims, if any, the "**Permitted Exceptions**");

(d)     to the best of Grantor's knowledge Grantor owns the Personalty free and clear of any security interests, reservations of title or conditional sales contracts, and there is no presently valid financing statement affecting the Personalty on file in any public office except as disclosed in connection with Grantor's Bankruptcy Case;

(e)     the legal name of Grantor is as appears in the first paragraph of this Deed of Trust;

(f)     Grantor has not used any trade name, assumed name or other name;

(g)     if Grantor is anything other than a natural Person, it has complied with all Applicable Laws concerning its organization, existence and the transaction of its business, and is in existence and good standing in its state of organization and each state in which it conducts its business;

(h)     if Grantor is anything other than a natural Person, the execution, delivery and performance by Grantor of this Deed of Trust is within the powers and authority of Grantor and has been duly authorized;

(i)     to Grantor's knowledge this Deed of Trust does not conflict with any Applicable Law;

(j)     this Deed of Trust is a legal, valid and binding agreement of Grantor, enforceable against Grantor in accordance with its terms, and any instrument or agreement required hereunder, when executed and delivered, will be similarly legal, valid, binding and enforceable;

(k)     there is no lawsuit, tax claim or other dispute pending or to Grantor's knowledge threatened against Grantor or the Property that, if determined adverse to Grantor, is reasonably likely to have a Material Adverse Effect;

(l)     Grantor is not the subject of any Judgment;

(m)     [reserved];

(n)     [reserved];

(o)     Grantor has complied with all current laws, regulations and ordinances or other requirements of any governmental authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or hazardous substances ("**Environmental Laws**");

(p)     Grantor has not received any notices of violations of any Applicable Laws; and Grantor is in compliance with all Applicable Laws;

(q)     there are no claims, actions, proceedings or investigations pending or threatened against Grantor or affecting the Property with respect to any violations of Applicable Laws;

(r)     Grantor's place of business is located at the address specified below;

(s)     unless otherwise disclosed to Beneficiary, Grantor is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986;

(t)     and there is no Event of Default or event which, with notice or lapse of time would be an Event of Default.

## ARTICLE 6 - WARRANTY OF TITLE

**6.01     Warranty of Title**. Grantor represents and warrants that (a) Grantor lawfully possesses and holds fee simple title to all of the Land and the Improvements; (b) that Grantor has the right, power and authority to grant, convey and assign the Property; and (c) that except for Permitted Encumbrances (defined herein), the Property is unencumbered. Grantor especially agrees and declares that the estate of him, whether vested, contingent or in expectancy, is hereby conveyed and shall be bound for the payment and performance of the Secured Obligations.

**6.02     Defense and Notice of Claims and Actions**. At Grantor's sole expense, Grantor shall protect, preserve and defend the Property and title to and right of possession of the Property, and the security of this Deed of Trust and the rights and powers of Beneficiary and Trustee created under it, against all adverse claims. Grantor must give Beneficiary and Trustee prompt notice in writing if any claim is asserted which does or could affect any of these matters, or if any action or proceeding is commenced which alleges or relates to any such claim.

**6.03     Liens, Charges and Encumbrances**. Grantor shall immediately discharge any Lien on the Property, other than Permitted Encumbrances, to which Beneficiary has not consented in writing. Grantor must pay when due each obligation secured by or reducible to a Lien, charge or encumbrance which now does or later may encumber or appear to encumber all or part of the Property or any interest in it, whether the Lien, charge or encumbrance is or would be senior or subordinate to this Deed of Trust. "**Permitted Encumbrances**" shall mean the Permitted Exceptions.

## ARTICLE 7 - COVENANTS

**7.01     Performance of Secured Obligations**. Grantor shall promptly pay and perform each Secured Obligation in accordance with its terms.

**7.02     Taxes and Assessments**. Grantor shall pay (a) prior to delinquency all taxes, levies, charges and assessments imposed by Applicable Law or any public or quasi-public authority or utility company which are (or if not paid, may become) a Lien on all or part of the Property or any interest in it, or which may cause any decrease in the value of the Property or any part of it (individually and collectively an "**Imposition**"); (b) any and all intangible taxes and documentary stamp taxes determined at any time to be due on or as a result of the Secured Obligations, this Deed of Trust or any other Loan Documents, together with any and all interest and penalties thereon; and (c) taxes, levies, charges and assessments on Beneficiary's interest

therein or upon this mortgage or the Secured Obligations (collectively "**Mortgage Taxes**"). If after the date of this Deed of Trust, the State of California passes any law deducting from the value of Land for the purpose of taxation any Lien thereon, or changing in any way the laws for the taxation of mortgages or debts secured by mortgage for state or local purposes, or the manner of the collection of any such taxes, so as to affect this Deed of Trust, then within 180 days after notice by Beneficiary to Grantor, Grantor shall pay all Secured Obligations. Notwithstanding the foregoing provisions of this <u>Section 7.02</u>, Grantor may, at its expense, contest the validity or application of any Imposition by appropriate legal proceedings promptly initiated and conducted in good faith and with due diligence, provided that (a) Beneficiary is satisfied that neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, or lost as a result of such contest, and (b) Grantor shall have posted a bond or furnished such other security required from time to time by Beneficiary.

> **7.03** <u>**Damages and Insurance and Condemnation Proceeds**</u>.

(a)      Grantor hereby absolutely and irrevocably assigns to Beneficiary, and authorizes and requires the payor to pay to Beneficiary, the following claims, causes of action, awards, payments and rights to payment: (i) all awards, claims and causes of action, arising out of any warranty affecting all or any part of the Property, or for damage or injury to or decrease in value of all or part of the Property or any interest in it; (ii) all proceeds of any insurance policies payable because of loss sustained to all or part of the Property; and (iii) all interest which may accrue on any of the foregoing.

(b)      Grantor must immediately notify Beneficiary in writing if: (i) any damage occurs or any injury or loss is sustained in the amount of $25,000 or more to all or part of the Property, or any action or proceeding relating to any such damage, injury or loss is commenced; or (ii) any offer is made, or any action or proceeding is commenced, which relates to any actual or proposed condemnation or taking of all or part of the Property.

(c)      Beneficiary may, at its option, (i) in its own name appear in or prosecute any action or proceeding to enforce any cause of action based on warranty, or for damage, injury or loss to all or part of the Property, and it may make any compromise or settlement of the action or proceeding; (ii) participate in any action or proceeding relating to any Condemnation Award; and (iii) join Grantor in adjusting any insurance claim. All insurance proceeds, Condemnation Awards, and proceeds of any other claim based on warranty, or for damage, injury or loss to the Property which Grantor may receive or be entitled to must be paid to Beneficiary. In each instance, Beneficiary may apply those proceeds first toward reimbursement of all of Beneficiary's costs and expenses of recovering the proceeds or Condemnation Award, including legal fees, the balance shall, at Beneficiary's option, be applied to pay or prepay some or all of the Secured Obligations in such order and proportions as it may choose. GRANTOR HEREBY SPECIFICALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ALL RIGHTS OF A PROPERTY OWNER GRANTED UNDER CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1265.225(a), WHICH PROVIDES FOR ALLOCATION OF CONDEMNATION PROCEEDS BETWEEN A PROPERTY OWNER AND A LIENHOLDER, AND ANY OTHER LAW OR SUCCESSOR STATUTE OF SIMILAR IMPORT.

> **7.04** <u>**Maintenance and Preservation of Property**</u>. Grantor shall:

(a)      immediately discharge any Lien on the Property which Beneficiary has not consented to in writing, and shall also pay when due each obligation secured by or reducible to a Lien, charge or encumbrance which now or hereafter encumbers or appears to encumber all or part of the Property, whether the Lien, charge or encumbrance is or would be senior or subordinate to this Deed of Trust;

(b)      not alter, remove or demolish any portion of the Improvements, except as permitted or required by the Credit Agreement;

(c)      maintain (or cause to be maintained) all policies of insurance required under the Credit Agreement and pay (or cause payment of) all premiums for that insurance on or prior to the date when due;

(d)      promptly and completely repair and/or restore any portion of the Property which becomes damaged or destroyed, in a good and workmanlike manner in accordance with sound building practices, whether or not Grantor has received the proceeds of any Insurance Claim;

(e)      not commit or allow any waste of the Property, nor do or suffer to be done any act whereby the value of any part of the Property may be lessened;

(f)      not initiate or allow any change in any zoning or other land use classification which affects the Property or any part of it, except as permitted or required by the Credit Agreement;

(g)      if the Land is agricultural, keep the Property in good condition and repair; operate the Property, whether improved pastures, orchards, grazing, timber, or crop lands, in a good and husbandmanlike manner in accordance with accepted principles of sound agricultural and forestry practices; take all reasonable precautions to control wind and water erosion; fertilize improved pastures, if any, where necessary to maintain a good stand of desirable grasses; protect orchards and timber, if any, by reasonable precautions against loss or damage by fire including the maintenance of appropriate fire breaks; and neither to remove nor permit the removal of any timber, buildings, oil, gas, mineral, stone, rock, clay, fertilizer, gravel or top soil without the prior written consent of Beneficiary;

(h)      complete appropriation and all other requirements, if any, necessary to obtain the issuance of any license or water permit issued to Grantor, and take all other steps required or advisable for purposes of perfecting and maintaining in good status all other Water Rights;

(i)      not bring or keep any article on the Property or cause or allow any condition to exist on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Grantor on the Property or any part of it under this Deed of Trust; and

(j)      perform all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value and utility.

**7.05    Compensation and Reimbursement of Costs and Expenses**. Grantor shall pay (a) fees in the maximum amounts legally permitted, or reasonable fees as may be charged by Beneficiary or Trustee when the law provides no maximum limit, for any services that

Beneficiary or Trustee may render in connection with this Deed of Trust, including Beneficiary's providing a statement or Trustee's rendering of services in connection with a reconveyance; (b) all of Beneficiary's or Trustee's costs and expenses which may be incurred in rendering any such services; and (c) all costs, expenses and other advances which may be incurred or made by Beneficiary or Trustee in any efforts to enforce any terms of this Deed of Trust or protect the Property, including any rights or remedies afforded to Beneficiary or Trustee under Section 8.02, whether any lawsuit is filed or not, including any bankruptcy or other voluntary or involuntary proceeding, in or out of court, for the adjustment of debtor-creditor relationships, or in defending any action or proceeding arising under or relating to this Deed of Trust, including attorneys' fees and other legal costs, costs of any Foreclosure Sale (defined herein) and any cost of evidence of title. If Beneficiary chooses to dispose of Property through more than one Foreclosure Sale, Grantor must pay all costs, expenses or other advances that may be incurred or made by Beneficiary or Trustee in each of those Foreclosure Sales.

     **7.06** <u>**Indemnification**</u>. GRANTOR SHALL INDEMNIFY TRUSTEE AND BENEFICIARY AGAINST AND SHALL HOLD THEM HARMLESS FROM ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, CAUSES OF ACTION, JUDGMENTS, COURT COSTS, ATTORNEYS' FEES AND OTHER LEGAL EXPENSES, COST OF EVIDENCE OF TITLE, COST OF EVIDENCE OF VALUE, AND OTHER COSTS AND EXPENSES WHICH EITHER MAY SUFFER OR INCUR: (A) IN PERFORMING ANY ACT REQUIRED OR PERMITTED BY THIS DEED OF TRUST OR ANY OF THE OTHER SECURED OBLIGATION DOCUMENTS OR BY LAW; (B) BECAUSE OF ANY FAILURE OF GRANTOR TO PAY OR PERFORM ANY OF THE SECURED OBLIGATIONS; OR (C) EXCEPT FOR SOLE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF BENEFICIARY, BECAUSE OF ANY ALLEGED OBLIGATION OF OR UNDERTAKING BY BENEFICIARY TO PERFORM OR DISCHARGE ANY OF THE REPRESENTATIONS, WARRANTIES, CONDITIONS, COVENANTS OR OTHER OBLIGATIONS IN ANY DOCUMENT RELATING TO THE PROPERTY (OTHER THAN SUCH WARRANTIES, CONDITIONS, COVENANTS OR OTHER OBLIGATIONS IN THE SECURED OBLIGATION DOCUMENTS). THIS AGREEMENT BY GRANTOR TO INDEMNIFY TRUSTEE AND BENEFICIARY SURVIVES THE RELEASE AND CANCELLATION OF ANY OR ALL OF THE SECURED OBLIGATIONS AND THE FULL OR PARTIAL RELEASE AND/OR RECONVEYANCE OF THIS DEED OF TRUST.

     **7.07** <u>**Payments Due Under this Deed Of Trust**</u>. Grantor must pay all obligations to pay money arising under this Deed of Trust immediately upon demand by Trustee or Beneficiary. Each such obligation shall bear interest from the date the obligation arises at the Default Rate.

     **7.08** <u>**Site Visits, Observation and Testing**</u>. Beneficiary and its agents and representatives may enter and visit the Property at any reasonable time for the purposes of observing it, performing appraisals or inspections, taking and removing soil or groundwater samples, and conducting tests on any part of it, and otherwise to determine Grantor's compliance with this Deed of Trust.

     **7.09** <u>**Compliance with Applicable Law**</u>. Grantor shall not commit or allow any act upon or use of the Property which would violate any Applicable Law, whether now existing or

later to be enacted and whether foreseen or unforeseen, or any public or private covenant, condition, restriction or equitable servitude affecting the Property.

**7.10    Prohibited Transfers**. Grantor shall not, without the prior written consent of Beneficiary (which consent may be withheld in Beneficiary's sole discretion), make or permit, whether voluntarily or involuntarily by operation of law or otherwise, any Prohibited Transfer, and that any Prohibited Transfer in violation of the permitted transfer provisions hereinabove provided shall result in a material impairment of Beneficiary's interest in the Property and be deemed a breach of the foregoing covenant. If any Prohibited Transfer occurs, Beneficiary in its sole discretion may declare all of the Secured Obligations to be immediately due and payable and invoke any rights and remedies provided in Section 8.02 of this Deed of Trust. "**Prohibited Transfer**" means any sale, contract to sell, option, conveyance, encumbrance, pledge, mortgage, lease not expressly permitted under this Deed of Trust, the Credit Agreement or the other Loan Documents, or other transfer of all or any material part of the Property or any interest in it, including any transfer or exercise of any right to drill for or to extract any water (other than for Grantor's own use), oil, gas, or other hydrocarbon substances or any mineral of any kind under the surface of the Property, whether voluntary, involuntary, by operation of law or otherwise. If Grantor is an entity, "**Prohibited Transfer**" also means any transfer or transfers of the voting power or the direct or indirect beneficial ownership of Grantor.

## ARTICLE 8 - EVENTS OF DEFAULT; REMEDIES

**8.01    Events of Default**. Upon the occurrence of any one or more of the following events, Beneficiary may, by written notice delivered to Grantor, declare Grantor to be in default, and thereupon the same shall constitute an "Event of Default" under this Deed of Trust:

(a)    an Event of Default under the Note, the Credit Agreement or any other Loan Document;

(b)    any representation in this Deed of Trust is materially false, incorrect or misleading;

(c)    the occurrence of a Prohibited Transfer;

(d)    the filing of any notice limiting the maximum amount secured by this Deed of Trust to a sum less than the maximum amount secured as specified herein, or if no such amount is specified, to any amount;

(e)    for more than 10 days after notice from Beneficiary, Grantor is in default under any term, covenant or condition of this Deed of Trust not previously described in this Section 8.01 which can be cured by the payment of a sum of money;

(f)    for 30 days after notice from Beneficiary, Grantor is in default under any term, covenant or condition of this Deed of Trust not previously described in this Section 8.01; provided that if (i) it is reasonably certain that the default can be cured by Grantor within that 30 day period and (ii) Grantor has commenced curing that default within that 30 day period and thereafter diligently and expeditiously proceeds to cure that default, then that 30 day period shall

be extended for so long as reasonably required by Grantor in the exercise of due diligence to cure that default, up to a maximum of 90 days after the notice to Grantor of the Event of Default.

**8.02     Remedies**. At any time after an Event of Default, Beneficiary and Trustee shall be entitled to invoke any and all of the rights and remedies described herein. All of such rights and remedies are cumulative, and the exercise of any one or more of them does not constitute an election of remedies. Except as required under applicable law, no notice to Grantor shall be required in the event that Beneficiary and/or Trustee elect to pursue one or more of the remedies described hereinafter. Beneficiary and Trustee acknowledge and agree that, notwithstanding any provision of the Loan Documents, the lien created by this Deed of Trust and all rights and remedies under the Loan Documents are: (a) subject to the terms of the Plan of Reorganization dated _____, 2019, filed in the Bankruptcy Case, as confirmed by the [Confirmation Order] entered by the Bankruptcy Court on _____, 2019, and (b) subordinated to the rights of Metropolitan Life Insurance Company ("MetLife"), its successors and assigns, as set forth in that certain Intercreditor Agreement dated as of February 26, 2014 between Rabobank, N.A. (Beneficiary's assignor) and MetLife, recorded on February 28, 2014 as Document 2014-0012423-00 in the records of the Recorder of Stanislaus County, California.

(a)     Acceleration. Beneficiary may declare any or all of the Secured Obligations to be due and payable immediately.

(b)     Receiver. Beneficiary may apply to any court of competent jurisdiction for, and obtain appointment of, a receiver for the Property. Grantor hereby consents to, and agrees to not oppose, the appointment of a receiver.

(c)     Entry. Beneficiary, in person, by agent or by court-appointed receiver, may enter, take possession of, manage and operate all or any part of the Property, and may also do any and all other things in connection with those actions that Beneficiary may consider necessary and appropriate to protect the security of this Deed of Trust. Such other things may include: taking and possessing all of Grantor's or the then owner's books and records; entering into, enforcing, modifying, or canceling leases on such terms and conditions as Beneficiary may consider proper; obtaining and evicting tenants; fixing or modifying rents; collecting and receiving any payment of money owing to Grantor; completing any unfinished construction; and/or contracting for and making repairs and alterations. If Beneficiary so requests, Grantor will assemble all of the Property that has been removed from the Land and make all of it available to Beneficiary at the site of the Land. GRANTOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS BENEFICIARY AS GRANTOR'S ATTORNEY-IN-FACT TO PERFORM SUCH ACTS AND EXECUTE SUCH DOCUMENTS AS BENEFICIARY CONSIDERS APPROPRIATE IN CONNECTION WITH TAKING THESE MEASURES, INCLUDING ENDORSEMENT OF GRANTOR'S NAME ON ANY INSTRUMENTS. Regardless of any provision of this Deed of Trust or the other Secured Obligation Documents, Beneficiary shall not be considered to have accepted any property other than cash or immediately available funds in satisfaction of any obligation of Grantor to Beneficiary, unless Beneficiary has given express written notice of its election of that remedy in accordance with the UCC.

(d)     Cure; Protection of Security. Either Beneficiary or Trustee may cure any breach or default of Grantor, and if it chooses to do so in connection with any such cure, Beneficiary or

Trustee may also enter the Property and/or do any and all other things which it may in its sole discretion consider necessary and appropriate to protect the security of this Deed of Trust. Such other things may include: appearing in and/or defending any action or proceeding which purports to affect the security of, or the rights or powers of Beneficiary or Trustee under, this Deed of Trust; paying, purchasing, contesting or compromising any encumbrance, charge, Lien or claim of Lien which in Beneficiary's or Trustee's sole judgment is or may be senior in priority to this Deed of Trust, such judgment of Beneficiary or Trustee to be conclusive as among the parties to this Deed of Trust; obtaining insurance and/or paying any premiums or charges for insurance required to be carried under the Credit Agreement; otherwise caring for and protecting any and all of the Property; and/or employing counsel, accountants, contractors and other appropriate persons to assist Beneficiary or Trustee. Beneficiary and Trustee may take any of the actions permitted under this <u>Section 8.02</u> either with or without giving notice to any person.

(e)    <u>Uniform Commercial Code Remedies</u>. Beneficiary may exercise any or all of the remedies granted to a secured party under the UCC.

(f)    <u>Judicial Action</u>. Beneficiary may bring an action in any court of competent jurisdiction to foreclose this instrument or to obtain specific enforcement of any of the covenants or agreements of this Deed of Trust.

(g)    <u>Power of Sale</u>. Under this power of sale, Beneficiary has the discretionary right to cause some or all of the Property, including any Property which constitutes personal property, to be sold or otherwise disposed of in any combination and in any manner permitted by Applicable Law.

(i)    <u>Sales of Personal Property</u>.

(1)    For purposes of this power of sale, Beneficiary may elect to treat as personal property any Property which is intangible or which can be severed from the Land or Improvements without causing structural damage. If it chooses to do so, Beneficiary may dispose of any personal property separately from the sale of real property, in any manner permitted by Division 9 of the UCC, including any public or private sale, or in any manner permitted by any other Applicable Law. Any proceeds of any such disposition shall not cure any Event of Default or reinstate any Secured Obligation for purposes of Section 2924c of the California Civil Code.

(2)    In connection with any sale or other disposition of such Property, Grantor agrees that the following procedures constitute a commercially reasonable sale: Beneficiary must mail written notice of the sale to Grantor not later than forty-five (45) days prior to such sale. Once per week during the four weeks immediately preceding such sale, Beneficiary must publish notice of the sale in a local daily newspaper of general circulation. Upon receipt of any written request, Beneficiary must make the Property available to any bona fide prospective purchaser for inspection during reasonable business hours. Notwithstanding, Beneficiary is under no obligation to consummate a sale if, in its judgment, none of the offers received by it equals the fair value of the Property

offered for sale. The foregoing procedures do not constitute the only procedures that may be commercially reasonable.

(ii)     <u>Non-Judicial Foreclosure Sales of Real Property or Mixed Collateral</u>. Beneficiary may choose to dispose of some or all of the Property which consists solely of real property in any manner then permitted by Applicable Law. In its sole discretion, Beneficiary may also or alternatively choose to dispose of some or all of the Property, in any combination consisting of both real and personal property, together in one sale to be held in accordance with the law and procedures applicable to real property, as permitted by the UCC. Grantor agrees that such a sale of personal property together with real property constitutes a commercially reasonable sale of the personal property. For purposes of the Power of Sale, either a sale of real property alone, or a sale of both real and personal property together in accordance with the UCC, will sometimes be referred to as a "Non-Judicial Foreclosure Sale." Before any Non-Judicial Foreclosure Sale, Beneficiary or Trustee must give such notice of default and election to sell as may then be required by law. When all time periods then legally mandated have expired, and after such notice of sale as may then be legally required has been given, Trustee must sell the property being sold at a public auction to be held at the time and place specified in the notice of sale. Neither Trustee nor Beneficiary have any obligation to make demand on Grantor before any Non-Judicial Foreclosure Sale. From time to time in accordance with then Applicable Law, Trustee may, and in any event at Beneficiary's request must, postpone any Non-Judicial Foreclosure Sale by public announcement at the time and place noticed for that sale. At any Non-Judicial Foreclosure Sale, Trustee must sell to the highest bidder at public auction for cash in lawful money of the United States. Trustee must execute and deliver to the purchaser(s) a deed or deeds conveying the property being sold without any covenant or warranty whatsoever, express or implied. The recitals in any such deed of any matters or facts, including any facts bearing upon the regularity or validity of any Non-Judicial Foreclosure Sale, are conclusive proof of their truthfulness. Any such deed shall be conclusive against all persons as to the facts recited in it.

(h)     <u>Single or Multiple Foreclosure Sales</u>. If the Property consists of more than one lot, parcel or item of property, Beneficiary may: (i) designate the order in which the lots, parcels and/or items shall be sold or disposed of or offered for safe or disposition; and (ii) elect to dispose of the lots, parcels and/or items through a single consolidated sale or disposition to be held or made under the power of sale granted in <u>Section 8.02(g)</u>, or in connection with judicial proceedings, or by virtue of a judgment and decree of foreclosure and sale; or through two or more such sales or dispositions; or in any other manner Beneficiary may deem to be in its best interests (any such sale or disposition, a "<u>Foreclosure Sale</u>" and any two or more, "<u>Foreclosure Sales</u>"). If it chooses to have more than one Foreclosure Sale, Beneficiary at its option may cause the Foreclosure Sales to be held simultaneously or successively, on the same day, or on such different days and at such different times and in such order as it may deem to be in its best interests. No Foreclosure Sale or Non-Judicial Foreclosure Sale will terminate or affect the liens of this Deed of Trust on any part of the Property which has not been sold, until all of the Secured Obligations have been paid in full.

**8.03   Credit Bids**. At any Foreclosure Sale, any Person, including Grantor, Trustee or Beneficiary, may bid for and acquire the Property or any part of it to the extent permitted by then Applicable Law. Instead of paying cash for that property, Beneficiary may settle for the purchase price by crediting the sales price of the property against the following obligations:

(a)   First, the portion of the Secured Obligations attributable to the expenses of sale, costs of any action and any other sums for which Grantor is obligated to pay or reimburse Beneficiary or Trustee; and

(b)   Second, all other Secured Obligations in any order and proportions as Beneficiary in its sole discretion may choose.

**8.04   Application of Foreclosure Sale Proceeds**. Beneficiary and Trustee shall apply the proceeds of any Foreclosure Sale in the following manner:

(a)   First, to pay the portion of the Secured Obligations attributable to the expenses of sale, costs of any action and any other sums for which Grantor is obligated to reimburse Beneficiary or Trustee;

(b)   Second, to pay the portion of the Secured Obligations attributable to any sums expended or advanced by Beneficiary or Trustee under the terms of this Deed of Trust which then remain unpaid;

(c)   Third, to pay all other Secured Obligations in any order and proportions as Beneficiary in its sole discretion may choose; and

(d)   Fourth, to remit the remainder, if any, to the person or persons entitled to it.

**8.05   Application of Rents and Other Sums**. Beneficiary must apply any and all Rents collected by it pursuant to the assignment provided in Article 2 of this Deed of Trust, and any and all other sums, other than the proceeds of a Foreclosure Sale, received or collected by Beneficiary, in the following manner:

(a)   First, to pay the portion of the Secured Obligations attributable to the costs and expenses of collection of such sums, including reasonable attorneys' fees, that may be incurred by Beneficiary, Trustee and/or any receiver appointed in accordance with this Deed of Trust;

(b)   Second, to pay any and all Secured Obligations in any order and proportions as Beneficiary in its sole discretion may choose, and any and all expenses of leasing, operating, maintaining and managing the Property and all other costs and charges incident to the Property as provided in Section 2.05 of this Deed of Trust, and in such order and proportions as Beneficiary in its sole discretion may choose; and

(c)   Third, to remit the remainder, if any, to the person or persons entitled thereto.

**8.06   No Liability for Funds Not Received**. Neither Trustee nor Beneficiary has any liability for any funds which it does not actually receive.

## ARTICLE 9 - NOTICES

All notices, approvals, consents, and other communications, under this Deed of Trust ("**Notices**") must be given in accordance with and will be subject to the terms and provisions of the Credit Agreement. Notices must be mailed or delivered, if to Grantor, to the address adjacent Grantor's signature below; if to Trustee, to the address in the first paragraph of this Deed of Trust if to Beneficiary or Lender, to c/o Summit Investment Management LLC, 1700 Lincoln Street, Suite 2150, Denver, CO 80203; and in the case of any other Person, to the address designated by that Person in a notice to Grantor, Beneficiary, and Lender.

## ARTICLE 10 - REQUEST FOR NOTICE

Grantor requests that a copy of any notice of default and any notice of sale be mailed to it at the address specified adjacent to its signature below.

## ARTICLE 11 - TRUSTEE AND BENEFICIARY

**11.01   Releases, Extensions, Modifications and Additional Security**. Without affecting the personal liability of any Person, including Grantor, for the payment of the Secured Obligations or the lien of this Deed of Trust on the remainder of the Property for the unpaid amount of the Secured Obligations:

(a)      Beneficiary may from time to time and without notice: (i) release any person liable for payment of any Secured Obligation; (ii) extend the time for payment, or otherwise alter the terms of payment, of any Secured Obligation; (iii) accept additional real or personal property of any kind as security for any Secured Obligation, whether evidenced by deeds of trust, mortgages, security agreements or any other instruments of security; or (iv) alter, substitute or release any property securing the Secured Obligations.

(b)      From time to time when requested to do so by Beneficiary in writing, Trustee may perform any of the following acts without incurring any liability or giving notice to any Person: (i) consent to the making of any plat or map of the Property or any part of it; (ii) join in granting any easement or creating any restriction affecting the Property; (iii) join in any subordination or other agreement affecting this Deed of Trust or the lien of it; or (iv) reconvey the Property or any part of it without any warranty.

**11.02   Authority of Beneficiary**. Without affecting the personal liability of any Person, including Grantor, for the payment of the Secured Obligations or the lien of this Deed of Trust on the remainder of the Property for the unpaid amount of the Secured Obligations, Trustee may perform any of the following acts when requested to do so by Beneficiary in writing: (a) consent to the making of any plat or map of the Property or any part of it; (b) join in granting any easement or creating any restriction affecting the Property; (c) join in any subordination or other agreement affecting this Deed of Trust or the lien of it; or (d) reconvey the Property or any part of it without any warranty.

**11.03   Exculpation of Trustee and Beneficiary**. Neither Beneficiary nor Trustee will be directly or indirectly liable to Grantor or any other person as a consequence of any of the

following: (a) the exercise of or failure to exercise any rights, remedies or powers granted to it in this Deed of Trust; (b) any failure or refusal to perform or discharge any obligation or liability of Grantor under any agreement related to the Property or under this Deed of Trust; or (c) any loss sustained by Grantor or any third party resulting from any failure to lease the Property or from any other act or omission in managing the Property after an Event of Default, unless the loss is caused by the willful misconduct and bad faith of Beneficiary or Trustee, respectively. GRANTOR HEREBY EXPRESSLY WAIVES AND RELEASES ALL LIABILITY OF THE TYPES DESCRIBED ABOVE, AND AGREES THAT NO SUCH LIABILITY BE ASSERTED AGAINST OR IMPOSED UPON TRUSTEE OR BENEFICIARY.

**11.04　Substitution of Trustee**. Beneficiary may substitute a successor to any Trustee named in or acting under this Deed of Trust in any manner now or later to be provided at Applicable Law, or by a written instrument executed and acknowledged by Beneficiary and recorded in the office(s) of the recorder(s) of the county or counties where the Land and Improvements are situated. Any such instrument is conclusive proof of the proper substitution of the successor Trustee, who will automatically upon recordation of the instrument succeed to an estate, title, rights, powers and duties of the predecessor Trustee, without conveyance from it.

**11.05　Subrogation**. Beneficiary is subrogated to the liens of all encumbrances, whether released of record or not, which are discharged in whole or in part by Beneficiary in accordance with this Deed of Trust or with the proceeds of any loan secured by this Deed of Trust.

## ARTICLE 12 - RECONVEYANCE

When all Secured Obligations have been paid in full, and there are no further obligations under the Loan Documents, Trustee shall execute and deliver an instrument reconveying the Property, or so much of it as is then held under this Deed of Trust, without warranty to the person or persons legally entitled to it. In the reconveyance, the grantee may be described as the person or persons legally entitled thereto, and the recitals of any matters or facts shall be conclusive proof of their truthfulness. Trustee and Beneficiary will have no duty to determine the rights of persons claiming to be rightful grantees of any reconveyance of the Property.

## ARTICLE 13 - MISCELLANEOUS PROVISIONS

**13.01　Additional Provisions**. The Loan Documents fully state all of the terms and conditions of the parties' agreement regarding the matters mentioned in or incidental to this Deed of Trust. The Loan Documents also grant further rights to Beneficiary and contain further agreements and affirmative and negative covenants by Grantor which apply to this Deed of Trust and to the Property. In the event of a conflict between this Deed of Trust and any other Agreements required by this Deed of Trust, this Deed of Trust shall prevail.

**13.02　Other Acts**. Grantor shall cooperate with Beneficiary for the purposes of, and perform all acts which may be necessary or advisable to perfect any Lien provided for in this Deed of Trust or to carry out the intent of this agreement. Promptly (but in no event more than ten business days) after request by Beneficiary, Grantor will execute, acknowledge and deliver any document which Beneficiary deems necessary or advisable for these purposes, and will, on

demand, pay any expenses incurred by Beneficiary in the preparation, execution and filing of any such documents.

**13.03  No Waiver or Cure**. Each waiver by Trustee or Beneficiary must be in writing, and no waiver is to be construed as a continuing waiver. No waiver is to be implied from any delay or failure by Trustee or Beneficiary to take action on account of any default of Grantor. Consent by Trustee or Beneficiary to any act or omission by Grantor must not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Trustee's or Beneficiary's consent to be obtained in any future or other instance. The exercise by Trustee or Beneficiary of any right or remedy under this Deed of Trust or the other Secured Obligation Documents or under Applicable Law, shall not: cure or waive a breach, Event of Default or notice of default under this Deed of Trust or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed and all other defaults under the Secured Obligation Documents have been cured); or impair the security of this Deed of Trust; or prejudice Trustee or Beneficiary or any receiver appointed in accordance with this Deed of Trust, in the exercise of any right or remedy afforded any of them under this Deed of Trust; or be construed as an affirmation by Beneficiary of any tenancy, lease or option, or a subordination of the lien of this Deed of Trust.

**13.04  Powers of Beneficiary and Trustee**.

(a)  Trustee has no obligation to perform any act which it is empowered to perform under this Dead of Trust unless it is requested to do so in writing and is reasonably indemnified against loss, cost, liability and expense.

(b)  If either Beneficiary or Trustee performs any act which it is empowered or authorized to perform under this Deed of Trust that act alone does not release or change the personal liability of any person for the payment and performance of the Secured Obligations then outstanding, or the lien of this Deed of Trust on all or the remainder of the Property for full payment and performance of all outstanding Secured Obligations. The liability of the original Grantor does not release or change if Beneficiary grants any successor in interest to Grantor any extension of time for payment, or modification of the terms of payment, of any Secured Obligation. Beneficiary is not required to comply with any demand by the original Grantor that Beneficiary refuse to grant such an extension or modification to, or commence proceedings against, any such successor in interest.

(c)  Beneficiary may take any of the actions permitted under Sections 8.02(b) and/or 8.02(c) regardless of the adequacy of the security for the Secured Obligations, or whether any or all of the Secured Obligations have been declared to be immediately due and payable, or whether notice of default and election to sell has been given under this Deed of Trust.

**13.05  Merger**. No merger occurs as a result of Beneficiary's acquiring any other estate in or any other lien on the Property unless Beneficiary consents to a merger in writing.

**13.06  Joint and Several Liability**. If Grantor consists of more than one Person, each Grantor (a) acknowledges and undertakes, together with the other Grantors, joint and several

liability for the indebtedness, liabilities and obligations of Grantor under this Deed of Trust; (b) acknowledges that this Deed of Trust is the independent and several obligation of each Grantor and may be enforced against each Grantor separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Grantor; and (c) agrees that its liability hereunder and under any other Secured Obligation Document shall be absolute, unconditional, continuing and irrevocable. GRANTOR EXPRESSLY WAIVES ANY REQUIREMENT THAT BENEFICIARY EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST THE OTHER GRANTORS UNDER THIS DEED OF TRUST, OR ANY OTHER SECURED OBLIGATION DOCUMENTS, OR AGAINST ANY OTHER PERSON UNDER ANY GUARANTY OF, OR SECURITY FOR, ANY OF THE SECURED OBLIGATIONS.

**13.07  Choice of Law; Jurisdiction and Venue; Jury Trial Waiver; Judicial Reference Provision.**

(a)     **THE VALIDITY OF THIS DEED OF TRUST, THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF, THE RIGHTS OF THE PARTIES HERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR RELATED HERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR RELATED HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA. THE PARTIES HERETO AGREE THAT THE PROVISIONS IN THE CREDIT AGREEMENT WITH RESPECT TO JURISDICTION AND VENUE, ARE APPLICABLE TO THIS DEED OF TRUST AS IF FULLY SET FORTH HEREIN. THE PROVISIONS IN THIS SECTION ARE A MATERIAL INDUCEMENT TO ENTER INTO THIS DEED OF TRUST.**

(b)     **TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HERETO HEREBY WAIVES ITS/HIS RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS DEED OF TRUST OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH A "CLAIM"). EACH PARTY HERETO REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS/HIS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AMENDMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

(c)     **IN THE EVENT ANY LEGAL PROCEEDING IS FILED IN A COURT OF THE STATE OF CALIFORNIA (THE "COURT") BY OR AGAINST ANY PARTY HERETO IN CONNECTION WITH ANY CLAIM AND THE WAIVER SET FORTH IN SECTION 13.07(b) ABOVE IS NOT ENFORCEABLE IN SUCH PROCEEDING, THE PARTIES HERETO AGREE AS FOLLOWS:**

(i)     **WITH THE EXCEPTION OF THE MATTERS SPECIFIED IN SECTION 13.07(c)(ii) BELOW, ANY CLAIM SHALL BE DETERMINED BY A**

GENERAL REFERENCE PROCEEDING IN ACCORDANCE WITH THE PROVISIONS OF CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1. THE PARTIES INTEND THIS GENERAL REFERENCE AGREEMENT TO BE SPECIFICALLY ENFORCEABLE. VENUE FOR THE REFERENCE PROCEEDING SHALL BE IN THE COUNTY OF FRESNO, CALIFORNIA.

(ii)     THE FOLLOWING MATTERS SHALL NOT BE SUBJECT TO A GENERAL REFERENCE PROCEEDING: (A) NON-JUDICIAL FORECLOSURE OF ANY SECURITY INTERESTS IN REAL OR PERSONAL PROPERTY, (B) EXERCISE OF SELFHELP REMEDIES (INCLUDING SET-OFF OR RECOUPMENT), (C) APPOINTMENT OF A RECEIVER, AND (D) TEMPORARY, PROVISIONAL, OR ANCILLARY REMEDIES (INCLUDING WRITS OF ATTACHMENT, WRITS OF POSSESSION, TEMPORARY RESTRAINING ORDERS, OR PRELIMINARY INJUNCTIONS). THIS DEED OF TRUST DOES NOT LIMIT THE RIGHT OF ANY PARTY TO EXERCISE OR OPPOSE ANY OF THE RIGHTS AND REMEDIES DESCRIBED IN CLAUSES (A)-(D) AND ANY SUCH EXERCISE OR OPPOSITION DOES NOT WAIVE THE RIGHT OF ANY PARTY TO PARTICIPATE IN A REFERENCE PROCEEDING PURSUANT TO THIS DEED OF TRUST WITH RESPECT TO ANY OTHER MATTER.

(iii)    UPON THE WRITTEN REQUEST OF ANY PARTY, THE PARTIES SHALL SELECT A SINGLE REFEREE, WHO SHALL BE A RETIRED JUDGE OR JUSTICE. IF THE PARTIES DO NOT AGREE UPON A REFEREE WITHIN 10 DAYS OF SUCH WRITTEN REQUEST, THEN, ANY PARTY SHALL HAVE THE RIGHT TO REQUEST THE COURT TO APPOINT A REFEREE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 640(b). THE REFEREE SHALL BE APPOINTED TO SIT WITH ALL OF THE POWERS PROVIDED BY LAW. PENDING APPOINTMENT OF THE REFEREE, THE COURT SHALL HAVE THE POWER TO ISSUE TEMPORARY OR PROVISIONAL REMEDIES.

(iv)    EXCEPT AS EXPRESSLY SET FORTH IN THIS DEED OF TRUST, THE REFEREE SHALL DETERMINE THE MANNER IN WHICH THE REFERENCE PROCEEDING IS CONDUCTED INCLUDING THE TIME AND PLACE OF HEARINGS, THE ORDER OF PRESENTATION OF EVIDENCE, AND ALL OTHER QUESTIONS THAT ARISE WITH RESPECT TO THE COURSE OF THE REFERENCE PROCEEDING. ALL PROCEEDINGS AND HEARINGS CONDUCTED BEFORE THE REFEREE, EXCEPT FOR TRIAL, SHALL BE CONDUCTED WITHOUT A COURT REPORTER, EXCEPT WHEN ANY PARTY SO REQUESTS A COURT REPORTER AND A TRANSCRIPT IS ORDERED, A COURT REPORTER SHALL BE USED AND THE REFEREE SHALL BE PROVIDED A COURTESY COPY OF THE TRANSCRIPT. THE PARTY MAKING SUCH REQUEST SHALL HAVE THE OBLIGATION TO ARRANGE FOR AND PAY THE COSTS OF THE COURT REPORTER, PROVIDED THAT SUCH COSTS, ALONG WITH THE REFEREE'S FEES, SHALL ULTIMATELY BE BORNE BY THE PARTY WHO DOES NOT PREVAIL, AS DETERMINED BY THE REFEREE.

(v) **THE REFEREE MAY REQUIRE ONE OR MORE PREHEARING CONFERENCES. THE PARTIES HERETO SHALL BE ENTITLED TO DISCOVERY, AND THE REFEREE SHALL OVERSEE DISCOVERY IN ACCORDANCE WITH THE RULES OF DISCOVERY, AND SHALL ENFORCE ALL DISCOVERY ORDERS IN THE SAME MANNER AS ANY TRIAL COURT JUDGE IN PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA.**

(vi) **THE REFEREE SHALL APPLY THE RULES OF EVIDENCE APPLICABLE TO PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA AND SHALL DETERMINE ALL ISSUES IN ACCORDANCE WITH CALIFORNIA SUBSTANTIVE AND PROCEDURAL LAW. THE REFEREE SHALL BE EMPOWERED TO ENTER EQUITABLE AS WELL AS LEGAL RELIEF AND RULE ON ANY MOTION WHICH WOULD BE AUTHORIZED IN A TRIAL, INCLUDING MOTIONS FOR DEFAULT JUDGMENT OR SUMMARY JUDGMENT. THE REFEREE SHALL REPORT HIS OR HER DECISION, WHICH REPORT SHALL ALSO INCLUDE FINDINGS OF FACT AND CONCLUSIONS OF LAW. THE REFEREE SHALL ISSUE A DECISION AND PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE, SECTION 644, THE REFEREE'S DECISION SHALL BE ENTERED BY THE COURT AS A JUDGMENT IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED BY THE COURT. THE FINAL JUDGMENT OR ORDER FROM ANY APPEALABLE DECISION OR ORDER ENTERED BY THE REFEREE SHALL BE FULLY APPEALABLE AS IF IT HAS BEEN ENTERED BY THE COURT.**

(vii) **THE PARTIES RECOGNIZE AND AGREE THAT ALL CLAIMS RESOLVED IN A GENERAL REFERENCE PROCEEDING PURSUANT HERETO WILL BE DECIDED BY A REFEREE AND NOT BY A JURY. AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR OWN CHOICE, EACH PARTY HERETO KNOWINGLY AND VOLUNTARILY AND FOR THEIR MUTUAL BENEFIT AGREES THAT THIS REFERENCE PROVISION SHALL APPLY TO ANY DISPUTE BETWEEN THEM THAT ARISES OUT OF OR IS RELATED TO THIS DEED OF TRUST.**

**13.08** <u>**Counterpart Execution**</u>. This Deed of Trust may be executed in one or more counterparts, each of which is, for all purposes deemed an original and all such counterparts taken together, constitute one and the same instrument.

**13.09** <u>**Binding Effect; Successors and Assigns**</u>. The Secured Obligation Documents shall inure to the benefit of and snail be binding upon the parties and their respective successors and assigns; provided, that Grantor shall not assign its rights or obligations hereunder without Beneficiary's prior written consent. However, this <u>Section 13.09</u> does not waive the provisions of <u>Section 7.10</u>; and Grantor shall not assign its rights or obligations hereunder without Beneficiary's prior written consent. Beneficiary may transfer all or any portion of its rights under the Secured Obligation Documents to any other Person. Beneficiary may disclose to any actual or proposed transferee any information that Grantor has delivered to Beneficiary in connection with the negotiation of this Deed of Trust or pursuant to the Secured Obligation Documents; and Grantor shall cooperate fully with Beneficiary in providing that information to any actual or proposed transferee.

**13.10   Necessary Action**. Beneficiary is authorized to execute any other documents or take any other actions necessary to effectuate this Deed of Trust and the consummation of the transactions contemplated herein.

**13.11   Credit Report**. Beneficiary is authorized to order a credit report and verify all other credit information, including past and present loans and standard references from time to time to evaluate the creditworthiness of Grantor. Without limitation, a copy of the consent for release of information, general authorization or similar document on file with Beneficiary shall authorize third Persons to provide the information requested from time to time.

**13.12   Interpretation**. Whenever the context requires, all words used in the singular will be construed to have been used in the plural, and vice versa, and each gender will include any other gender. The captions of the sections of this Deed of Trust are for convenience only and do not define or limit any terms or provisions. The word "include(s)" means "include(s), without limitation", and the word "including" means "including, but not limited to". The word "obligations" is used in its broadest and most comprehensive sense, and includes all primary, secondary, direct, indirect, fixed and contingent obligations, and it further includes all principal, interest, prepayment charges, late fees, loan fees and any other fees and charges accruing or assessed at any time, as well as all obligations to perform acts or satisfy conditions. No listing of specific instances, items or matters in any way limits the scope or generality of any language of this Deed of Trust. The Exhibits to this Deed of Trust are hereby incorporated in this Deed of Trust.

**13.13   Time of the Essence**. Time is of the essence of this Deed of Trust.

**13.14   No Construction Against Drafter**. Each party has participated in negotiating and drafting this Deed of Trust, so if an ambiguity or a question of intent or interpretation arises, this Deed of Trust is to be construed as if the parties had drafted it jointly, as opposed to being construed against a party because it was responsible for drafting one or more provisions of this Deed of Trust.

**13.15   Attorneys' Fees and Costs**. Grantor agrees to pay all costs and expenses, including legal fees, expert witness fees, paralegal fees and court costs, incurred in connection with enforcement of the Loan Documents and this Deed of Trust, whether by negotiation, legal proceedings, or otherwise, including, without limitation, in the context of any bankruptcy proceedings. In addition, Borrower shall pay any and all stamp and other taxes and fees payable or determined to be payable in connection with the execution, delivery, filing, and recording of any of this Deed of Trust, and agrees to hold Beneficiary harmless from and against any and all liabilities with respect from any delay in paying or omission to pay such taxes and fees. Grantor's obligations to Beneficiary under this Section shall survive termination of this Deed of Trust and repayment of Grantor's obligations to Beneficiary under this Deed of Trust, shall also survive as unsecured obligations after any acquisition by Beneficiary of the Collateral or any part of it by foreclosure or any other means. Whenever Grantor is obligated to pay or reimburse Beneficiary or Trustee for any attorneys' fees, those fees shall include the allocated costs for services of in-house counsel.

**13.16 <u>Waiver of Marshalling</u>**. Grantor waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to require upon foreclosure sales of assets in a particular order, including any rights provided by California Civil Code sections 2899 and 3433, as such sections may be amended from time to time. Each successor and assign of Grantor, including any holder of a lien subordinate to this Deed of Trust, by acceptance of its interest or lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself.

**13.17 <u>Waiver of Certain Other Laws</u>**. To the full extent Grantor may do so, Grantor agrees that Grantor will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for appraisement, valuation, stay, extension or redemption, and Grantor, for Grantor, and its representatives, successors and assigns, and for any and all persons ever claiming any interest in the Property, to the extent permitted by law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution, or notice of election to mature or declare due the whole of the Secured Obligations in the event of foreclosure of the lien created by this Deed of Trust.

**13.18 <u>Rights and Remedies Cumulative</u>**. All rights and remedies under this Deed of Trust and the Secured Obligation Documents are cumulative, and the exercise of any one or more of them does not constitute an election of remedies.

**13.19 <u>Severability</u>**. If any provision of this Deed of Trust should be held unenforceable or void, that provision shall be deemed severable from the remaining provisions and in no way affect the validity of this Deed of Trust except that if such provision relates to the payment of any monetary sum, then Beneficiary may, at its option, declare all Secured Obligations immediately due and payable.

Grantor is signing and delivering this Deed of Trust effective as of the day and year first above written.


**GRANTOR:**


_____

Jeffery E. Arambel, Reorganizing Debtor for the Bankruptcy Estate of Jeffery E. Arambel in In Re Arambel, E.D. Cal. Bankr. No. 18-90029


<u>Address</u>:
Jeffery E. Arambel
433 Roxanne Drive
Patterson, CA 95363

[NOTARY ACKNOWLEDGMENTS SET FORTH ON THE FOLLOWING PAGE]

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA

COUNTY OF _____

On_____ before me _____, Notary Public, personally appeared _____ who proved o me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

**EXHIBIT A**

# EXHIBIT B

| Arambel Budget | Pre-Confirmation April | May | June | July | 2019 August Month 1 | September Month 2 | October Month 3 | November Month 4 | December Month 5 | 2020 January Month 6 | February Month 7 | March Month 8 | April Month 9 | May Month 10 | June Month 11 | July Month 12 | August Month 13 | September Month 14 | October Month 15 | November Month 16 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Starting Cash** | 42,628 | 128,030 | 85,292 | 285,034 | 245,250 | 50,000 | 81,646 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 75,507 | 50,000 | 50,000 | 50,000 | 50,000 | 237,752 | 118,601 | 245,250 |
| **Cash-In** | | | | | | | | | | | | | | | | | | | | | |
| Plan Loan Draw (Summit/MetLife) | - | - | - | - | 429,021 | - | 67,451 | 107,780 | 239,943 | 113,692 | 108,251 | 103,688 | - | 81,574 | 105,037 | 116,026 | 127,595 | - | - | - | 1,600,058 |
| FLCC Deposit | 120,000 | - | 256,000 | - | 820,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 1,000,000 |
| Crop Retainage | - | - | - | - | - | - | - | - | - | - | - | - | 250,000 | - | - | - | - | - | - | - | 250,000 |
| Rental Income | - | - | - | - | - | 138,610 | 24,302 | - | - | - | - | - | - | - | - | - | - | - | - | - | 162,911 |
| Property Sale (Net of Liens) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 300,000 | - | - | 300,000 |
| **Total Cash-In** | 120,000 | - | 256,000 | - | 1,249,021 | 150,610 | 103,753 | 119,780 | 251,943 | 125,692 | 120,251 | 115,688 | 262,000 | 93,574 | 117,037 | 128,026 | 139,595 | 312,000 | 12,000 | 12,000 | 3,558,219 |
| *(DIP Loan + FLCC Deposit Balance)* | - | - | - | - | 1,249,021 | 1,261,021 | 1,340,472 | 1,460,252 | 1,712,195 | 1,837,887 | 1,958,138 | 2,073,826 | 2,085,826 | 2,179,400 | 2,296,437 | 2,424,463 | 2,564,058 | 2,576,058 | 2,588,058 | 2,600,058 | |
| **Cash-Out** | | | | | | | | | | | | | | | | | | | | | |
| **Personal Expenses** | | | | | | | | | | | | | | | | | | | | | |
| Pharmacy | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 4,500 |
| Misc. Medical | - | - | - | - | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 7,500 |
| Home maintenance + HOA | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 6,000 |
| Home Mortgage | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 102,000 |
| Food, Clothing, and Household | 1,500 | 1,500 | 1,500 | 1,500 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 30,000 |
| Utilities | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 24,000 |
| Transportation | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 6,000 |
| **Total Personal** | 11,000 | 11,000 | 11,000 | 11,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 180,000 |
| **Farm Expenses (including payroll and withholding and employment related taxes)** | | | | | | | | | | | | | | | | | | | | | |
| Water and Power | 5,000 | 5,000 | 5,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 130,000 |
| Fuel | 400 | 400 | 400 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 400 | 400 | 400 | 400 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 14,000 |
| Parts | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 9,000 |
| Labor | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 112,500 |
| Reorganizing Debtor's Professionals | - | - | - | - | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 112,500 |
| **Total Farm** | 13,500 | 13,500 | 13,500 | 19,300 | 26,800 | 26,800 | 26,800 | 26,800 | 26,800 | 26,800 | 26,800 | 21,000 | 21,000 | 21,000 | 21,000 | 26,800 | 26,800 | 26,800 | 26,800 | 26,800 | 378,000 |
| **Plan Expenses** | | | | | | | | | | | | | | | | | | | | | |
| Insurance | 8,148 | 8,148 | 13,502 | 8,148 | 8,148 | 8,148 | 8,148 | 8,148 | 8,148 | 8,148 | 8,148 | 8,148 | 8,148 | 8,148 | 8,148 | 8,148 | 8,148 | 8,148 | 8,148 | 8,148 | 122,220 |
| Property Taxes | - | - | - | - | 354,326 | - | - | - | 116,747 | - | - | - | 116,747 | - | - | - | 15,825 | - | - | - | 603,644 |
| Accountant | - | - | - | - | 2,500 | - | - | 15,000 | - | - | - | - | 2,500 | - | - | - | - | 2,500 | - | - | 22,500 |
| Plan Administrator's Attorneys | - | - | - | - | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 225,000 |
| US Trustees Fees | 1,950 | 10,090 | - | 1,336 | 16,030 | - | - | 5,071 | - | - | 3,616 | - | - | 4,726 | - | - | 3,919 | - | - | - | 33,363 |
| Plan Administrator Fees | - | - | - | - | 45,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 465,000 |
| **Total Plan** | 10,098 | 18,238 | 13,502 | 9,484 | 424,974 | 53,148 | 69,178 | 53,148 | 184,895 | 58,219 | 53,148 | 53,148 | 173,511 | 55,648 | 53,148 | 57,874 | 68,973 | 53,148 | 59,567 | 53,148 | 1,471,727 |
| **Sub-Total** | 34,598 | 42,738 | 38,002 | 39,784 | 463,774 | 91,948 | 107,978 | 91,948 | 223,695 | 97,019 | 91,148 | 86,148 | 206,511 | 88,648 | 86,148 | 96,674 | 107,773 | 91,948 | 98,367 | 91,948 | 1,971,144 |
| Accrued Professional Fees | - | - | - | - | 824,805 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 824,805 |
| 2018 Income Tax | - | - | 18,256 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Misc. Allowed Admin. Expenses | - | - | - | - | 103,883 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 103,883 |
| Class 2 Periodic Payment | - | - | - | - | 26,616 | 27,015 | 27,420 | 27,832 | 28,249 | 28,673 | 29,103 | 29,540 | 29,983 | 30,432 | 30,889 | 31,352 | 31,822 | 32,300 | 32,784 | - | 444,010 |
| Class 3 Cure Payments | - | - | - | - | 25,193 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 25,193 |
| **Sub-Total** | - | - | 18,256 | - | 980,497 | 27,015 | 27,420 | 27,832 | 28,249 | 28,673 | 29,103 | 29,540 | 29,983 | 30,432 | 30,889 | 31,352 | 31,822 | 32,300 | 32,784 | - | 1,397,395 |
| **Total Cash-Out** | 34,598 | 42,738 | 56,258 | 39,784 | 1,444,271 | 118,963 | 135,399 | 119,780 | 251,944 | 125,692 | 120,251 | 115,688 | 236,493 | 119,080 | 117,037 | 128,026 | 139,595 | 124,248 | 131,151 | 91,948 | 3,369,035 |
| **Ending Cash** | 128,030 | 85,292 | 285,034 | 245,250 | 50,000 | 81,646 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 75,507 | 50,000 | 50,000 | 50,000 | 50,000 | 237,752 | 118,601 | 38,653 | 38,653 |

*Class 2: pre-petition property tax
*Class 3: Wells Fargo Mortgage to clear default

Tentative Preliminary Draft:  For Review and Discussion Purposes Only.  Subject to Change.  UNAUDITED.

# EXHIBIT C

Jeffery E. Arambel
Liquidation Analysis

| | Asset Description | Chapter 11 | Chapter 7 | Secured Claim | Exemption | Taxes | Net to Ch. 7 Estate |
|---|---|---|---|---|---|---|---|
| 1 Residential | 433 Roxanne | 284,000 | 213,000 | 173,330 | - | 63,900 | - |
| 2 Residential | 49 Echo Court | 604,000 | 453,000 | 762,798 | 175,000 | - | - |
| 3 BizPark | Arambel Business Park | 96,893,352 | 48,100,481 | | | | |
| 4 BizPark | 601 Rogers | 1,773,981 | 1,330,486 | | | | |
| 5 BizPark | Gail Ranch | 16,399,750 | 9,144,115 | 62,325,950 | - | 23,687,911 | - |
| 6 Rangeland | Rangeland | 34,527,295 | 16,057,120 | | | | |
| 7 Other Property | Non-Rangeland developments | 7,847,500 | 4,327,500 | | | | |
| 8 Machinery and Equipment | Machinery and Equipment | 1,525,000 | 1,067,500 | - | 8,000 | 320,250 | 739,250 |
| 9 Vehicles | Vehicles | 57,500 | 40,250 | - | 8,000 | 12,075 | 20,175 |
| 10 Household Good | Household Good | 16,730 | 11,711 | - | 11,711 | - | - |
| 11 JEA2 (154.62 acres) | JEA2 | 20,000,000 | 10,000,000 | - | - | 3,000,000 | 7,000,000 |
| | **Totals** | **179,929,108** | **90,745,163** | | **202,711** | **34,798,941** | **7,759,425** |

| | |
|---|---|
| Chapter 11 Adminisrative Expenses: | 816,088 |
| Chapter 7 Costs of Sale and Adminisrative Expenses: | 833,081 |
| Chapter 7 Trustee Fees: | 356,483 |
| Chapter 7 Trustee's Professionals: | 175,000 |
| Priority Claims: | 20,246 |
| Net Funds Available for Distribution to Unsecured Creditors: | 5,558,527 |

| | |
|---|---|
| Estimated Amolunt of Unsecured Claims | 10,555,993 |
| Anticpated Dividend | 52.66% |

# EXHIBIT D

Stanislaus, County Recorder
Lee Lundrigan Co Recorder Office
**DOC- 2018-0006784-00**
Acct 403-Mail Documents
Thursday, FEB 01, 2018 08:20:45
Ttl Pd   $121.00      Rcpt # 0004080491
                          JLO/R3/1-11

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Seyfarth Shaw LLP
333 South Hope Street, Suite 3900
Los Angeles, California 90071
Attention: Richard C. Mendelson, Esq.

(Above Space for Recorder's Use Only)

## FIRST AMENDMENT TO MEMORANDUM OF RIGHT OF FIRST REFUSAL

THIS FIRST AMENDMENT TO MEMORANDUM OF RIGHT OF FIRST REFUSAL (this "***Memorandum***") is made and entered into effective as of January 29, 2018, by and among JEFFERY E. ARAMBEL, a single man ("***Owner***"), LBA REALTY LLC, a Delaware limited liability company ("***Original ROFR Holder***"), and LBA RV-COMPANY XXVII, LP, a Delaware limited partnership ("***ROFR Holder***"), with reference to the following facts:

A.      Owner is the owner of that certain real property located in the City of Patterson, County of Stanislaus, State of California, more particularly set forth in Exhibit A attached hereto and made a part hereof (collectively, the "***ROFR Property***").

B.      Owner previously granted to Original ROFR Holder, and Original ROFR Holder accepted from Owner, a right of first refusal to purchase the ROFR Property pursuant to the terms and conditions set forth in Section 20 of that certain unrecorded Purchase and Sale Agreement dated as of April 4, 2017, by and between Owner and ROFR Holder, as amended by (i) that certain unrecorded First Amendment to Purchase and Sale Agreement dated as of May 23, 2017, (ii) that certain unrecorded Second Amendment to Purchase and Sale Agreement dated as of May 25, 2017 and (iii) that certain unrecorded Third Amendment to Purchase and Sale Agreement dated as of May 26, 2017 (as so amended, the "***Original ROFR Agreement***").

C.      Owner and Original ROFR Holder recorded that certain Memorandum of Right of First Refusal dated as of May 31, 2017 by and between Owner and Original ROFR Holder, recorded in the Official Records of Stanislaus County, California (the "***Official Records***") as Instrument No. 2017-0040349 (the "***Original Memorandum of ROFR***"). The Original Memorandum of ROFR was partially terminated with respect to certain property purchased by ROFR Holder from Owner, as evidenced by that certain Partial Termination of Memorandum of Right of First Refusal dated as of June 6, 2017 by and between Owner and Original ROFR Holder, recorded in the Official Records on June 7, 2017 as Instrument No. 2017-0040789.

D.      The Original ROFR Agreement has been further amended by (i) that certain unrecorded Fourth Amendment to Purchase and Sale Agreement dated as of June 5, 2017 and (ii) that certain unrecorded Fifth Amendment to Purchase and Sale Agreement of even date herewith (collectively, the "***Amendments***"), and has been assigned by Original ROFR Holder to ROFR Holder pursuant to that certain Assignment and Assumption of Purchase and Sale Agreement

1

This instrument filed for record by
Commonwealth Land Title Company
as an accommodation only. It has
not been examined as to its execution
or as to its effect upon the title.


dated for reference purposes only as of May 31, 2017 (the "*Assignment*"). The Original ROFR Agreement as amended by the Amendments, as assigned pursuant to the Assignment, and as hereafter amended by the parties from time to time, is referred to herein as the "***ROFR Agreement.***"

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, the parties hereby declare and agree as follows:

1.      The recitals to this Memorandum are hereby incorporated herein and made a part hereof by this reference.

2.      This Memorandum is being made and entered into for the purpose of providing notice of the unrecorded Amendments to the ROFR Agreement and the provisions thereof. The ROFR Agreement (as amended) is incorporated herein by this reference and hereby is made a part hereof as if set forth in full herein.

3.      This Memorandum may be executed in multiple counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same document.

[Signature page follows]

IN WITNESS WHEREOF, the undersigned have executed this Memorandum of Right of First Refusal as of the day and year first above written.

<u>OWNER</u>:

_____,
JEFFERY E. ARAMBEL, a single man

<u>ORIGINAL ROFR HOLDER</u>:

LBA REALTY LLC,
a Delaware limited liability company

By:     LBA Inc.,
       a California Corporation,
       its Managing Member

       By: _____
       Name: _____Steve Layton_____
       Title: _____Authorized Signatory_____

<u>ROFR HOLDER</u>:

LBA RV-COMPANY XXVII, LP,
a Delaware limited partnership

By:     LBA Fund V GP II, LLC,
       a Delaware limited liability company
       its General Partner

       By: _____
       Name: _____Steve Layton_____
       Title: _____Authorized Signatory_____

3

IN WITNESS WHEREOF, the undersigned have executed this Memorandum of Right of First Refusal as of the day and year first above written.

OWNER:

*Jeffery E. Arambel* 1/23/18
JEFFERY E. ARAMBEL, a single man

ORIGINAL ROFR HOLDER:

LBA REALTY LLC,
a Delaware limited liability company

By:    LBA Inc.,
       a California Corporation,
       its Managing Member

       By: _____
       Name: _____
       Title: _____

ROFR HOLDER:

LBA RV-COMPANY XXVII, LP,
a Delaware limited partnership

By:    LBA Fund V GP II, LLC,
       a Delaware limited liability company
       its General Partner

       By: _____
       Name: _____
       Title: _____

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _CA_

COUNTY OF _Stanislaus_

On _Jan 23_, 2018, before me, _Daljeet Singh_, a Notary Public, personally appeared _Jeffery Edward Arambel_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

(Seal)

DALJEET SINGH
Notary Public – California
Stanislaus County
Commission # 2214525
My Comm. Expires Sep 17, 2021

4

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**          CIVIL CODE § 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California          )
County of _____ Orange _____ )
On January 29, 2018 before me, _____ E. Manning, Notary Public _____,
_____ Date _____          *Here Insert Name and Title of the Officer*
personally appeared _____ Steve Layton _____
                              *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

E. MANNING
Commission # 2068079
Notary Public - California
Orange County
My Comm. Expires May 12, 2018

Signature _____

          *Signature of Notary Public*

          *Place Notary Seal Above*
─────────────────── **OPTIONAL** ───────────────────
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____
Document Date: _____ Number of Pages: _____
Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual      ☐ Attorney in Fact
☐ Trustee         ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual      ☐ Attorney in Fact
☐ Trustee         ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

©2016 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

**Exhibit A**

**Legal Description of Right of First Refusal Property**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF PATTERSON, COUNTY OF STANISLAUS, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

TRACT A:

PARCEL ONE:

ALL THAT CERTAIN REAL PROPERTY IDENTIFIED AS PARCEL "A" IN THAT CERTAIN CERTIFICATE OF COMPLIANCE (GOVERNMENT CODE, SECTION 66499.35) CITY OF PATTERSON, STATE OF CALIFORNIA LOT LINE ADJUSTMENT NO. 17-02 RECORDED MAY 30, 2017 AS INSTRUMENT 2017-0038657-00, OFFICIAL RECORDS, DESCRIBED AS FOLLOWS:

A PORTION OF PARCELS 10, 14 AND 15 AS SHOWN ON PARCEL MAP FILED FOR RECORD NOVEMBER 12, 2002 IN BOOK 51 OF PARCEL MAPS, AT PAGE 89, STANISLAUS COUNTY RECORDS, LYING IN SECTION 22, TOWNSHIP 5 SOUTH, RANGE 7 EAST, MOUNT DIABLO MERIDIAN, SITUATE IN THE CITY OF PATTERSON, COUNTY OF STANISLAUS, STATE OF CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE EAST LINE OF SAID SECTION 22 WITH THE EASTERLY PROLONGATION OF THE NORTH LINE OF PARCEL 1 AS SHOWN IN BOOK 57 OF PARCEL MAPS, PAGE 01, STANISLAUS COUNTY RECORDS;

    1.    THENCE ALONG SAID EASTERLY PROLONGATION, THE SAID NORTH LINE OF PARCEL 1 AND THE WESTERLY PROLONGATION OF SAID NORTH LINE, NORTH 89°43'51" WEST, 2520.50 FEET TO THE POINT OF BEGINNING;

    2.    THENCE ALONG A LINE THAT LIES 2520.50 FEET WEST OF AND PARALLEL WITH SAID EAST LINE OF SECTION 22, NORTH 00°15'57" EAST, 977.88 FEET;

    3.    THENCE ALONG A LINE THAT IS AT RIGHT ANGLES TO SAID EAST LINE OF SECTION 22, SOUTH 89°44'03" EAST, 2520.50 FEET TO SAID EAST LINE;

    4.    THENCE ALONG SAID EAST LINE, NORTH 00°15'57" EAST, 495.67 FEET TO THE NORTHEAST CORNER OF SAID PARCEL 10;

    5.    THENCE ALONG THE NORTH LINE OF SAID PARCELS 10 AND 15, NORTH 89°44'11" WEST, 3977.21 FEET TO THE EASTERLY LINE OF THE DELTA MENDOTA CANAL AS GRANTED TO THE UNITED STATES OF AMERICA BY

GRANT DEED RECORDED FEBRUARY 3, 1947 IN VOLUME 872, OF OFFICIAL RECORDS, PAGE 516, STANISLAUS COUNTY RECORDS;

6.      THENCE ALONG SAID EASTERLY LINE, SOUTH 19°48'14" EAST, 1227.92 FEET;

7.      THENCE CONTINUING ALONG SAID EASTERLY LINE, SOUTH 26°37'14" EAST, 358.77 FEET TO THE SAID WESTERLY PROLONGATION OF THE NORTH LINE OF SAID PARCEL 1;

8.      THENCE ALONG SAID WESTERLY PROLONGATION, SOUTH 89°43'51" EAST, 873.09 FEET TO THE POINT OF BEGINNING.

APN: 021-022-059

PARCEL TWO:

ALL THAT CERTAIN REAL PROPERTY IDENTIFIED AS PARCEL "C" IN THAT CERTAIN CERTIFICATE OF COMPLIANCE (GOVERNMENT CODE, SECTION 66499.35) CITY OF PATTERSON, STATE OF CALIFORNIA LOT LINE ADJUSTMENT NO. 17-02 RECORDED MAY 30, 2017 AS INSTRUMENT 2017-0038657-00, OFFICIAL RECORDS, DESCRIBED AS FOLLOWS:

PARCEL 14 AS SHOWN ON PARCEL MAP FILED FOR RECORD NOVEMBER 12, 2002 IN BOOK 51 OF PARCEL MAPS, AT PAGE 89, STANISLAUS COUNTY RECORDS, LYING IN SECTION 22, TOWNSHIP 5 SOUTH, RANGE 7 EAST, MOUNT DIABLO MERIDIAN, SITUATE IN THE CITY OF PATTERSON, COUNTY OF STANISLAUS, STATE OF CALIFORNIA.

EXCEPTING THEREFROM ALL THAT PORTION LYING NORTHERLY AND EASTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT THE NORTHWEST CORNER OF PARCEL 1 AS SHOWN IN BOOK 57 OF PARCEL MAPS, PAGE 01, STANISLAUS COUNTY RECORDS; THENCE ALONG THE WESTERLY PROLONGATION OF THE NORTH LINE OF SAID PARCEL 1, NORTH 89°43'51" WEST, 2051.05 FEET, MORE OR LESS TO THE EASTERLY LINE OF THE DELTA MENDOTA CANAL AS GRANTED TO THE UNITED STATES OF AMERICA BY GRANT DEED RECORDED FEBRUARY 3, 1947 IN VOLUME 872, OF OFFICIAL RECORDS, PAGE 516, STANISLAUS COUNTY RECORDS; THENCE ALONG SAID EASTERLY LINE, NORTH 26°37'14" WEST, 358.77 FEET; THENCE CONTINUING ALONG SAID EASTERLY LINE, NORTH 19°48'14" WEST, 97.76 FEET TO THE NORTHWEST CORNER OF SAID PARCEL 14 AND THE POINT OF TERMINATION.

APN: 021-022-061

PARCEL THREE:

PARCEL 18, AS SHOWN UPON THAT CERTAIN PARCEL MAP FILED FOR RECORD NOVEMBER 12, 2002 IN BOOK 51 OF PARCEL MAPS, AT PAGE 89, STANISLAUS COUNTY RECORDS.

APN: 021-022-043

PARCEL FOUR:

PARCEL 19, AS SHOWN UPON THAT CERTAIN PARCEL MAP FILED FOR RECORD NOVEMBER 12, 2002 IN BOOK 51 OF PARCEL MAPS, AT PAGE 89, STANISLAUS COUNTY RECORDS.

APN: 021-022-044

PARCEL FIVE:

PARCEL 20, AS SHOWN UPON THAT CERTAIN PARCEL MAP FILED FOR RECORD NOVEMBER 12, 2002 IN BOOK 51 OF PARCEL MAPS, AT PAGE 89, STANISLAUS COUNTY RECORDS.

APN: 021-022-045

PARCEL SIX:

PARCEL 21, AS SHOWN UPON THAT CERTAIN PARCEL MAP FILED FOR RECORD NOVEMBER 12, 2002 IN BOOK 51 OF PARCEL MAPS, AT PAGE 89, STANISLAUS COUNTY RECORDS.

APN: 021-022-046

PARCEL SEVEN:

PARCEL 22, AS SHOWN UPON THAT CERTAIN PARCEL MAP FILED FOR RECORD NOVEMBER 12, 2002 IN BOOK 51 OF PARCEL MAPS, AT PAGE 89, STANISLAUS COUNTY RECORDS.

APN'S: 021-022-018 and 021-025-022

TRACT B:

ALL THAT CERTAIN REAL PROPERTY IDENTIFIED AS "DESIGNATED REMAINDER" PARCEL AS SHOWN ON PARCEL MAP FILED IN BOOK 57 OF PARCEL MAPS, AT PAGE 54, STANISLAUS COUNTY RECORDS, LYING IN SECTIONS 22 AND 27, TOWNSHIP 5 SOUTH, RANGE 7 EAST, MOUNT DIABLO MERIDIAN, SITUATE IN THE CITY OF PATTERSON, COUNTY OF STANISLAUS, STATE OF CALIFORNIA.

EXCEPTING THEREFROM ALL THAT PORTION LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT THE INTERSECTION OF THE EAST LINE OF SAID SECTION 22 WITH THE EASTERLY PROLONGATION OF THE NORTH LINE OF PARCEL 1 AS SHOWN IN BOOK 57 OF PARCEL MAPS, PAGE 01, STANISLAUS COUNTY RECORDS; THENCE ALONG SAID EASTERLY PROLONGATION, THE SAID NORTH LINE OF PARCEL 1 AND THE WESTERLY PROLONGATION OF SAID NORTH LINE, NORTH 89°43'51" WEST, 2128.67 FEET TO THE WEST LINE OF SAID DESIGNATED REMAINDER AND EAST LINE OF PARCEL 14 AS SHOWN IN BOOK 51 OF PARCEL MAPS, AT PAGE 89, STANISLAUS COUNTY RECORDS AND THE POINT OF TERMINATION.

APN: 021-022-062

TRACT C:

PARCEL 1:

PARCEL 1 AS SHOWN UPON THAT CERTAIN PARCEL MAP FILED FOR RECORD APRIL 3, 1969 IN BOOK 6 OF PARCEL MAPS, PAGE 96, STANISLAUS COUNTY RECORDS, BEING A PORTION OF SECTIONS 22 AND 27, TOWNSHIP 5 SOUTH, RANGE 7 EAST, MOUNT DIABLO BASE AND MERIDIAN.

PARCEL 2:

AN EASEMENT FOR ROAD PURPOSES OVER A STRIP OF LAND 30 FEET WIDE, LYING 3 FEET NORTHERLY AND 27 FEET SOUTHERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT ON THE EASTERLY LINE OF SECTION 22, TOWNSHIP 5 SOUTH, RANGE 7 EAST, MOUNT DIABLO BASE AND MERIDIAN, DISTANT THEREON SOUTH 0° 22' WEST 400.00 FEET FROM THE 1/4 SECTION CORNER SET IN THE EASTERLY LINE OF SECTION 22, SAID LINE ALSO BEING THE CENTERLINE OF ROGERS ROAD; THENCE FROM SAID POINT OF BEGINNING, SOUTH 70° 38' WEST 2218.60 FEET; THENCE OVER A STRIP OF LAND LYING 30 FEET WESTERLY FROM A LINE DESCRIBED AS SOUTH 1° 00' WEST 1528.60 FEET TO A 3/4 INCH IRON PIPE SET IN THE SOUTHERLY LINE OF SECTION 22.

APN: 021-022-055

TRACT D:

PARCEL NO. 1:

THOSE PORTIONS OF THE NORTH HALF OF SECTION 21, TOWNSHIP 5 SOUTH, RANGE 7 EAST, MOUNT DIABLO BASE AND MERIDIAN, BEING A PORTION OF PARCEL A DESCRIBED IN THE DEED TO THE STATE OF CALIFORNIA, RECORDED

MAY 13, 1966 IN BOOK 2103, AT PAGE 337, OFFICIAL RECORDS OF STANISLAUS COUNTY, CALIFORNIA, DESCRIBED AS FOLLOWS :

BEGINNING AT THE 3/4 INCH IRON PIPE WITH BRASS PLUG MARKED CA 601 DESCRIBED IN PARCEL A IN SAID DEED; THENCE FROM SAID POINT OF BEGINNING ALONG THE BOUNDARY OF SAID PARCEL A, THE FOLLOWING 9 COURSES: THENCE NORTH 62 DEGREES 35' 43" EAST, 434.89 FEET; THENCE SOUTH 45 DEGREES 51' 32" EAST, 540.09 FEET; THENCE NORTH 77 DEGREES 12' 25" EAST, 188.68 FEET; THENCE SOUTH 46 DEGREES 04' 16" EAST, 450.11 FEET; THENCE SOUTH 34 DEGREES 42' 38" WEST, 549.18 FEET; THENCE SOUTH 47 DEGREES 17' 15" EAST, 690.65 FEET; THENCE SOUTH 44 DEGREES 29' 48" EAST, 824.36 FEET TO A 3/4 INCH IRON PIPE WITH BRASS PLUG MARKED CA 615; THENCE SOUTH 31 DEGREES 42' 53" EAST, 261.00 FEET TO THE SOUTH LINE OF THE NORTH HALF OF SAID SECTION 21; THENCE ALONG SAID SOUTH LINE, NORTH 89 DEGREES 39' 12" WEST, 91.66 FEET; THENCE LEAVING SAID BOUNDARY AND SAID SOUTH LINE, NORTH 43 DEGREES 55' 18" WEST, 760.18 FEET; THENCE NORTH 43 DEGREES 48' 28" WEST, 943.95 FEET; THENCE NORTH 41 DEGREES (ERRORNEOUSLY SHOWN AS 14 DEGREES IN VARIOUS INSTRUMENTS OF RECORD) 39' 19" WEST, 876.41 FEET; THENCE NORTH 26 DEGREES 42' 41" EAST, 127.76 FEET; THENCE NORTH 01 DEGREES 19' 52" EAST, 98.55 FEET; THENCE NORTH 87 DEGREES 13' 36" WEST, 75.46 FEET; THENCE SOUTH 72 DEGREES 26' 54" WEST, 191.38 FEET; THENCE NORTH 46 DEGREES 00' 42" WEST, 192.51 FEET TO THE POINT OF BEGINNING.

APN's: 021-022-027 (Portion) and 021-022-028 (Portion)

PARCEL NO. 2:

ALL THAT PORTION OF THE NORTHEAST QUARTER AND THE NORTHWEST QUARTER OF SECTION 21, TOWNSHIP 5 SOUTH, RANGE 7 EAST, MOUNT DIABLO BASE AND MERIDIAN LYING NORTHEASTERLY OF THE PROPERTY DESCRIBED AS PARCEL A IN THE DEED TO THE STATE OF CALIFORNIA, RECORDED MAY 13, 1966 IN BOOK 2103, PAGE 337, OFFICIAL RECORDS, AS INSTRUMENT NO. 17368.

APN's: 021-022-027 (Portion) and 021-022-028 (Portion)

EXCEPTING THAT CERTAIN 39.04 ACRE PORTION OF THE FOREGOING DESIGNATED AS 021-022-027